**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

GUY CARPENTER & COMPANY, LLC, and
MARSH & MCLENNAN COMPANIES, INC.,

                   Plaintiffs,

      v.

TIMOTHY GARDNER, NICHOLAS DURANT,
and CLAUDE YODER,

                   Defendants.

Case No. __19 CV 5062__

**COMPLAINT**

---

Plaintiffs Guy Carpenter & Company, LLC ("Guy Carpenter") and Marsh & McLennan Companies, Inc. ("MMC," and together with Guy Carpenter, "Guy Carpenter" or "Plaintiffs"), by their attorneys, for their Complaint against Defendants Timothy Gardner, Nicholas Durant and Claude Yoder (collectively, "Defendants") hereby allege as follows:

## NATURE OF THE CLAIMS

1.     Guy Carpenter, along with its parent MMC, brings this action to enforce the contractual promises of three of its former executives, to redress and enjoin the unlawful and ongoing solicitation of its employees and clients, to prevent unfair competition and irreparable injury to its business interests, and to safeguard its confidential, proprietary and trade secret information.

2.     Guy Carpenter and Lockton Companies LLC ("Lockton") are competitors. For decades, Guy Carpenter has expended time, effort, and resources to develop substantial goodwill and establish itself as a venerated industry leader in the global risk and reinsurance space. As a reinsurance broker, Guy Carpenter acts as an intermediary in reinsurance contract transactions between insurance and reinsurance companies. Guy Carpenter provides valuable services to its

1

insurer clients, including assisting them in determining their reinsurance needs, identifying reinsurance companies to meet those needs, and assisting in the placement of reinsurance and the negotiation and drafting of reinsurance contracts.

3. Lockton, which describes itself on its website as "the world's largest privately held, independent insurance broker," has recently launched its own global reinsurance division, called Lockton Global Re, and now seeks to expand its reinsurance business off of the back of senior Guy Carpenter and its longtime clients, by raiding multiple top-level Guy Carpenter executives, and inducing them to breach their contractual obligations to Guy Carpenter and MMC.

4. On the morning of March 7, 2019—within one hour of one another—Defendants each tendered their resignations from Guy Carpenter, effective in 60 days' time. Each announced that he would be joining Lockton's reinsurance business. Upon information and belief, on May 7, 2019, immediately upon the expiration of their 60-day notice periods, Defendants each commenced employment at Lockton, with the intention of competing directly against Guy Carpenter in the reinsurance brokerage space.

5. Timothy Gardner, Nicholas Durant and Claude Yoder were not just any employees. Gardner was Guy Carpenter's CEO of North America Operations, and had worked for Guy Carpenter and/or other MMC-affiliated entities for the past 26 years. As CEO of North America Operations, Gardner oversaw Guy Carpenter's entire North American reinsurance operations, with direct managerial responsibility for several dozen senior executives, plus oversight over the rest of the approximately 550-employee workforce. Durant was a Managing Director and Head of Sales and Segments at Guy Carpenter and had worked for Guy Carpenter and/or other MMC-affiliated entities for 22 years. As Head of Sales and Segments, Durant supervised all the sales personnel at Guy Carpenter North America, and had various direct reports, including but not limited to multiple

Segment leaders and their teams, as well as all personnel in charge of client business proposals, including formal requests for proposals ("RFPs"). Yoder was a Managing Director and the Global Chief Innovation and Product Development Officer at Guy Carpenter, in which capacity he was responsible for, among other things, spearheading Guy Carpenter's acclaimed "GC Genesis" initiative in the "InsurTech" space. Yoder had worked for Guy Carpenter and/or other MMC-affiliated entities for nearly eight years. Before joining Guy Carpenter, Yoder was employed by Marsh as the Global Head of Analytics, leading a team that delivered solutions supporting Marsh's global insurance broking and consulting activities. At Guy Carpenter, Yoder supervised all of the employees involved in the GC Genesis unit. As more fully detailed below, Yoder specialized in insurance modeling and analytics—a highly technical field requiring a particularized skillset and experience. Through this work, Yoder gained extensive knowledge of Guy Carpenter's unique and proprietary reinsurance modeling and analytics techniques and products.

6. The actions and conduct of Defendants, both leading up to and following their simultaneous resignations, were not just highly coordinated: they were unlawful. That is because for many years, including most recently in February 2018, in exchange for their receipt of valuable equity grants and significant cash bonus payments on top of their substantial salaries, Defendants each expressly agreed—both during their employment and for 12 months thereafter—to refrain from, *inter alia*, directly or indirectly soliciting employees to leave Guy Carpenter, or soliciting, interfering with or servicing Guy Carpenter clients and prospective clients with whom they had worked or obtained confidential information during the two-year period prior to their separation of employment.

7. Specifically, with respect to client relationships, Defendants agreed that for the 12-month post-termination period, they would not directly or indirectly (i) solicit any clients of Guy

Carpenter, or induce any clients or prospective clients of Guy Carpenter, to terminate, cancel, not renew, or not place business with Guy Carpenter; or (ii) perform or supervise the performance of services, or the provision of products of the type sold or provided by Guy Carpenter, on behalf of any clients or prospective clients of Guy Carpenter. Defendants further agreed not to ever use or disclose Guy Carpenter's confidential and proprietary information. Moreover, they each expressly acknowledged that "irreparable injury will result to [Guy Carpenter] in the event of a breach," entitling Guy Carpenter to temporary and permanent injunctive relief, in addition to other legal remedies and damages available.

8.     Defendants have each breached the contractual restrictions by which they had expressly promised to abide. Beginning at least as early as November 2018, Gardner breached his contractual promises and obligations, as well as his fiduciary duties, to Guy Carpenter and MMC by soliciting Durant and Yoder to leave Guy Carpenter with him to join Lockton. Durant and Yoder breached their respective contractual promises and obligations, as well as their fiduciary duties, to Guy Carpenter by working in concert with Gardner and soliciting one another to leave Guy Carpenter to join Lockton.

9.     Next, and even more brazenly, Gardner again flagrantly breached his contractual restrictions *within days* of leaving Guy Carpenter and commencing work at Lockton—despite repeated, detailed written warnings from Guy Carpenter during the 60-day notice period, explicitly advising him and the other Defendants of their contractual obligations and restrictions. Specifically, on May 14, 2019, Gardner called Michael Jameson, a senior executive and Managing Director at Guy Carpenter and head of the company's "MGA/MGU" (Managing General Agent/Managing General Underwriter) practice, as well as a direct report to Gardner prior to Gardner's resignation. On that call, Gardner openly solicited Jameson to leave Guy Carpenter to

join Lockton. Gardner made no bones about the purpose of his call, saying to Jameson: "If I could point a golden arrow at someone and hit them with it to lead a portion of my organization, it would be you." Notably, Gardner had *specifically identified* the MGA/MGU practice in a memo he drafted to prepare for his Lockton interview on November 20, 2018 (the "Lockton Interview Memo"), describing the practice area as a target for "immediate broker recruiting" once he arrived at Lockton. As discussed in detail below, the Lockton Interview Memo delineated Gardner's business and recruiting plan on behalf of Lockton, a principal part of which involved laying siege to Guy Carpenter's employees and clients. To wit, Gardner stated, *inter alia*: "[r]ecruiting will be the primary success driver for [Lockton's] business," with specific reference to "Program (MGA/MGU clients) brokers"—*i.e.*, the exact profile of Michael Jameson. By executing on that plan and soliciting Jameson, Gardner's clear intent was to induce Jameson's MGA clients to place their business at Lockton rather than at Guy Carpenter.

10. Defendants' flagrant solicitation of Guy Carpenter's executives and broking talent has continued unabated. The very next week—on May 21, 2019—Durant again unabashedly breached his contractual restrictions by calling Arthur R. (Rob) Collins, a senior broker and Managing Director at Guy Carpenter, openly soliciting him to leave Guy Carpenter and join Lockton. Collins specializes in the "captive" insurance market. A "captive" is an insurance company that is wholly-owned and controlled by its insureds. Guy Carpenter's "Captives" practice, led by Collins, has experienced dramatic growth in recent years, generating multi-million dollars in annual revenue. Upon information and belief, Durant solicited Collins at Gardner's direction, thus constituting yet another breach by Gardner of his RCA.

11. As detailed below, Durant did not target Collins by accident. Rather, as Guy Carpenter's former Head of Sales and Segments, and as a long-time business colleague of Collins,

Durant had extensive access to confidential information concerning Collins' work at Guy Carpenter. Indeed, in his role as Head of Segments, Durant had complete access to highly confidential information pertaining to actual and prospective clients in *all* of Guy Carpenter's various business "Segments." This reach covers the vast majority of Guy Carpenter's client base.

12. Durant was hardly subtle in his attempt to poach Collins: he provided extensive information about Lockton's business model and compensation structure, why he chose to join Lockton, and why Collins should (according to Durant) also join Lockton. Durant told Collins that Lockton was determined to recruit already-successful brokers and compensate those brokers generously through a commissions model that would pay them a significant percentage of the revenues they generated. Durant even specifically referenced a list of numerous other current Guy Carpenter employees that Lockton was targeting. Durant told Collins that Lockton does not want "book sitters" (*i.e.*, brokers who do nothing more than "babysit" an existing book of business), but rather, that they are seeking brokers who would both bring their books and work to grow their books of business.

13. Durant also told Collins that the Lockton team—which surely would have included Gardner, Collins' former boss and the new CEO of Lockton Global Re—had identified a group of brokers to target for recruitment. Durant left no uncertainty about the purpose of his call: he told Collins that, although he couldn't personally offer Collins a job at Lockton, if Collins wanted a job, Durant would hang up and someone else from Lockton would call Collins back and offer him a job. Coming almost immediately on the heels of Gardner's similarly unlawful solicitation of Jameson, Durant's solicitation of Collins is further proof that Defendants are engaged in a full-on assault of Guy Carpenter's broker workforce, targeting Guy Carpenter's top producers not only for their talent, but also for their client relationships. Defendants are thus actively seeking to inflict

unfair competitive and irreparable harm on Guy Carpenter, in utter disregard of their contractual obligations.

14.     Just two days later, on May 23, 2019, Defendants struck again.  As detailed below, Durant and Yoder, as part of a Lockton "pitch" team, met with and presented to, an important and long-time Guy Carpenter client at its corporate headquarters.  Notably, Durant, in his capacity as Guy Carpenter's Head of Sales and Segments, had access to confidential and proprietary information concerning this client.  Additionally, Yoder had met with the CEO of that client as recently as January 28, 2019, and Gardner had met with that client as recently as February 28, 2019, when they both were still employed by Guy Carpenter.

15.     Because of Defendants' repeated and deliberate breaches of their contractual and fiduciary obligations not to, *inter alia*, solicit Guy Carpenter's employees and clients, to redress the damage already caused by Defendants, and to prevent any further damage to Guy Carpenter's business, Plaintiffs bring this action seeking to enforce their contractual rights against Defendants and to enjoin them from any further violations of their agreements, including, among other improper conduct, any further attempts to raid Guy Carpenter's workforce, and any further attempts to interfere with Guy Carpenter's client relationships.

**THE PARTIES**

16.     Plaintiff Guy Carpenter, a Delaware limited liability company with its principal place of business in New York County, is a wholly-owned subsidiary of MMC.

17.     Plaintiff MMC, a corporation organized under the laws of Delaware with its principal place of business in New York County, is the parent company of Guy Carpenter.

18.     Defendant Timothy Gardner is, and at all times relevant herein was, a citizen and resident of the State of New Jersey.

19. Defendant Nicholas Durant is, and at all times relevant herein was, a citizen and resident of the State of Pennsylvania.

20. Defendant Claude Yoder is, and at all times relevant herein was, a citizen and resident of the State of Connecticut.

## JURISDICTION AND VENUE

21. This Court has original subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1) because this is an action between citizens of different states, and the amount in controversy exceeds $75,000 exclusive of interests and costs.

22. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(3) because Defendants are subject to personal jurisdiction in this forum pursuant to a mandatory forum selection clause contained in the Restrictive Covenants Agreement giving rise to this action. Defendants are also subject to personal jurisdiction in this forum by virtue of the ongoing business that they transact in this District.

## FACTUAL ALLEGATIONS

### I. Defendants' Employment with Guy Carpenter

23. Gardner first commenced employment with Plaintiffs in 1993 and held numerous positions at Guy Carpenter and other MMC-affiliated entities throughout his 26 years of employment. Gardner rejoined Guy Carpenter from Marsh USA Inc. on August 1, 2015. Prior to his appointment as CEO of North America Operations for Guy Carpenter, Gardner was head of sales for Marsh USA Inc.'s International Division.

24. Durant first commenced employment with Plaintiffs in 1996. Since then, he has held several different positions at Guy Carpenter and other MMC-affiliated entities, and since October 16, 2017, he has served as Head of Sales and Segments for Guy Carpenter. Prior to

rejoining Guy Carpenter, Durant led Marsh Captive Solutions, which provides advisory solutions and manages more than 1,250 captives worldwide.

25.     Yoder first commenced employment with Guy Carpenter on September 19, 2017, as Chief Innovation and Product Development Officer.  Prior to that, Yoder held several positions at Marsh, including Global Head of Analytics.

26.     Over the course of many years at Guy Carpenter, Defendants, on behalf of Guy Carpenter and with its financial and other support, developed extensive and unique knowledge in the area of reinsurance, including unique knowledge and insight into the industry and its key players, and unique knowledge regarding analytics and other technology that is valuable in the industry.

27.     As Guy Carpenter's CEO of North America Operations, Gardner was responsible for strengthening and maintaining Guy Carpenter's relationships with many of its largest and most important clients.  These clients typically generated seven or eight figure revenues annually.  Guy Carpenter invested significant resources in business development activities and client relationships.  For example, Guy Carpenter gave Gardner a significant client entertainment expense account, through which he entertained clients at dinners, golf outings, and other events, using Guy Carpenter's resources.  Guy Carpenter also paid for Gardner to attend conferences and other industry events in order to maintain and strengthen Guy Carpenter's relationships with its clients.

28.     As Guy Carpenter's Head of Sales and Segments, Durant had two significant areas of managerial oversight and responsibility.  First, he managed Guy Carpenter's critical Sales division.  In that regard, he was responsible for, among other things, monitoring the sales performance of Guy Carpenter's offices and its individual managers and brokers.  As such, Durant

interacted with every Guy Carpenter branch office across the United States, devised account and engagement strategies to grow revenue, and had several direct supervisory reports (including the entire RFP team, a knowledge manager, and the administrator of Guy Carpenter's sales tool). At bottom, Durant was the "keeper" of all new business and all prospective business at Guy Carpenter. Second, as Head of Segments, Durant was heavily involved in investment and growth strategies across all of Guy Carpenter's various business Segments—including, among others, Property, Casualty, Medical Malpractice, Surety, and Accident & Health Insurance.

29. As Guy Carpenter's Chief Innovation and Product Development Officer, Yoder specialized in reinsurance analytics and modeling. An actuarial fellow *(i.e.*, an advanced actuary), Yoder has particular expertise in designing and implementing cutting-edge technologies used by reinsurance brokerage companies. Yoder was primarily responsible for an innovative program, GC Genesis, which uses proprietary technology to match insurers *(i.e.*, Guy Carpenter's clients) with InsurTech partners *(i.e.*, companies that use technological innovations to create efficiencies or other improvements in the insurance industry). InsurTech is a diverse and complex field, and each InsurTech company has its own unique capabilities and specialties. For an insurer to independently locate the InsurTech partner best situated to meet its needs would be extremely time-consuming and expensive. GC Genesis saves Guy Carpenter's insurer clients time and money by using Guy Carpenter's proprietary, confidential database of InsurTech industry information to help them find the most suitable InsurTech partners. Guy Carpenter developed GC Genesis's proprietary database through a substantial investment of resources, requiring countless hours of work from Guy Carpenter employees who painstakingly researched thousands of InsurTech companies, identifying each company's areas of focus and technical abilities and then matching that information with Guy Carpenter's specialized knowledge of the insurance industry.

GC Genesis provides a highly valuable tool to Guy Carpenter's clients, and accordingly, gives Guy Carpenter a meaningful leg up on its competition.

30.     Yoder's development of and close involvement with GC Genesis is well-known in the industry.  Indeed, Yoder has spoken about GC Genesis at multiple Guy Carpenter client events, and he and Guy Carpenter have received industry-wide acclaim for spearheading this cutting-edge, invaluable InsurTech tool.  *See* L.S. Howard, GC GENESIS, GUY CARPENTER'S INSURER-INSURTECH MATCHMAKER, AIMS TO PREVENT BAD RELATIONSHIPS (Insurance Journal), *available at* https://www.insurancejournal.com/news/international/2018/09/11/500683.htm (last accessed May 30, 2019).  Guy Carpenter presented Yoder to clients as the face of GC Genesis, and invited him to speak about the product at conferences (*e.g.*, the prestigious Global Reinsurance Rendezvous), Guy Carpenter-hosted client events (*e.g.*, a high-profile client event in August, 2018 announcing the launch of the "InsurTech Alliance," a complementary suite of services available to GC Genesis clients), and one-on-one meetings with clients interested in this unique service.  For example, Yoder presented to one client's board of directors and to a larger group of the client's employees.  That presentation was successful, and the client became a founding member of Guy Carpenter's InsurTech Alliance.

31.     Yoder also had primary responsibility for another Guy Carpenter proprietary database known as GC Logic, a content management platform that allows Guy Carpenter's brokers to easily and efficiently access information to assist them in offering products and services to Guy Carpenter's clients.

## II.     Defendants' Access to Confidential, Proprietary and Trade Secret Information

32.     Through their positions as senior executives at Guy Carpenter, Defendants had access to highly confidential, proprietary, and trade secret information about Guy Carpenter, including, without limitation, information about: Guy Carpenter's current and historical revenues;

its cost structure; its profitability; and its historical, current, and future marketing and business development plans and strategies, including, for example, information about areas of concentration and prospective clients, and the strategies Guy Carpenter would implement in an effort to develop and maintain particular business and/or clients.  Defendants also had access to Guy Carpenter's confidential information about its clients, including, for example, each client's key personnel, budgets, and specific reinsurance needs and preferences.  This information is strictly confidential and is available only to a limited number of senior level Guy Carpenter employees, and certainly not to Lockton or any of Guy Carpenter's other competitors.

33.    Gardner, in his capacity as CEO of Guy Carpenter's North America Operations, was personally involved in developing and implementing the marketing and business development plans that Guy Carpenter has successfully implemented and continues to implement.  As a member of Guy Carpenter's Executive Committee, he was also personally involved in, and had unfettered access to, all aspects of Guy Carpenter's confidential strategic business plans, financial analyses, and profit and loss information.

34.    Gardner had access to any manner of information about each of Guy Carpenter's accounts, clients, and client prospects.  This information includes, by way of example and without limitation: all details of such clients' reinsurance programs and submissions, including the expiration and renewal dates of their current reinsurance programs and policies; details concerning available markets, market contacts, and the cost of each clients' reinsurance programs; each client's current and historical revenues, loss exposure data, and insurance premiums; details concerning prior bargaining and claims settlement negotiations and experiences that each client had with historical insurers, and each client's level of satisfaction or displeasure with particular individual or groups of carriers; the fee structure (*i.e.*, fee or commission) utilized by Guy

Carpenter with each client and the amount of income that Guy Carpenter derived therefrom; contact details and personal information concerning the key representatives from each of the clients; each client's level of satisfaction with Guy Carpenter, including as described in clients' responses to confidential annual client surveys conducted by Guy Carpenter; which client accounts are considered "at risk" by Guy Carpenter (*i.e.*, which accounts may be vulnerable to competition) and the reasons therefor; and lists of top "prospects" identified by Guy Carpenter brokers to target for business, including Guy Carpenter's strategies for developing business with such prospects. This information is maintained as confidential by Guy Carpenter, is not readily available to competitors, and would be harmful if disclosed to or used by competitors. Gardner, though, had unfettered access to and routinely relied upon this information, including at the time of his resignation.

35.     Gardner also had unrestricted access to confidential information concerning Guy Carpenter's employees—including, by way of example, their compensation (which he helped to set), aptitudes, and potential for advancement within the company. For example, Gardner had access to each Guy Carpenter broker's highly confidential financial assessment forms regarding each of their accounts.

36.     Durant, in his capacity as Head of Sales and Segments, also had broad and deep access to confidential, proprietary, and trade secret information concerning Guy Carpenter's clients as well as to Guy Carpenter's own investment and growth strategies, relating to both current engagements and future prospects. Because he managed all of Guy Carpenter's sales activities, it was also Durant's job to know which Guy Carpenter products and services clients purchased, the needs and preferences of those clients, and client revenue and profitability information. Durant

also gained knowledge of confidential and proprietary information through personally servicing various Guy Carpenter clients.

37.     Like Gardner, Durant also had access to confidential information concerning Guy Carpenter's employees, including sensitive personnel information.  For example, because Durant was responsible for tracking the sales performance of all of Guy Carpenter's brokers, he knew the identity of Guy Carpenter's top performing brokers, as well as the nature and extent of each broker's client relationships.

38.     Yoder, as Managing Director and Global Chief Innovation and Product Development Officer, had access to, developed, and worked closely with Guy Carpenter's proprietary analytics and modeling systems.  As discussed above, Yoder was instrumental in developing and bringing to market the highly successful InsurTech tool GC Genesis.  Through his role at Guy Carpenter, Yoder had access to all of the confidential, proprietary information on which GC Genesis is based, including but not limited to the proprietary database of InsurTech companies Guy Carpenter utilizes to match its insurer clients with InsurTech partners.  Yoder had supervisory responsibility for the other employees who worked in the GC Genesis unit.  In that capacity, Yoder had access to confidential information concerning those employees, including sensitive personnel information.  Yoder also had access to Guy Carpenter's clients through his work on GC Genesis, as Yoder frequently pitched the GC Genesis product to clients at conferences, meetings, and other client events.

## III.    <u>Defendants' Agreements with Guy Carpenter</u>

39.     As set forth above, Defendants each entered into certain written agreements with Plaintiffs that imposed upon them various restrictions, both during the course of their employment at Guy Carpenter, and during the 12-month period following their separation from Guy Carpenter.

### A.  Restrictive Covenants Agreements

40.  In exchange for Guy Carpenter's grant of lucrative equity awards to each Defendant in 2018, they each entered into, and are accordingly bound by, a Restrictive Covenants Agreement ("RCA"), attached hereto as Exhibit A.

41.  In Paragraph 3 of the RCA, Defendants acknowledged and agreed that, during their employment and for 12 months thereafter, they would not "directly or indirectly, solicit, or endeavor to cause any employee of [Guy Carpenter] with whom [Defendants], during the last two (2) years of [their] employment with [Guy Carpenter], came into contact for the purpose of soliciting or servicing business or about whom [Defendants] obtained Confidential Information to leave employment with [Guy Carpenter]."  Thus, under the plain language of the RCA, Defendants are proscribed from directly or indirectly soliciting, or otherwise attempting to induce to leave their employment, "***any employee***" of Guy Carpenter with whom they either had ***any*** business-related "contact" over the last two years, or about whom they "obtained Confidential Information," as that term is defined in the RCA.

42.  The RCA also addresses the solicitation of Guy Carpenter current and prospective clients during the 12-month period after they leave Guy Carpenter.  Specifically, Paragraph 2(b) states that, during this 12-month period, Defendants will not, directly or indirectly:

> (i) solicit clients of [Guy Carpenter] for the purpose of selling or providing products or services of the type sold or provided by [you] while employed by [Guy Carpenter]; or (ii) induce clients or prospective clients of [Guy Carpenter] to terminate, cancel, not renew, or not place business with [Guy Carpenter]; or (iii) perform or supervise the performance of services or provision of products of the type sold or provided by [you] while [you were] employed by [Guy Carpenter] on behalf of any clients or prospective clients of [Guy Carpenter]; or (iv) assist others to do the acts specified in Paragraphs 2(b)(i)-(iii).

43. Paragraph 2(b) also makes clear that it "shall not be a defense to a claim that this provision has been breached that [your] new employer . . . has previously solicited or served the client."

44. Paragraph 2(b) further states that Defendants will not:

> engage in any subterfuge to circumvent this prohibition, including, but not limited to accompanying others on calls to the client, contacting the client with other persons, supervising other persons in soliciting or serving the client, providing Confidential Information to others to assist them in soliciting or serving the client, participating in developing presentations to be made to the client, or other similar activities.

45. In Paragraph 4 of the RCA, Defendants agreed that during the entirety of their employment, and at any time following the termination of their employment, they would not "disclose to any other person or entity . . . any Confidential Information" (as that term is broadly defined in the RCA) in any form, including but not limited to "verbal, written or machine readable, including electronic files."

46. Defendants expressly acknowledged, in Paragraph 6, that each of the above "restrictions and obligations" are "necessary to protect the legitimate business interests of [Guy Carpenter] and are reasonable in view of the benefits and consideration [they have] received" from Guy Carpenter.

47. In Paragraph 7, Defendants further agreed that "irreparable injury will result to [Guy Carpenter] in the event of a breach" of the RCA, and that "monetary damages for such breach would not be readily calculable, and that [Guy Carpenter] would not have an adequate remedy at law therefor," such that in the event of a breach, Guy Carpenter would be entitled to temporary and permanent injunctive relief, in addition to other legal remedies and damages available.

48.     Defendants also agreed in Paragraph 7 that Guy Carpenter would be entitled to recover its attorneys' fees and other costs Guy Carpenter incurs in seeking to enforce the provisions of the RCA.

**B.     Durant and Yoder's Non-Solicitation Agreements**

49.     In addition to the RCA, Durant is also bound by a Non-Solicitation Agreement, which he signed on February 7, 2011 (the "Durant NSA"), attached hereto as Exhibit B.

50.     Yoder is likewise bound by a Non-Solicitation Agreement, which he signed on September 21, 2017 (the "Yoder NSA"), attached hereto as Exhibit C.

51.     The Durant NSA and the Yoder NSA each prohibit the solicitation of Guy Carpenter employees.  In Paragraph 2 of those agreements, Durant and Yoder agreed that for one year following their date of termination, they would not, directly or indirectly:

> solicit, induce, or encourage, or assist others in soliciting, inducing, or encouraging, any employee of [Guy Carpenter] or its affiliates to terminate his or her employment with [Guy Carpenter] or such affiliate, as applicable, for any reason.

52.     Durant and Yoder further agreed that for that same one year period following their termination from Guy Carpenter, they would not, directly or indirectly:

> solicit or accept business of the type offered by [Guy Carpenter] during [their] term of employment with [Guy Carpenter], or perform, participate in, or supervise the performance of any services related to such type of business, from or for (i) clients or prospects of [Guy Carpenter] or its affiliates who were solicited or serviced directly by [Durant or Yoder] or where [they] supervised or participated in, directly or indirectly, in whole or in part, the solicitation or servicing activities related to such clients or prospects within two (2) years prior to [their] termination of employment; or (ii) any former client of [Guy Carpenter] or its affiliates who was a client within two (2) years prior to [their] termination and who was solicited or serviced directly by [Durant or Yoder] or where [Durant or Yoder] supervised or participated in, directly or indirectly, in whole or in part, the solicitation or servicing activities related to such former clients.  *See id.*

53.     In Paragraph 3 of the Durant NSA and the Yoder NSA, Durant and Yoder also agreed that during the period of their employment with Guy Carpenter, and at any time following the termination of their employment, they would not, directly or indirectly, use or disclose Confidential Information (as that term is broadly defined in those two agreements) except to the extent required to carry out their duties as Guy Carpenter employees.

54.     In Paragraph 7(c) of their respective NSAs, Durant and Yoder agreed that the restrictions included therein were "vital to protect [Guy Carpenter's] legitimate business interests (including the protection of its Confidential Information and customer goodwill)." They also expressly acknowledged that the agreements were "reasonably drawn" with respect to duration and scope, not unduly burdensome, not injurious to the public interest, and supported by adequate consideration.

55.     As in the RCA, Durant and Yoder further acknowledged in Paragraph 7(c) that "irreparable injury will result to [Guy Carpenter] in the event of a breach" of their obligations, and that "monetary damages for such breach would not be readily calculable, and that [Guy Carpenter] would not have an adequate remedy at law therefor." They consented that Guy Carpenter would be entitled to temporary and permanent injunctive relief to retrain violations or threatened violations of their obligations in addition to any other legal remedies and damages available.

**IV.     Defendants Breach Their RCAs, Coordinate Their Defections from Guy Carpenter to Lockton, and Immediately Solicit Other Guy Carpenter Employees and Clients**

    **A.     Gardner Lays Out His Blueprint for Solicitation of Guy Carpenter Brokers and Clients**

56.     The employees' collusive conduct in the weeks and months leading up to their coordinated resignations evinced their collective disregard for their obligations under their RCAs. On November 7, 2018, Gardner booked a round-trip plane ticket for November 20, 2018 from Newark, New Jersey to Kansas City, Missouri: Lockton's corporate headquarters. He forwarded

this ticket from his Guy Carpenter email to his personal email. Upon information and belief, Gardner traveled to Kansas City on November 20 to interview with Lockton.

57. Two days before that interview, on November 18, 2018, Gardner forwarded the Lockton Interview Memo from his Guy Carpenter email to his personal email, which contained Gardner's "talking points" for his November 20 interview with Lockton. As would soon become clear, these "talking points" laid out Gardner's blueprint for building Lockton's reinsurance business through unlawful solicitation of Guy Carpenter's employees and clients—a plan that Gardner, in conjunction with Durant, Yoder and Lockton, is now seeking to execute.

58. The Lockton Interview Memo acknowledges that Guy Carpenter is a "competitor" of Lockton, and identifies *by name* numerous Guy Carpenter clients. It touts Gardner's "relationship building" prowess and his "strong relationships" with the C-Suite of many large, high-revenue-generating Guy Carpenter clients. Indeed, it boasts that ***"Guy Carpenter['s] . . . client list is the envy of the industry"*** (emphasis added).

59. In addition, as part of Gardner's pitch to Lockton, the Lockton Interview Memo states that in order to develop a successful reinsurance broker, ***"[r]ecruiting will be the primary success driver for the business"*** (emphasis added). Indeed, in the Lockton Interview Memo, Gardner states that he is "***trained to constantly pursue . . . [h]ighest caliber talent***," and boasts of his prior "***success with talent and recruiting***" (emphasis added). Foreshadowing his direct solicitation of Michael Jameson, the head of Guy Carpenter's MGA/MGU practice, Gardner highlighted in the Lockton Interview Memo the need for "[i]mmediate broker recruiting" with specific reference to ***"Program (MGA/MGU clients) brokers"*** (emphasis added), who, he wrote, are ripe for recruitment by Lockton because their clients are "reinsurance dependent, personal relationship driven, [and] transportable."

60.     The Lockton Interview Memo also emphasizes the importance of recruiting brokers with ***"[e]xisting client relationships"*** (emphasis added).  Tellingly, it highlights Gardner's own "[s]ignificant activity and success with talent and recruiting," including with respect to the "GC Genesis Team." As Gardner wrote, "[h]aving spent 26 years in the reinsurance market, I know the talent and I know the pitfalls to avoid."  Gardner was thus billing himself as an "immediate" recruiter of the "[h]ighest quality talent" in the industry.

61.     The Lockton Interview Memo's emphasis on talent recruitment did not end at the "best brokers."  It also states that ***"analytics talent is an imperative. . . . Building a world class analytics offering for clients is vital"*** (emphasis added).  As noted above, Yoder specializes in reinsurance analytics.

62.     Furthermore, Gardner also wrote that ***"[h]iring sole operators with client* [sic] *that have followed them from job to job is [] short sighted and dangerous to a culture"*** (emphasis added).  This statement foreshadowed Durant's solicitation of Rob Collins on May 21, when Durant told Collins that Lockton does not want "book sitters" who merely babysit existing clients.

**B.     Gardner Solicits Durant and Yoder to Defect from Guy Carpenter to Lockton**

63.     On November 25, 2018 – just days after his meeting with Lockton in Kansas City – Gardner sent a text message to Durant, saying ***"Hey pal. You around today for a quick call? Something I wanted to bounce off of you"*** (emphasis added).  Upon information and belief, during this call, Gardner solicited Durant to leave employment with Guy Carpenter in favor of Lockton, in breach of the terms of the RCA and his duty of loyalty to Guy Carpenter.

64.     The next day – November 26, 2018 – Gardner sent another text message to Durant, stating ***"Spoke to CY [Claude Yoder]. All good for you two to connect"*** (emphasis added).  Upon information and belief, this message refers to a conversation Gardner had with Yoder in which Gardner solicited Yoder to leave employment with Guy Carpenter in favor of Lockton, in another

breach of the RCA and his duty of loyalty to Guy Carpenter.  In encouraging Durant and Yoder to discuss the same opportunity with one another, Gardner further breached the RCA.

65.     On January 21, 2019, Durant sent an email from his Guy Carpenter email to his personal email with the subject line "RCA."  He attached, with the file name "Non-Compete.TIF," the terms and conditions of Guy Carpenter's November 1, 2005 special long-term incentive grant, which contained restrictive covenants similar to those in the RCA.  Durant was thus aware of the restrictive covenants to which he had agreed.

66.     Based on text message exchanges, it is clear that Gardner, Durant, and Yoder repeatedly met and held conference calls between and among themselves between December 2018 and January 2019.  These interactions, which occurred only among Defendants, occurred on at least the following dates: December 13, 2018, January 3, 2019, and January 12, 2019.

67.     On January 23, 2019, Durant forwarded an announcement to Yoder specifically about Lockton, entitled "Announcement – Jerry Ridge to Lead Lockton Reinsurance Broking."

68.     Two days after that – on January 25, 2019 – Durant forwarded another Lockton-related announcement to Yoder, entitled "Lockton Digital Insurance Broker Raises $28M."

69.     Upon information and belief, Yoder traveled to Kansas City, Missouri on February 12, 2019 to meet with Lockton, and returned the following day.

70.     On February 17, 2019, Gardner booked yet another flight to Kansas City on February 24, 2019. He forwarded the ticket from his Guy Carpenter email to his personal email.

71.     Shortly before announcing his departure from Guy Carpenter, Gardner accessed— *and then deleted*—a Guy Carpenter succession planning document containing detailed information about Guy Carpenter North America's most promising executives and reinsurance talent.  Shortly before his departure announcement, Gardner also accessed and then deleted a spreadsheet

containing highly detailed current and forecasted revenue information for many of Guy Carpenter's largest clients.

72.      At 9:00 a.m. on March 7, 2019, Gardner informed Peter Hearn, CEO of Guy Carpenter, of his intention to terminate his employment with Guy Carpenter in 60 days' time, and to thereafter join Lockton, where he would be working in the reinsurance space.  He provided Hearn with a resignation letter.  Gardner gave no prior indication or advanced warning of his departure to Hearn.

73.      At nearly the same time that morning, Durant contacted John Trace, President of Guy Carpenter, who was then President of Guy Carpenter's U.S. Operations, to request an in-person meeting.  At the meeting, Durant informed Trace that he, too, was resigning his employment at Guy Carpenter to join Lockton.  He gave Trace a resignation letter that was nearly identical in sum and substance to Gardner's resignation letter.

74.      Within the hour, Yoder also announced that he would be resigning from Guy Carpenter and joining Lockton.  Yoder returned his company-issued iPad restored to its initial settings (*i.e.*, empty of any emails, text messages, and other files), and his company-issued iPhone was encrypted.

75.      Highlighting the coordinated nature of Defendants' scheme, Lockton issued a public press release ***that very same day***, March 7, 2019, announcing its new hires and extolling the virtues of its incoming "elite leadership team" consisting of "Tim Gardner, current CEO of North America Operations for Guy Carpenter, Claude Yoder, current Managing Director and Global Chief Innovation and Product Development Officer for Guy Carpenter, and Nick Durant, current Managing Director for Guy Carpenter."

### C. Defendants' Violation of Their RCAs Continues Immediately Upon Their Departures from Guy Carpenter

76.     Defendants' solicitation conduct did not end there, or with one another.  On May 14, 2019 – ***eight days*** after his employment with Guy Carpenter ended and after joining Lockton – Gardner called Michael Jameson, a senior Guy Carpenter executive who leads its "MGA" sector, and engaged in an open act of solicitation.

77.     Jameson, who joined Guy Carpenter in January 2017, is the Branch Manager for Guy Carpenter's Dallas, Texas office, as well as a broker who specializes in the "MGA/MGU" (Managing General Agent / Managing General Underwriter) space, in addition to maintaining a robust portfolio of traditional insurance carrier clients.  An MGA or MGU (which terms are often used interchangeably) is a specialized type of insurance agent and administrator who has binding authority and policy issuance capabilities on behalf of an insurance carrier.  MGAs are able to negotiate policy terms and conditions for those insurance carriers that have appointed the entity via a Program Administrator Agreement.  When insurance carriers delegate authority to an MGA/MGU, they typically do so in areas where the carrier lacks the required expertise or geographical distribution.  The MGA practice area, which is highly specialized due to the knowledge and expertise required to match insurers and reinsurers, is a rapidly growing, $30-$40 billion space within the U.S. domestic insurance marketplace.

78.     In the two and a half years since Jameson joined Guy Carpenter, the company's MGA practice (based out of the Dallas office) has grown substantially, both through new hires and through the generation of new business, including from several newly developed client relationships.  Jameson reported directly to Gardner during Jameson's employment and until Gardner's recent departure.  Jameson and Gardner interacted frequently, including in-person, by phone, and with clients, servicing and entertaining clients together, discussing client prospects,

and working on the implementation of the MGA practice's business plan and strategy. Gardner also played an active role in hiring; he approved every new hire in Dallas, and even flew certain of them to New York to meet them personally during the hiring process. Jameson also discussed his own and his team's compensation with Gardner at annual compensation time, including as recently as late February 2019, just days before Gardner announced his resignation.

79.     Jameson also interacted with Durant on multiple occasions. As Head of Sales and Segments, Durant had access to and knowledge of substantial confidential information regarding Jameson's MGA practice, including its clients, revenues, and prospects. Jameson traveled to New York, at Durant's request, to attend a strategy meeting on July 11, 2018 among several high-ranking account executives to discuss a list of Guy Carpenter's top 100 "prospects" (many of which were Jameson's MGA prospects) and strategies for developing business with those prospective clients. That meeting followed on the heels of a project in which Durant had asked multiple managers, including Jameson, to generate a "top prospects" list. At that meeting, attendees shared information about their respective client prospects and discussed strategies to most effectively enable Guy Carpenter to utilize its resources to grow its business.

80.     Jameson and Durant met in-person again on November 26, 2018, when Durant made a special trip to Guy Carpenter's Dallas office to discuss significant Guy Carpenter prospects. During that visit, which was Durant's first time visiting Jameson and the MGA team in Dallas, Durant met with Jameson's entire team and focused on the Dallas branch's top 30-35 prospects. Jameson and his team shared with Durant their evaluation of each prospect on the list and strategies to target them. Durant also met individually with almost every one of Guy Carpenter's Dallas employees, including extensive time with Jameson's co-head of the MGA practice. Little did Jameson and his team know that Durant, at the time of those meetings, was in

the midst of discussions between and among Gardner and Yoder regarding leaving Guy Carpenter to join Lockton.

81.     At approximately 10:00 p.m. on March 6, 2019, the day before he announced his resignation, Gardner left Jameson a voicemail, stating that he wanted to speak with Jameson about a specific client, which he identified in the voicemail.  Jameson was not able to return Gardner's call that evening.  The following morning at work, Jameson learned that Gardner had submitted his notice of resignation from Guy Carpenter.  Jameson did not hear from Gardner again during Gardner's 60-day notice period.  However, that would soon change.

82.     On May 14, 2019, eight days after his employment at Guy Carpenter ended, at approximately 6:00 p.m. CST, Jameson, while having an after-work drink with colleagues, received a call from Gardner.  After Jameson informed Gardner that it was not a good time to talk, Gardner asked when Jameson would not be around colleagues.  After missing each other, Jameson called Gardner back en route to a dinner engagement.  After exchanging pleasantries, Gardner wasted no time soliciting Jameson to join Lockton.  Among other things, Gardner memorably stated:  "If I could point a golden arrow at someone and hit them with it to lead a portion of my organization, it would be you."  Gardner told Jameson that he wanted to meet with him in Dallas to discuss why he had joined Lockton, and to share with him Lockton's battle plan for developing a powerful reinsurance platform, including the very substantial financial investment it was making to recruit top brokers and develop infrastructure that could service and support clients brought in by recruited brokers and those developed organically.  Jameson asked if that financial investment would be used for a corporate acquisition, to which Gardner replied that it would not, because he had always wanted to build something and wanted to do that at Lockton.  Gardner told Jameson

that he wanted to give brokers the opportunity to build something and ultimately "hit a home run." He also told Jameson that he envisioned Jameson taking on a "leadership position" at Lockton.

83.     The conversation concluded with Gardner stating that he wanted to come visit Jameson in Dallas for a further discussion, and asking Jameson to check his schedule and get back to Gardner with a suggested time and date for a one-on-one meeting. Gardner specifically asked Jameson not to discuss the call or the proposed visit with anyone.

84.     As noted above, this act of solicitation was previewed in the Lockton Interview Memo, in which Gardner focused on "immediate broker recruiting" from "Program (MGA/MGU clients) brokers." In flagrant violation of the RCA, Gardner encouraged Jameson to leave Guy Carpenter to join Lockton. Notably, Gardner's breach came on the heels of, and directly contradicted, his written representation to Guy Carpenter, dated April 26, 2019, that he "[did] not intend to violate any valid restrictions in the RCA, including with respect to solicitation."

85.     Just two days after Gardner's call to Jameson, Defendants' unlawful solicitation of Guy Carpenter personnel continued. On May 16, 2019, while attending the PGA Championship, Arthur R. (Rob) Collins, a current Guy Carpenter broker and Managing Director who has been employed with Guy Carpenter in various sales and leadership roles for over twenty years (including as a direct report to Gardner), received two missed calls from a number with a "215" area code (*i.e.*, Philadelphia, where Durant is based). On May 21, Collins received another call from the same number. That call came in at 6:21 p.m., and the caller left a voicemail (which Collins listened to as he was driving). The voicemail message was as follows: "Hey Rob, it's Nick calling. 215-***-****. Hope you're doing well." Collins returned his call that evening and spoke to Durant for 26 minutes.

86.     Durant's call to Collins was no accident; rather, it was part of Defendants' plan to build a reinsurance business off of Guy Carpenter's back.  In their capacities as Guy Carpenter's CEO of North America Operations and Head of Sales and Segments, respectively, Gardner and Durant were well aware of Collins' role as head of Guy Carpenter's "Captives" practice and his substantial experience at Guy Carpenter in that space (*i.e.*, brokering reinsurance deals for "captive" insurance companies, which are wholly-owned and controlled by their insureds), as well as Collins' notable portfolio of clients in the "Property and Casualty" insurance space.  Durant was intimately familiar with the Captives space, having served as President of Marsh Captive Solutions immediately prior to re-joining Guy Carpenter in 2017.  Durant and Collins had also both attended a captive insurance industry event in Vermont while they were Captives specialists at Marsh and Guy Carpenter, respectively.  Gardner also knew Collins well, having supervised him both directly and indirectly; having met with him in-person on numerous occasions (including in the last two years) to discuss business, as well as Collins' career path and compensation; and having participated with Collins in visiting several of Guy Carpenter's Captives clients, including on multiple occasions in the last two years.  Thus, in their senior management roles at Guy Carpenter, Gardner and Durant had detailed knowledge of Collins' clients and business lines.

87.     Armed with extensive knowledge, Durant aggressively pitched Collins to defect from Guy Carpenter to Lockton.  In explaining why he had chosen to join Lockton and why he believed others should make the same choice, Durant praised the virtues of working for a private company like Lockton, discussed Lockton's plan for building a reinsurance business, and detailed the generous compensation package that Lockton intended to offer to brokers: an "eat what you kill" commissions model that would pay the brokers a significant percentage of the revenues they generate.  Durant told Collins that Lockton was determined to recruit already-successful brokers.

Durant told Collins that the Lockton team—which surely would have included Gardner— had identified specific broking talent, including those who can "move their books" and/or "expand their books," to target for recruitment. Durant also told Collins that Lockton does not want "book sitters" (*i.e.*, brokers who do nothing more than "babysit" an existing book of business), but rather brokers who would bring and then grow "their books" of business.

88.     Durant left no uncertainty about the purpose of his call: he told Collins that, although he could not personally offer Collins a job at Lockton, if Collins wanted a job, Durant would hang up and someone else from Lockton would call Collins back and offer him a job.

89.     Just two days later, Defendants' unlawful solicitation offensive continued. On May 23, 2019, Durant and Yoder, along with two other senior executives at Lockton, presented at an in-person meeting at the offices of a longtime, substantial Guy Carpenter client (which generates eight figure annual revenues), seeking to land a large portion of that client's international book of business. Remarkably, on February 28, 2019—just days before Defendants announced their resignations—Gardner had met in-person at this same client's offices, with its CEO, presumably laying the groundwork for the improper solicitation that would soon follow. Yoder, too, had met in-person with this client's CEO while on Guy Carpenter's payroll but presumably after he had already decided to join Lockton. That meeting occurred in late January 2019 at the "Executive Roundtable Seminar and Board of Directors Meeting" in Naples, Florida where Yoder was presenting on GC Genesis and InsurTech-related issues.

## V.     Guy Carpenter's Diligence in Seeking to Ensure Defendants' Compliance With Their Contractual Obligations

90.     Upon receiving Defendants' simultaneous notices of resignation, Guy Carpenter immediately began an investigation into the circumstances surrounding their abrupt resignations.

91.    On March 11, 2019, counsel for Guy Carpenter sent letters to each of Defendants reminding them of their continuing obligations under the RCA, advising them of Guy Carpenter's investigation into the circumstances surrounding their departures, and demanding that they immediately certify their compliance with their obligations (the "March 11 Letters").

92.    Also on March 11, 2019, counsel for Guy Carpenter sent a separate letter to Lockton, advising Lockton of Defendants' obligations under the RCA.  Lockton has never responded to this letter.

93.    On March 13, 2019, Defendants, who are represented by the same counsel, each provided identical, generic responses to the March 11 Letters.  Far from providing Guy Carpenter with any assurances that they would comply with their contractual obligations, the response letters each stated opaquely: "I *believe* that I have not violated and do not intend to violate any *valid* restrictions in the RCA including with respect to solicitation" (emphasis added).  The letters gave no indication whatsoever as to which of the RCA's restrictions Defendants viewed as "valid" or "invalid."

94.    On March 20, 2019, counsel for Guy Carpenter responded to counsel for Defendants (the "March 20 Letter").  In light of Defendants' opaque and cursory responses to the March 11 Letter, the March 20 Letter further underscored, for the avoidance of any doubt, Defendants' obligations and responsibilities—both while they remained employed by Guy Carpenter and following their separation of employment.  *Id.*  The March 20 Letter also demanded that, in accordance with their RCAs, Defendants be "completely screened from any work or information relating to any current or prospective clients of Guy Carpenter with which Defendants had contact or about which they had obtained Confidential Information or trade secrets during their last two years at Guy Carpenter."  *Id.*  The March 20 Letter further requested that Defendants (i)

search for any Guy Carpenter property or Confidential Information, as defined in the RCA, in their possession or control, and (ii) certify in accordance with the RCA that they possess no tangible or hard copy property or Confidential Information belonging to Guy Carpenter. *Id.*

95.     That same day, Guy Carpenter received a response from counsel for Defendants, which completely ignored Guy Carpenter's demand that Defendants be screened from directly or indirectly servicing Guy Carpenter clients during their first 12 months at Lockton.

96.     On March 26, 2019, having received nothing but obfuscations from Defendants, counsel for Guy Carpenter called counsel for Defendants in an attempt to further explain Guy Carpenter's concerns, obtain information about the process by which Defendants would be searching for and returning Guy Carpenter's Confidential Information, and yet again request that Defendants certify their full compliance with the RCA. At the request of counsel for Defendants, who was on vacation, counsel for Guy Carpenter extended the professional courtesy of deferring the call until the following week.

97.     On March 28, 2019, Guy Carpenter followed up with a letter identifying the various issues that had not been addressed by Defendants in response to the March 11 Letters and March 20 Letter (the "March 28 Letter"). Among other things, the March 28 Letter expressed Guy Carpenter's deep concerns with Defendants' stonewalling and lack of candor in response to basic questions about their conduct and post-termination intentions. As Guy Carpenter's counsel stated to Defendants' counsel in the March 28 Letter: "We need to know what your clients have done and what their intentions are vis-à-vis Guy Carpenter's clients, employees and Confidential Information before and once they commence employment at Lockton."

98.     Initially attempting to dodge a simple phone call, counsel for Defendants instead responded in writing on April 2, 2019, sending three identical letters on behalf of each Defendant.

Once more, Defendants simply refused to certify that they would comply with the terms of the RCA, or even to state which terms of the RCA they believed to be "valid" or "invalid."

99.     Between April 4 and April 12, the parties negotiated the scope and process of Defendants' search for and collection of the *reams* of Guy Carpenter property and Confidential Information that they inexplicably maintained on their personal devices.

100.    Frustrated with Defendants' foot-dragging, counsel for Guy Carpenter sent counsel for Defendants another letter on April 15, 2019 (the "April 15 Letter").  Among other things, the April 15 Letter demanded the return of all Guy Carpenter information and other property by no later than April 19, 2019, and reminded Defendants of their obligation to provide Guy Carpenter with a signed statement certifying their full compliance with the RCA.

101.    Counsel for Defendants responded by email on April 19, 2019, not with the return of the Guy Carpenter property and Confidential Information, but with an unspecified representation that "[w]e will return documents to you and provide certifications after the review has been completed."

102.    A full week later – on April 26, 2019 – counsel for Defendants produced to counsel for Guy Carpenter *over 30,000* electronic files that Defendants had on their *personal devices,* as well as a box of hard-copy documents that Yoder had in his personal possession.

103.    These electronic files reveal that Defendants all had Guy Carpenter property and Confidential Information stored on their personal electronic devices, in direct violation of company policy regarding "Acceptable Use of Information Assets."  That policy states, among other things, "You must not store [MMC] information on any computer or other type of information system that is not owned or leased by the Company," and the "use of external systems are permitted only with

proper authorization." Defendants' personal devices, on which they extensively stored Guy Carpenter files, were not authorized or approved by Plaintiffs.

104. Many of the Guy Carpenter files that Defendants improperly stored on their personal devices, or that were otherwise in their personal possession, contained highly confidential, proprietary, and commercially sensitive information. For example, on Gardner's personal devices, there was a spreadsheet and a slide deck containing detailed information about one of Guy Carpenter's major clients—including that client's business strategies and Guy Carpenter's analysis of that client's unique reinsurance needs. Based on the associated metadata, Gardner accessed these files on January 5, 2019, shortly before he announced his departure from Guy Carpenter. Likewise, on November 7, 2018, Yoder forwarded from his Guy Carpenter email to his personal email a detailed presentation, prepared for one of Guy Carpenter's major clients, which contained proprietary and non-public information about Guy Carpenter's GC Genesis program. Yoder also had numerous other similar GC Genesis–related documents – including multiple client presentations – in hard copy form in his personal possession.

105. Defendants' 30,000-file "document dump" was accompanied by identical, generic letters from Defendants—characterized by their counsel as "certifications." Each of the letters, however, merely restated the same refrain Defendants had been repeating since announcing their resignations: "I *believe* that I have not violated and do not intend to violate any *valid* restrictions in the RCA, including with respect to solicitation . . . ." (emphasis added). These so-called "certifications" were facially deficient because, among other reasons, they did not confirm Defendants' current and future compliance with all of their contractual obligations under the RCA; rather, they limited their representations and warranties to only "any valid" restrictions.

106.     Thus, despite Guy Carpenter's numerous requests both orally and in writing –
including but not limited to in the March 11 Letters, the March 20 Letter, the March 28 Letter, and
the April 15 Letter – Defendants have flatly refused to provide ***any specific assurances*** that they
have complied or will comply with the RCA, or even to explain which terms of the RCA they
believe may be invalid.   Instead, Defendants have continued to rely on intentionally vague
statements about their conduct and intentions.

107.     On May 6, 2019 – the last day of Defendants' 60-day notice period –  counsel for
Guy Carpenter tried one final time (the "May 6 Letter").   The May 6 Letter offered Defendants
"yet an additional opportunity to advise [Guy Carpenter]" of any provisions in the RCA that they
deem "invalid."   The May 6 Letter further expressed Guy Carpenter's shock as to the sheer volume
of Guy Carpenter-related material on Defendants' personal computers and devices.   In the letter,
Guy Carpenter reiterated that it "expects and demands ***full compliance*** with the restrictions
contained in [Defendants'] RCA—all of which are valid and lawful, as [they] have already
acknowledged and agreed" (emphasis in original).   To that end, the May 6 Letter clearly outlined—
once again—each of Defendants' continuing obligations under the RCA, and advised Defendants
in no uncertain terms that Guy Carpenter would "not hesitate to take immediate legal action, with
or without notice, for injunctive and/or monetary relief in the event the circumstances warrant it."

108.     As detailed extensively above, however, Guy Carpenter's repeated entreaties went
unheeded.   Defendants' illegal solicitation offensive on Guy Carpenter's executives and clients
continues to this day.

**COUNT I**
**(Breach of Contract – Solicitation of Employees)**
**(Against All Defendants)**

109.     Guy Carpenter realleges and incorporates by reference herein the allegations set
forth in Paragraphs 1 through 108 above.

110. Defendants have each breached the terms of their RCAs by, among other things, directly and/or indirectly:

- Soliciting or otherwise endeavoring to cause employees of Guy Carpenter with whom Defendants, during the last two years of their employment with Guy Carpenter, came into contact for the purpose of soliciting or servicing business or about whom Defendants obtained confidential information, to leave employment with Guy Carpenter; and/or

- Assisting others to do the acts specified above.

111. Specifically, Gardner breached the RCA by soliciting or otherwise endeavoring to cause Durant and Yoder to leave employment with Guy Carpenter.

112. Gardner further breached the RCA on or about May 14, 2019 by soliciting or otherwise endeavoring to cause Michael Jameson, a current Guy Carpenter senior executive and Managing Director, to leave his employment with Guy Carpenter.

113. Durant breached the RCA by soliciting or otherwise endeavoring to cause Yoder to leave his employment with Guy Carpenter.

114. Durant further breached the RCA and Durant NSA on or about May 21, 2019 by soliciting or otherwise endeavoring to cause Collins, a current Guy Carpenter broker and Managing Director, to leave his employment with Guy Carpenter. Upon information and belief, Durant acted at Gardner's direction, and Gardner thus further breached the RCA by indirectly soliciting Collins and/or by endeavoring to cause Collins to leave his employment with Guy Carpenter.

115. Yoder breached the RCA by soliciting or otherwise endeavoring to cause Durant to leave his employment with Guy Carpenter.

116.    Plaintiffs fully performed their obligations under the RCAs.

117.    As a direct and proximate result of Defendants' breach of the RCAs, Guy Carpenter already has suffered and will continue to suffer extensive, irreparable injury, loss of goodwill, harm to its business, and other injury and damages for which there is no adequate remedy at law. Guy Carpenter will continue to suffer further harm unless and until Defendants are restrained from their current conduct and are compelled to abide by the terms of the RCAs.

118.    As a direct and proximate result of Defendants' breach of the RCAs, Guy Carpenter already has suffered and will continue to suffer additional damages in an amount that is presently unascertainable, including but not limited to in the form of attorneys' fees and costs related to this litigation, and lost business, in an amount to be proven at trial.

### COUNT II
**(Breach of Contract – Solicitation of Clients)**
**(Against All Defendants)**

119.    Guy Carpenter realleges and incorporates by reference herein the allegations set forth in Paragraphs 1 through 118 above.

120.    Defendants have each breached the terms of their RCAs by, among other things, directly and/or indirectly:

- soliciting clients of Guy Carpenter for the purpose of selling or providing products or services of the type sold or provided by Defendants while employed by Guy Carpenter;

- inducing clients and/or prospective clients of Guy Carpenter to terminate, cancel, not renew, or not place business with Guy Carpenter;

- performing or supervising the performance of services or the provision of products, of the type sold or provided by Defendants while they were employed by Guy Carpenter, on behalf of clients and/or prospective clients of Guy Carpenter; and/or

- Assisting others to do the acts specified above.

121. Specifically, on May 23, 2019, Durant and Yoder breached their respective RCAs by soliciting a longtime and substantial Guy Carpenter client during an in-person meeting at which they presented on behalf of Lockton, along with two other Lockton senior executives. Lockton was pitching this client in connection with an RFP that had been issued. Defendants all had contacts with this client and/or obtained Confidential Information about this client, during the last two years of their employment at Guy Carpenter. Among other things, in the immediate lead-up to their resignations from Guy Carpenter, both Gardner and Yoder met with this client. Gardner had an in-person meeting with its CEO at the client's headquarters on February 28, 2019—just days before he announced his resignation from Guy Carpenter. In January 2019, Yoder likewise met with the same CEO at the "Executive Roundtable Seminar and Board of Directors Meeting" in Naples, Florida where Yoder was presenting on GC Genesis and InsurTech-related issues.

122. Plaintiffs fully performed their obligations under the RCAs.

123. As a direct and proximate result of Defendants' breach of the RCAs, Guy Carpenter already has suffered and will continue to suffer extensive, irreparable injury, loss of goodwill, harm to its business, and other injury and damages for which there is no adequate remedy at law. Guy Carpenter will continue to suffer further harm unless and until Defendants are restrained from their current conduct and are compelled to abide by the terms of the RCAs.

124. As a direct and proximate result of the Defendants' breach of the RCAs, Guy Carpenter already has suffered and will continue to suffer additional damages in an amount that is presently unascertainable, including but not limited to in the form of attorneys' fees and costs related to this litigation, and lost business, in an amount to be proven at trial.

## COUNT III
### (Breach of Fiduciary Duty)
### (Against All Defendants)

125.    Guy Carpenter realleges and incorporates by reference herein the allegations set forth in Paragraphs 1 through 124 above.

126.    By virtue of Defendants' positions at Guy Carpenter, the special relationship of trust and confidence reposed by Guy Carpenter in them, and the permission afforded them by Guy Carpenter to its most confidential, proprietary and trade secret information, Defendants were required to act solely in Guy Carpenter's interest.  Defendants also had duties of loyalty and of utmost good faith to Guy Carpenter, and were obligated not to subvert or misappropriate Guy Carpenter's confidential and trade secret information or business opportunities.

127.    Defendants breached their fiduciary duties owed to Guy Carpenter by, among other things, directly or indirectly soliciting and diverting Guy Carpenter's employees, clients, and opportunities.

128.    Durant's breach of his fiduciary duties includes, without limitation, his meeting on November 26, 2018 in Dallas with Michael Jameson and the rest of the MGA practice, to discuss their top prospects.  Notably, Durant had never before traveled to Dallas to meet with Jameson and the MGA team—but did so for the first time at the very same time as he, Gardner and Yoder were planning their defection to Lockton.  Moreover, the subject matter of the meeting, which Durant initiated, was a discussion of the MGA practice's top "prospects" and strategies for gaining business with those prospects—confidential Guy Carpenter information that would be harmful in the hands of a competitor.

129.    Gardner and Yoder's breaches of their fiduciary duties include, without limitation, each having met in-person on separate occasions in February 2019—very shortly before their March 7 resignations from Guy Carpenter—with the CEO of a longtime, substantial Guy

Carpenter client. Yet, on May 23, 2019, just after Defendants formally commenced employment with Lockton, Yoder and Durant travelled with two other Lockton executives to attend a meeting at the offices of this very same client, presumably for the purpose of soliciting the client's business. The temporal proximity of Gardner's and Yoder's January and February meetings with this client prior to their early March resignations and the May 23 presentation by Yoder and Durant indicates that Gardner's and Yoder's earlier meetings were conducted with an eye toward benefiting their future employer, Lockton—thereby violating their fiduciary duties to their then-current employer, Guy Carpenter.

130. As a direct and proximate result of Defendants' breach of their fiduciary duties, Guy Carpenter has suffered extensive injury, loss of goodwill, harm to its business, and other damages.

131. As a direct and proximate result of Defendants' breach of their fiduciary duties, Guy Carpenter already has suffered and will continue to suffer additional damages in an amount that is presently unascertainable, including but not limited to attorneys' fees and costs related to this litigation, as well as lost business, in an amount to be proven at trial.

132. Defendants committed these actions knowingly, willfully and in conscious disregard of Guy Carpenter's rights. Accordingly, Guy Carpenter is entitled to recover actual and exemplary damages in an amount to be determined at trial.

## COUNT IV
### (Declaratory Judgment)
### (Against All Defendants)

133. Guy Carpenter realleges and incorporates by reference herein the allegations set forth in Paragraphs 1 through 132 above.

134. By taking the position that they will only abide by the "valid" restrictions in the RCA, but refusing to identify which restrictions they deem to be "valid" or "invalid," Defendants

have effectively taken the position that New York law purportedly prohibits Guy Carpenter from enforcing certain, unidentified terms in the RCA.

135. Defendants' position has also been made clear by their repeated refusals to acknowledge that each and every provision in the RCA is lawful and enforceable.

136. Guy Carpenter has taken the position that there is no legal basis for Defendants' positions.

137. By virtue of the foregoing, there now exists an actual, justiciable controversy between Guy Carpenter and Defendants relating to their respective legal rights, duties, and obligations, which controversy is ripe for adjudication.

138. Declaratory relief will resolve the legal issues between the parties pertaining to the enforceability of the RCA.

139. Guy Carpenter thus requests a judgment declaring the rights and obligations of the parties under the RCA, including a declaration that:

    i. Until a date to be set by the Court, Defendants may not directly or indirectly solicit or endeavor to cause any employee of Plaintiffs with whom Defendants, during the last two years of their employment with Guy Carpenter, came into contact for the purpose of soliciting or servicing business, or about whom Defendants obtained Confidential Information (as defined in their RCAs), to leave employment with Guy Carpenter;

    ii. Until a date to be set by the Court, Defendants may not directly or indirectly solicit clients of Guy Carpenter for the purpose of selling or providing products or services of the type sold or provided by Defendants while they were employed by Guy Carpenter (where clients are limited to those clients with which Defendants had "contact" or about which Defendants obtained "Confidential Information" or trade secrets, during the last two years of their employment with Guy Carpenter, as those terms are defined in their RCAs);

    iii. Until a date to be set by the Court, Defendants may not directly or indirectly induce clients or prospective clients of Guy Carpenter to terminate, cancel, not renew, or not place business

with Guy Carpenter (where clients and "prospective" clients are limited to those clients or prospective clients with which Defendants had "contact" or about which Defendants obtained "Confidential Information" or trade secrets, during the last two years of their employment with Guy Carpenter, as those terms are defined in their RCAs);

iv.   Until a date to be set by the Court, Defendants may not directly or indirectly perform or supervise the performance of services or provision of products of the type sold or provided by Defendants while they were employed by Guy Carpenter on behalf of any clients or prospective clients of Guy Carpenter (where clients and "prospective" clients are limited to those clients or prospective clients with which Defendants had "contact" or about which Defendants obtained "Confidential Information" or trade secrets, during the last two years of their employment with Guy Carpenter, as those terms are defined in their RCAs);

v.    Until a date to be set by the Court, Defendants may not directly or indirectly assist others to do the acts specified in paragraphs (ii) – (iv) above;

vi.   Until a date to be set by the Court, Defendants may not, as set forth under their RCAs, engage in any subterfuge to circumvent these prohibitions, including, but not limited to accompanying others on calls to clients, contacting clients with other persons, supervising other persons in soliciting or serving clients, providing Confidential Information to others to assist them in soliciting or serving clients, participating in developing presentations to be made to clients, or other similar activities (where clients are limited to those clients with which Defendants had "contact" or about which Defendants obtained "Confidential Information" or trade secrets, during the last two years of their employment with Guy Carpenter, as those terms are defined in their RCAs); and

vii.  Defendants may not disclose or use for their own purpose, or for the purpose of any other person or entity (including, without limitation, their current employer, Lockton), any of Guy Carpenter's trade secrets or other Confidential Information (as defined in the RCAs).

**WHEREFORE**, Guy Carpenter respectfully requests that the Court:

A.  Enter a preliminary injunction and permanent injunction that:

i. Enjoins Defendants, until a year from the issuance of such injunctive relief, from directly or indirectly soliciting or endeavoring to cause any employee of Plaintiffs Guy Carpenter & Company, LLC and Marsh & McLennan Companies, Inc. (collectively, "Guy Carpenter" or "Plaintiffs") with whom Defendants, during the last two years of their employment with Guy Carpenter, came into contact for the purpose of soliciting or servicing business, or about whom Defendants obtained Confidential Information (as defined in their Restrictive Covenant Agreements ("RCAs")), to leave employment with Guy Carpenter;

ii. Enjoins Defendants, until a year from the issuance of such injunctive relief, from directly or indirectly soliciting clients of Guy Carpenter for the purpose of selling or providing products or services of the type sold or provided by Defendants while they were employed by Guy Carpenter (where clients are limited to those clients with which Defendants had "contact" or about which Defendants obtained "Confidential Information" or trade secrets, during the last two years of their employment with Guy Carpenter, as those terms are defined in their RCAs);

iii. Enjoins Defendants, until a year from the issuance of such injunctive relief, from directly or indirectly inducing clients or prospective clients of Guy Carpenter to terminate, cancel, not renew, or not place business with Guy Carpenter (where clients and "prospective" clients are limited to those clients or prospective clients with which Defendants had "contact" or about which Defendants obtained "Confidential Information" or trade secrets, during the last two years of their employment with Guy Carpenter, as those terms are defined in their RCAs);

iv. Enjoins Defendants, until a year from the issuance of such injunctive relief, from directly or indirectly performing or supervising the performance of services or provision of products of the type sold or provided by Defendants while they were employed by Guy Carpenter on behalf of any clients or prospective clients of Guy Carpenter (where clients and "prospective" clients are limited to those clients or prospective clients with which Defendants had "contact" or about which Defendants obtained "Confidential Information" or trade secrets, during the last two years of their employment with Guy Carpenter, as those terms are defined in their RCAs);

v. Enjoins Defendants, until a year from the issuance of such injunctive relief, from directly or indirectly assisting others to do the acts specified in paragraphs (ii) – (iv) above;

vi. Enjoins Defendants, until a year from the issuance of such injunctive relief, from, as set forth under their RCAs, engaging in any subterfuge to circumvent these prohibitions, including, but not limited to accompanying others on calls to clients, contacting clients with other persons, supervising other persons in soliciting or serving clients, providing Confidential Information to others to assist them in soliciting or serving clients, participating in developing presentations to be made to clients, or other similar activities (where clients are limited to those clients with which Defendants had "contact" or about which Defendants obtained "Confidential Information" or trade secrets during the last two years of their employment with Guy Carpenter, as those terms are defined in their RCAs);

vii. Enjoins Defendants from disclosing or using for their own purpose, or for the purpose of any other person or entity (including, without limitation, their current employer, Lockton), any of Guy Carpenter's trade secrets or other Confidential Information (as defined in the RCAs); and

viii. Enjoins Defendants in all such other and further ways necessary to bring Defendants into full and complete compliance and conformance with their contractual agreements contained in the RCAs.

B. Enter judgment awarding Guy Carpenter direct and consequential damages in an amount to be determined at trial, to compensate Guy Carpenter for the losses it suffered by reason of Defendants' breaches of the RCAs, Defendants' actual or threatened misappropriation or disclosure of confidential, proprietary or trade secret information, and the Defendants' wrongful interference with Guy Carpenter's employment and existing and prospective client relationships.

C. Enter judgment awarding Guy Carpenter its reasonable costs and attorneys' fees incurred by Guy Carpenter in connection with this litigation, as expressly provided under the RCAs;

D. Grant to Guy Carpenter such other and further relief as the Court deems just and appropriate.

DATED this 30th day of May, 2019.

Gary D. Friedman
Jonathan D. Polkes
David Yolkut
Ami G. Zweig
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
gary.friedman@weil.com

*Attorneys for Plaintiffs*