JUDGE ENGELMAYER

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

GUY CARPENTER & COMPANY, LLC AND
MARSH & MCLENNAN COMPANIES, INC.,

               Plaintiffs,

   v.

TIMOTHY GARDNER, NICHOLAS
DURANT, and CLAUDE YODER,

               Defendants.

19 CV 5062

Case No. _____

**MEMORANDUM OF LAW IN SUPPORT OF ORDER TO SHOW CAUSE FOR A
TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Plaintiffs
GUY CARPENTER & COMPANY, LLC
and MARSH & MCLENNAN
COMPANIES, INC.

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ............................................................................................ 1

STATEMENT OF FACTS ................................................................................................... 3

    A.    Defendants' Employment with Guy Carpenter, and Their Access to
    Confidential, Proprietary and Trade Secret Information ........................... 4

        1.    Gardner ......................................................................................... 4

        2.    Durant ........................................................................................... 5

        3.    Yoder ............................................................................................ 6

    B.    Defendants' Restrictive Covenant Agreements ........................................ 7

    C.    Defendants' Breach Their RCAs and Resign from Guy Carpenter
    In A Coordinated Fashion to Join Lockton ............................................... 9

        1.    Gardner Lays Out His Solicitation Blueprint ............................... 9

        2.    Gardner Solicits Durant and Yoder, and Each Solicits One
        Another ....................................................................................... 10

    D.    Defendants' Violation Of Their RCAs Continues Immediately
    After Joining Lockton .............................................................................. 11

        1.    Unlawful Solicitation of Michael Jameson ................................. 11

        2.    Unlawful Solicitation of Rob Collins .......................................... 12

        3.    Unlawful Solicitation of Guy Carpenter Clients ......................... 13

    E.    Guy Carpenter Takes Steps To Ensure Defendants Adhere To
    Their Contractual Obligations ................................................................. 14

ARGUMENT ................................................................................................................... 15

    I.    GUY CARPENTER IS ENTITLED TO A TEMPORARY
    RESTRAINING ORDER AND PRELIMINARY INJUNCTION ...................... 15

    A.    Guy Carpenter Has Suffered And Will Continue To Suffer
    Irreparable Harm Absent Injunctive Relief ............................................. 15

    B.    Guy Carpenter Is Likely to Succeed On The Merits ............................... 17

        1.    Defendants Have Breached Their RCAs ...................................... 17

        2.    The RCAs Are Valid And Enforceable ........................................ 18

            a    The RCAs Are Supported by Legitimate Business
            Interests .............................................................................. 19

            b    The RCAs Are Reasonable In Time And Scope ............... 22

            c    The RCAs Do Not Unduly Burden
            Defendants Or Harm The Public ....................................... 23

| C. | The Balance Of Hardships Overwhelming Favors Guy Carpenter And Granting The Proposed Injunction Is Consistent With The Public Interest | 24 |
| D. | An Injunction Should Issue For One Year From The Court's Order | 25 |
| E. | Guy Carpenter Is Entitled To Recover Its Attorneys' Fees | 25 |

CONCLUSION .................................................................................................................... 25

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Bulman v. 2BKCO, Inc.*,
  882 F. Supp. 2d 551 (S.D.N.Y. 2012) (Sullivan, J.)................................................................15

*Capstone Logistics Holdings, Inc. v. Navarrete*,
  2018 WL 6786338 (S.D.N.Y. Oct. 25, 2018) (Daniels, J.) ....................................................15

*Chernoff Diamond & Co. v. Fitzmaurice, Inc.*,
  234 A.D.2d 200 (1st Dep't 1996).............................................................................21, 23, 24

*Design Strategies, Inc. v. Davis*,
  384 F. Supp. 2d 649 (S.D.N.Y. 2005) (Marrero, J.) ..............................................................17

*Design Strategy, Inc. v. Davis*,
  469 F.3d 284 (2d Cir. 2006) ...................................................................................................17

*Devos, Ltd. v. Record*,
  2015 WL 9593616 (E.D.N.Y. Dec. 24, 2015)........................................................................18

*Genesee Valley Tr. Co. v. Waterford Grp., LLC*,
  323 F. Supp. 2d 525 (4th Dep't 2015).......................................................................16, 17, 18

*H & R Block E. Tax Servs., Inc. v. Vorpahl*,
  255 F. Supp. 2d 930 (E.D. Wis. 2003) ..................................................................................17

*ICBC Standard Sec., Inc. v. Luzuriaga*,
  217 F. Supp. 3d 733 (S.D.N.Y. 2016) ....................................................................................24

*Kelly v. Evolution Markets, Inc.*,
  626 F. Supp. 2d 364 (S.D.N.Y. 2009) ....................................................................................25

*Malcolm Pirnie, Inc. v. Werthman*,
  280 A.D.2d 934 (4th Dep't 2001)............................................................................................22

*Marsh USA Inc. v. Karasaki*,
  2008 WL 4778239 (S.D.N.Y. Oct. 31, 2008) (Koeltl, J.) ...............................................*passim*

*Medicrea USA, Inc. v. K2M Spine, Inc.*,
  2018 WL 3407702 (S.D.N.Y. Feb. 7, 2018) (Torres, J.)........................................................15

*Mercer Health & Benefits LLC v. DiGregorio*,
  307 F. Supp. 3d 326 (S.D.N.Y. 2018) ...............................................................................*passim*

*New York Real Estate Institute, Inc. v Edelman,*
    42 A.D.3d 321 (1st Dep't 2007) ........................................................................................25

*Oliver Wyman, Inc. v. Eielson,*
    282 F. Supp. 3d 684 (S.D.N.Y. 2017) ..........................................................................17, 19

*OTG Mgmt., LLC v. Konstantinidis,*
    40 Misc. 3d 617 (Sup. Ct. N.Y. Cnty. 2013) ...............................................................22, 23

*Reed, Roberts Assocs., Inc. v. Strauman,*
    40 N.Y.2d 303 (1976) ........................................................................................................21

*Renaissance Nutrition, Inc. v. Jarrett,*
    2012 WL 42171 (W.D.N.Y. Jan. 9, 2012) ............................................................19, 20, 23

*New York ex rel. Schneiderman v. Actavis PLC,*
    787 F.3d 638 (2d Cir. 2015) ..............................................................................................15

*Silipos, Inc. v. Bickel,*
    2006 WL 2265055 (S.D.N.Y. Aug. 8, 2006) ..............................................................18, 21

*Spinal Dimensions, Inc. v. Chepenuk,*
    2007 WL 2296503 (N.Y. Sup. Ct. Albany Cnty. Aug. 9, 2007) ........................................18

*Sterling v. Deutsche Bank Nat'l Tr. Co. as Trustees for Femit Tr., 2006-FF6,*
    368 F. Supp. 3d 723 (S.D.N.Y. 2019) ..............................................................................14

*USI Ins. Servs. LLC v. Miner,*
    801 F. Supp. 2d 175 (S.D.N.Y. 2011) ........................................................................19, 21

*Verizon Commc'n, Inc. v. Pizzirani,*
    462 F. Supp. 2d 648 (E.D. Pa. 2006) ................................................................................24

*Williams v. City of New York,*
    2018 WL 1785486 (E.D.N.Y. Apr. 13, 2018) ...................................................................17

*Willis of New York, Inc. v. DeFelice,*
    299 A.D.2d 240 (1st Dep't 2002) ...........................................................................16, 21, 25

*Yurman Design, Inc. v. Chaindom Enters., Inc.,*
    1999 WL 1075942 (S.D.N.Y. Nov. 29, 1999) ..................................................................16

**Statutes**

28 U.S.C. § 2201(a) ......................................................................................................................24

## PRELIMINARY STATEMENT

Beginning at least as early as November 2018, Timothy Gardner made plans to leave his position as CEO of North America Operations for Guy Carpenter & Company, LLC ("Guy Carpenter")—a reinsurance brokerage that had nurtured and developed him for over two decades—to join Lockton, an insurance brokerage firm seeking to launch, with Gardner at the helm, a reinsurance business off of the back of Guy Carpenter by raiding Guy Carpenter's workforce and client base. Gardner did not act alone: he solicited and coordinated his departure with fellow Guy Carpenter senior executives Nicholas Durant and Claude Yoder (together with Gardner, "Defendants"). Over the next several months, with Gardner as the ringleader, the trio cashed their substantial Guy Carpenter paychecks while secretly soliciting one another and working together to further Lockton's interests at Guy Carpenter's expense. The first part of their plan culminated on the morning of March 7, 2019, when Defendants—within the span of an hour—each abruptly announced their resignations from Guy Carpenter, effective in 60 days, as required under their agreements. That same day, Lockton issued a press release announcing its new hires and touting its incoming "elite leadership team."

Defendants repeatedly breached their contractual and fiduciary obligations to Guy Carpenter and its parent company, Marsh & McLennan Companies, Inc. ("MMC," and together with Guy Carpenter, "Guy Carpenter" or "Plaintiffs"), both before and after their simultaneous resignations. For many years, and most recently in 2018, each of the Defendants had expressly agreed, in exchange for valuable equity grants on top of their substantial salaries, to abide by a "Restrictive Covenant Agreement" (the "RCA"). The RCA requires Defendants, during their employment and for 12 months thereafter, to refrain from, *inter alia*, directly or indirectly soliciting employees to leave Guy Carpenter, or soliciting, interfering with or servicing Guy Carpenter clients and prospective clients with whom they had worked or obtained "Confidential Information" (as defined in the RCA) during the two years prior to their separation. Significantly, the RCA does not contain a covenant not to compete; Defendants are free to earn a living with the employer of their choice, subject only to the RCA's narrowly tailored restrictions.

Throughout Defendants' contractual 60-day notice period, Guy Carpenter gave them numerous opportunities to confirm that they intended to honor their contracts. But Defendants, all of whom were represented by the same legal counsel from the date they announced their resignations, assiduously avoided making any such commitment. Instead, they each offered the following identical refrain: "I *believe* that I have not violated and do not intend to violate any *valid* restrictions in the RCA, including with respect to solicitation" (emphasis added). During the 60-day period, Plaintiffs repeatedly sought to penetrate that intentionally enigmatic statement, but to no avail. Defendants delayed, dodged and detoured, but would not assure Plaintiffs that they would fully honor their agreements. We now know why.

Immediately upon joining Lockton in early May 2019, Defendants began a full-on assault on Guy Carpenter's broker workforce, targeting top producers for both their talent and their client relationships. As detailed below, on May 14, 2019, Gardner called Michael Jameson, head of Guy Carpenter's "MGA/MGU" (Managing General Agent/Managing General Underwriter) practice, and openly solicited Jameson to join Lockton, telling him: "If I could point a golden arrow at someone and hit them with it to lead a portion of my organization, it would be you." Indeed, this was Gardner's plan all along: in preparation for his November 2018 interview with Lockton, Gardner drafted a memo (the "Lockton Interview Memo") delineating his business and recruiting plan on behalf of Lockton, a principal part of which involved laying siege to Guy Carpenter's broking talent (including those with Jameson's *exact profile*) and clients.

The unlawful solicitation continued the very next week. On May 21, 2019, Durant, acting at Lockton's and Gardner's direction, called Rob Collins, the head of Guy Carpenter's "Captive" practice, and solicited him to defect to Lockton. Armed with substantial, confidential information about Collins and his business that Durant had gleaned as Guy Carpenter's Head of Sales and Segments, Durant did not target Collins by accident. Nor was Durant subtle in his approach: he solicited Collins by relaying extensive information about Lockton's business model and compensation structure, why Durant chose to join Lockton, and why Collins should (according to Durant) do the same. Durant also told Collins that the Lockton team—surely

2

including Gardner—had identified a list of brokers to target for recruitment. Durant punctuated his solicitation of Collins by telling Collins that he (Durant) couldn't personally offer Collins a job, but that if Collins were interested, Durant would hang up the phone and someone from Lockton would call him promptly to offer him a job.

Defendants' onslaught continued. Just two days later, Defendants extended their unlawful solicitation offensive to Guy Carpenter's client base. On May 23, 2019, Durant and Yoder, along with two other senior executives at Lockton, made a business pitch at an in-person meeting at the corporate headquarters of a longtime, substantial Guy Carpenter client (which generates eight figure annual revenues), seeking to land a large portion of that client's international book of business. This conduct was particularly insidious as, on February 28, 2019—just *days* before Defendants announced their resignations—Gardner had met in-person at this same client's headquarters, with its CEO, presumably laying the groundwork for the improper solicitation that would soon follow. Yoder, too, had an in-person meeting with this same CEO at a conference in which Yoder presented on his areas of expertise in late January 2019. Yet, the record is clear that Defendants had hatched their plot as early as November 2018.

Absent emergency intervention from this Court, Defendants will continue to willfully breach their contractual obligations and inflict irreparable harm on Guy Carpenter. Given the flagrant nature of Defendants' breaches, Guy Carpenter will easily be able to show a likelihood of success on the merits of its claims. Moreover, Guy Carpenter will continue to sustain irreparable harm unless Defendants are enjoined from further violating their RCAs—including, among other improper conduct, any further attempts to raid Guy Carpenter's workforce, and any attempts to interfere with Guy Carpenter's client relationships.

## STATEMENT OF FACTS

Gardner, Durant, and Yoder were not just any employees. They were each longtime senior executives at Guy Carpenter, which nurtured, promoted, and generously compensated each of them. In their various high-ranking capacities, in addition to benefiting from Guy Carpenter's financial and other support, Defendants obtained virtually unfettered access to Guy

3

Carpenter's most highly confidential, proprietary, and trade secret information, and developed extensive, valuable knowledge about Guy Carpenter's business, clients, and workforce.

A. **Defendants' Employment with Guy Carpenter, and Their Access to Confidential, Proprietary and Trade Secret Information**

1. Gardner

Gardner worked for Guy Carpenter and other MMC-affiliated entities for 26 years, culminating in his elevation to CEO of North America Operations for Guy Carpenter on August 1, 2015. In that capacity, Gardner oversaw Guy Carpenter's entire North American reinsurance operations, with direct managerial responsibility for several dozen senior executives, plus oversight over the rest of the approximately 550-employee workforce. Declaration of John J. Trace ("Trace Decl.") ¶ 6. Gardner was responsible for strengthening and maintaining Guy Carpenter's relationships with its most important clients, many of which generated seven or eight figure revenues annually. *Id.* ¶ 7. Guy Carpenter invested substantial resources toward Gardner's business development activities and client relationships, such as through a significant client entertainment expense account, and by paying for Gardner to attend conferences and other industry events to further hone Guy Carpenter's client relationships. *Id.*

Gardner had unfettered access to any manner of highly confidential, proprietary, and trade secret information regarding Guy Carpenter's business, its clients, and its employees. Gardner was personally involved in developing and implementing the marketing and business development plans that Guy Carpenter has successfully implemented and continues to implement; he knew every aspect of Guy Carpenter's confidential strategic business plans, financial analyses, and profit and loss information. *Id.* ¶ 8. At Gardner's fingertips, he had access to and regularly reviewed the widest possible array of confidential information about each of Guy Carpenter's accounts, clients, and client prospects. *Id.* Moreover, Gardner possessed unrestricted access to and knowledge of confidential and competitively valuable information concerning Guy Carpenter's employees, including their compensation (which he helped to set), aptitudes, books of business, and potential for advancement. *Id.* ¶ 9. For example, as the direct

supervisor of Michael Jameson and Rob Collins (the heads of Guy Carpenter's "MGA" and "Captive" practices, respectively), Gardner worked closely with both Jameson and Collins in various business development activities, and helped determine their compensation and that of their teams. *Id.*; Declaration of Michael Jameson ("Jameson Decl.") ¶ 6; Declaration of Arthur R. Collins ("Collins Decl.") ¶ 8.

        2.   <u>Durant</u>

Durant worked for Guy Carpenter and/or other MMC-affiliated entities for 22 years, including most recently as Managing Director and Head of Sales and Segments at Guy Carpenter since October 16, 2017. Trace Decl. ¶ 11. In that capacity, Durant had two broad areas of managerial oversight and responsibility. First, as Head of Sales, Durant was responsible for, among other things, monitoring the sales performance of Guy Carpenter's branch offices and individual brokers across the country. As such, Durant interacted with brokers and branch office managers nationwide—such as Jameson, with whom Durant met in-person on multiple occasions within the past two years, and Collins, whose professional relationship with Durant goes back more than 20 years (*see* Jameson Decl. ¶¶ 7-8; Collins Decl. ¶¶ 5-6)—to devise account and engagement strategies to grow revenue. He also had several direct supervisory reports, including the entire RFP team, a knowledge manager, and the administrator of Guy Carpenter's sales tool. At bottom, Durant was the "keeper" of all new business and all prospective business at Guy Carpenter. Trace Decl. ¶ 12. Second, as Head of Segments, Durant was heavily involved in investment and growth strategies across all of Guy Carpenter's various business Segments— including, among others, Property, Casualty, Medical Malpractice, Surety, and Accident & Health Insurance. *Id.* ¶ 13.

Durant also had broad and deep access to confidential, proprietary, and trade secret information concerning Guy Carpenter's clients, as well as Guy Carpenter's own investment and growth strategies, relating to both current engagements and future prospects. *Id.* ¶ 14.[1] Because

---

[1] For example, shortly before Durant announced his resignation from Guy Carpenter, he visited Guy Carpenter's Dallas office to discuss significant Guy Carpenter client prospects and probed the Dallas team for information

he managed all of Guy Carpenter's sales activities, it was Durant's job to know which Guy Carpenter products and services clients purchased, the needs and preferences of those clients, and client revenue and profitability information. *Id.* Durant also gained knowledge of confidential and proprietary information by servicing various Guy Carpenter clients. *Id.* And, like Gardner, Durant also had access to confidential information concerning Guy Carpenter's employees, including sensitive personnel information. *Id.* ¶ 15.

3.   Yoder

Yoder joined Guy Carpenter on September 19, 2017 as Chief Innovation and Product Development Officer. Prior to that, Yoder, held several positions at Marsh USA Inc. ("Marsh"), including Global Head of Analytics, in which capacity he led a team of approximately 40 employees worldwide. *Id.* ¶ 16. Yoder is an actuary with extensive background in insurance analytics and modeling, and has particular expertise in designing and implementing cutting-edge technologies used by reinsurance brokerage companies. Trace Decl. ¶ 18; Declaration of Steven E. Jones III ("Jones Decl.") ¶ 8.

At Guy Carpenter, Yoder was primarily responsible for leading two innovative initiatives: (1) "GC Genesis," a proprietary database that uses technology and know-how to match Guy Carpenter's insurer and reinsurer clients with "InsurTech" partners (*i.e.*, companies that use technological innovations to create efficiencies or other improvements in the insurance industry); and (2) "GC Logic," a proprietary database and content management platform that allows Guy Carpenter's brokers to easily and efficiently access information to assist them in offering products and services to Guy Carpenter's clients. Trace Decl. ¶ 16; Jones Decl. ¶ 8.

Guy Carpenter developed GC Genesis's proprietary database of InsurTech industry information through a substantial investment of resources, requiring countless hours of work from Guy Carpenter employees who painstakingly researched thousands of InsurTech companies, identifying each company's areas of focus and technical abilities and then matching

---

concerning its prospects and strategies for converting them into clients, including an evaluation of each prospect on the list and the company's action plan for each. Jameson Decl. ¶ 8.

that information with Guy Carpenter's specialized knowledge of the insurance industry. Trace Decl. ¶ 18; Jones Decl. ¶ 7. GC Genesis also offers clients membership in the "InsurTech Alliance," an association of insurers who attend quarterly training and presentations on the latest developments in InsurTech, and who collectively fund "proof of concept" work on selected InsurTech companies. Trace Decl. ¶ 19; Jones Decl. ¶ 6.

Guy Carpenter presented Yoder to clients as the face of GC Genesis, and invited him to speak about the product at conferences (*e.g.*, the prestigious Global Reinsurance Rendezvous), Guy Carpenter-hosted client events (*e.g.*, a high-profile client event in August, 2018 announcing the launch of the InsurTech Alliance), and one-on-one meetings with clients interested in this unique service. Trace Decl. ¶ 19; Jones Decl. ¶ 10. Yoder had access to all of Guy Carpenter's confidential information relating to GC Genesis, including the underlying methodologies and processes that Guy Carpenter developed and uses to match its insurer clients with InsurTech partners; the lists of clients and prospects identified as targets for GC Genesis and the InsurTech Alliance; and business plans and marketing strategies in connection with GC Genesis, all of which give Guy Carpenter an advantage over its competitors. Trace Decl. ¶ 20; Jones Decl. ¶ 9.

### B. Defendants' Restrictive Covenant Agreements

For decades, Guy Carpenter has expended time, effort, and resources to develop substantial goodwill and establish itself as an industry leader in the global risk and reinsurance space. Trace Decl. ¶ 3. As a reinsurance broker, Guy Carpenter acts as an intermediary in reinsurance contract transactions between insurance and reinsurance companies. The lifeblood of a reinsurance brokerage company is its insurer client base, and by extension, the individual reinsurance brokers whose job it is to acquire, develop, and cultivate the relationships with those clients and service their business needs. *Id.* Guy Carpenter has gone to great lengths to protect its client relationships and safeguard the type of confidential and proprietary information that Defendants had access to and used—including through the use of restrictive covenant agreements and the adoption of extensive written information security policies and practices. *Id.* 8; Declaration of Michael G. Borik ("Borik Decl.") ¶ 8.

7

In exchange for substantial equity awards in 2018, each Defendant entered into an RCA. Borik Decl. ¶¶ 2-5 and Ex. A.  Among other things, they agreed that during their employment with Guy Carpenter and for 12 months thereafter, they would not "*directly or indirectly, solicit, or endeavor to cause any employee of [Guy Carpenter]* with whom [Defendants], during the last two (2) years of [their] employment with [Guy Carpenter], came into contact for the purpose of soliciting or servicing business or about whom the [Defendant] obtained Confidential Information *to leave employment with [Guy Carpenter]*." Borik Ex. A ¶ 3 (emphases added).

The RCA also addresses the solicitation of Guy Carpenter current and prospective clients. Specifically, Paragraph 2(b) states that for 12 months after the end of their employment with Guy Carpenter, Defendants will not, directly or indirectly:

> (i) *solicit clients of [Guy Carpenter]* for the purpose of selling or providing products or services of the type sold or provided by [the Defendant] while employed by [Guy Carpenter]; or (ii) *induce clients or prospective clients of [Guy Carpenter] to terminate, cancel, not renew, or not place business with [Guy Carpenter]*; or (iii) perform or supervise the performance of services or provision of products of the type sold or provided by [the Defendant] while [the Defendant] was employed by [Guy Carpenter] on behalf of any clients or prospective clients of [Guy Carpenter]; or (iv) *assist others to do the acts* specified in Paragraphs 2(b)(i)-(iii).[2]

For the avoidance of doubt, the RCAs clarify that Defendants "*shall not engage in any subterfuge* to circumvent this prohibition, including, but not limited to accompanying others on calls to the client, contacting the client with other persons, supervising other persons in soliciting or serving the client, providing Confidential Information to others to assist them in soliciting or serving the client, participating in developing presentations to be made to the client, or other similar activities." Borik Ex. A ¶ 2(b) (emphasis added).

---

[2] The client solicitation restrictions in Paragraph 2(b) are limited in scope, since they apply "only to those clients or prospective clients of [Guy Carpenter] with which the [Defendant] had contact or about which the [Defendant] obtained Confidential Information or trade secrets during the last two (2) years of his . . . employment with [Guy Carpenter]." *Id.*

The RCA also protects Guy Carpenter's confidential information: Defendants agreed that they would not, at any time, "disclose to any other person or entity . . . any Confidential Information" (as defined in the RCA) in any form, including but not limited to "verbal, written or machine readable, including electronic files." *Id.* ¶ 4(a).

Defendants expressly acknowledged that the above restrictions are "necessary to protect the legitimate business interests of [Guy Carpenter] and are reasonable in view of the benefits and consideration" Defendants received from Guy Carpenter. *Id.* ¶ 6. They further agreed that "irreparable injury will result to [Guy Carpenter] in the event of a breach" of the RCA, that "monetary damages for such breach would not be readily calculable, and that [Guy Carpenter] would not have an adequate remedy at law therefor," thereby entitling Guy Carpenter to temporary and permanent injunctive relief, in addition to other legal remedies and damages, in the event of a breach. *Id.* ¶ 7. Finally, the RCA expressly entitles Guy Carpenter to recover its attorneys' fees and other costs incurred in seeking to enforce the RCA. *Id.*[3]

### C.  **Defendants' Breach Their RCAs and Resign from Guy Carpenter In A Coordinated Fashion to Join Lockton**

#### 1.  Gardner Lays Out His Solicitation Blueprint

The plot began at least as early as November 2018, when Gardner flew to Kansas City, Missouri to interview with Lockton. In preparation for that meeting, Gardner drafted the Lockton Interview Memo, which lays out a blueprint for building Lockton's reinsurance business through unlawful solicitation of Guy Carpenter's employees and clients—a plan that Defendants are now seeking to execute. Borik Decl. ¶ 11(a)-(b) and Ex. D.[4] In the Lockton Interview

---

[3] In addition to the RCAs, Durant and Yoder are subject to Non-Solicitation Agreements ("NSAs") which, among other things, prohibit them from soliciting Guy Carpenter employees and clients for one year after termination of their employment. See Borik Decl. ¶¶ 6-7 and Exs. B-C. As set forth herein, Durant and Yoder have violated both their RCAs and their NSAs, and Plaintiffs' lawsuit and the present motion seeks redress for all such violations.

[4] The version of the Lockton Interview Memo submitted herewith contains very limited redactions of confidential information regarding Guy Carpenter's financial results and projections, which Gardner may have improperly disclosed to Lockton. See Borik Decl. Ex. D; Trace Decl. ¶ 8. If the Court wishes to review an unredacted version of the Lockton Interview Memo, Plaintiffs will provide one with a simultaneous motion to file the document under seal, or proceed in any other manner as the Court may direct.

Memo, Gardner acknowledges that Guy Carpenter is a "competitor" of Lockton, identifies numerous Guy Carpenter clients *by name*, boasts that *"Guy Carpenter['s] . . . client list is the envy of the industry,"* and touts his own "strong relationships" with the C-Suite executives of Guy Carpenter's largest clients. Borik Ex. D (emphasis added). He states that *"[r]ecruiting will be the primary success driver"* for developing a reinsurance brokerage—specifically, recruiting brokers who have *"[e]xisting client relationships." Id.* (emphases added). Foreshadowing Gardner's direct solicitation of Michael Jameson, the head of Guy Carpenter's MGA/MGU practice, the Lockton Interview Memo highlights the need for "[i]mmediate" recruiting of *"Program (MGA/MGU clients) brokers"* (emphasis added), who, Gardner wrote, are desirable targets because their clients are "reinsurance dependent, personal relationship driven, [and] transportable." *Id.* (emphasis added). Gardner further states that to build a successful reinsurance brokerage, *"analytics talent"*—*i.e.*, Yoder's area of expertise—*"is an imperative. . . . Building a world class analytics offering for clients is vital." Id.* (emphasis added). Tellingly, he highlights his own "[s]ignificant activity and success with talent and recruiting," including with respect to the "*GC Genesis [T]eam*"—*i.e.*, Yoder and his staff.

        2.     <u>Gardner Solicits Durant and Yoder, and Each Solicits One Another</u>

On November 25, 2018—just five days after Gardner's meeting with Lockton—Gardner sent a text message to Durant: "Hey pal. You around today for a quick call? Something I wanted to bounce off of you." Borik Decl. ¶ 11(c). The next day, Gardner sent Durant another text message: "*Spoke to CY [Claude Yoder]. All good for you two to connect." Id.* ¶ 11(d) (emphasis added). Given the timing and nature of these communications, they appear to constitute the beginning of Defendants' unlawful solicitation of one another to defect to Lockton. In the ensuing weeks and months, Gardner, Durant, and Yoder repeatedly met and held conference calls between and among themselves (and no one else), including on December 13, 2018, January 3, 2019, and January 12, 2019. Borik Decl. ¶ 11(e). Additionally, on at least two occasions in January 2019, Durant sent Yoder press releases about Lockton. *Id.* ¶ 11(f)-(g).

Shortly before resigning, Gardner accessed—*and then deleted*—a Guy Carpenter succession planning document containing detailed information about Guy Carpenter North America's most promising executives and reinsurance talent, as well as a spreadsheet containing detailed revenue projections for many of Guy Carpenter's largest clients. *Id.* ¶ 11(i).

On the morning of March 7, 2019—all within the span of an hour—Gardner, Durant, and Yoder each abruptly tendered their resignations to Guy Carpenter, effective in 60 days. *See* Trace Decl. ¶¶ 21-26 & Exs. A-C. That very same day, Lockton issued a press release announcing its new hires and detailing their lengthy careers with Guy Carpenter and Marsh. *Id.* Ex. D.

## D.  **Defendants' Violation Of Their RCAs Continues Immediately After Joining Lockton**

Defendants commenced work at Lockton on or about May 7, 2019, following their 60-day "garden leave" at Guy Carpenter. *Almost immediately*, they brazenly violated their RCAs yet again by directly soliciting key Guy Carpenter brokers and clients.

### 1.  Unlawful Solicitation of Michael Jameson

On May 14, 2019—*eight days* after his employment with Guy Carpenter ended and after joining Lockton—Gardner called Jameson, the head of Guy Carpenter's MGA practice. Jameson Decl. ¶ 11. Jameson is a broker and Branch Manager for Guy Carpenter's Dallas, Texas office; he specializes in the MGA/MGU space, and also maintains a robust portfolio of traditional insurance carrier clients. *Id.* ¶¶ 2-3.[5] Gardner wasted no time in soliciting Jameson to join Lockton in a "leadership position," memorably stating: "If I could point a golden arrow at someone and hit them with it to lead a portion of my organization, it would be you." *Id.* ¶ 12.

---

[5] As Jameson explains, an MGA (also known as an MGU) is a "specialized type of insurance agent and administrator who has binding authority and policy issuance capabilities on behalf of an insurance carrier. MGAs are able to negotiate policy terms and conditions for those insurance carriers that have appointed the entity via a Program Administrator Agreement. When insurance carriers delegate authority to an MGA, they typically do so in areas where the carrier lacks the required expertise or geographical distribution." *Id.* ¶ 3. The MGA practice area is both highly specialized (due to the expertise required to match insurers and reinsurers) and rapidly growing (constituting a $30-$40 billion space within the U.S. domestic insurance marketplace). *Id.*

Prior to Gardner's departure from Guy Carpenter, Jameson reported directly to Gardner. *Id.* ¶¶ 5-6. They interacted with each other frequently, including in-person, by phone, and with clients, servicing and entertaining clients together, discussing client prospects, and working on the implementation of the MGA practice's business plan and strategy. *Id.* Gardner also played an active role in hiring, approving every new hire in Dallas. *Id.* ¶ 6. Jameson discussed his and his team's annual compensation with Gardner, as recently as late February 2019. *Id.*

Notably, in the Lockton Interview Memo, Gardner had *specifically identified* the need for "[i]mmediate" recruiting of "Program (MGA/MGU clients) brokers"—*i.e.*, Jameson's exact profile. Borik Decl. Ex. D. As Gardner knew well, Guy Carpenter's MGA practice had grown substantially since Jameson started in 2017, both through new hires and the generation of new client relationships. Jameson Decl. at ¶ 4. By now executing on the plan set forth in his Lockton Interview Memo and soliciting Jameson, Gardner's clear intent was to induce Jameson's MGA clients to place their business at Lockton rather than at Guy Carpenter.

### 2.   Unlawful Solicitation of Rob Collins

On May 16, 2019—just two days after Gardner's call to Jameson—Durant placed multiple calls to Rob Collins, a Guy Carpenter broker and Managing Director who has worked in various sales and leadership roles for over twenty years (including as Gardner's direct report). Collins Decl. ¶ 10. On May 21, 2019, Durant tried again, leaving a voicemail at 6:21 p.m. Collins returned Durant's call that evening. *Id.* ¶¶ 11-12.

During a 26-minute call, Durant explained to Collins why he had chosen to join Lockton and why he believed Collins should, too. *Id.* ¶ 12. Durant detailed the generous, commissions-based compensation package that Lockton intended to offer, which would pay brokers a significant percentage of the revenues they generate. *Id.* Durant told Collins that the Lockton team—surely including Gardner—had identified a list of specific, already-successful brokers to target for recruitment, and that Lockton was not seeking "book sitters" (*i.e.*, brokers who do nothing more than "babysit" an existing book of business), but rather brokers who would bring and then grow their books of business. *Id.* ¶¶ 13-15. Durant told Collins that, although he could

not offer Collins a job at Lockton, if Collins wanted a job, Durant would hang up and someone else from Lockton would call Collins back and offer him a job. *Id.* ¶ 16.

Durant's solicitation of Collins was part of Defendants' plan to build a reinsurance business off of Guy Carpenter's back. In their executive roles at Guy Carpenter, Gardner and Durant obtained confidential information concerning Collins' role as head of Guy Carpenter's "Captive" practice (one of Guy Carpenter's focus areas in recent years), including his client roster and client prospects, the significant annual revenues that his book of business generated for Guy Carpenter, the dramatic recent growth of Guy Carpenter's Captive practice, its projected revenues for future years, and strategies for maintaining and growing that business, as well as Collins' notable portfolio of clients in the "Property and Casualty" insurance space. *See* Trace Decl. ¶¶ 14-15. Durant was intimately familiar with the Captive space, having served as President of Marsh Captive Solutions at immediately prior to re-joining Guy Carpenter in 2017. Collins Decl. ¶ 6.

### 3. Unlawful Solicitation of Guy Carpenter Clients

Defendants are also unlawfully soliciting Guy Carpenter's clients. On February 28, 2019—just *days* before Defendants announced their resignations from Guy Carpenter—Gardner traveled to the offices of a longtime, substantial Guy Carpenter client (*i.e.*, global annual revenues in the eight figures) to meet with the client's CEO. Declaration of Hartwell Dew ("Dew Decl.") ¶¶ 3, 6. At this meeting, Gardner discussed the recently-announced RFP relating to a portion of the client's international business, while presumably laying the groundwork for Lockton to participate in that same RFP process. *Id.* ¶ 6. Indeed, Yoder, had also met in-person with this same CEO, immediately following Yoder's presentation at an industry conference on January 28, 2019, also presumably with a solicitation on behalf of Lockton on his mind. *Id.* ¶¶ 15-16. Within the past two years, each of Defendants either serviced, had business interactions with, and/or obtained confidential information about this particular client. *Id.* ¶¶ 12-16.

On April 19, 2019, a team of Guy Carpenter employees made a presentation to this client in response to the RFP. *Id.* ¶ 8. They were advised at the meeting that no other RFP meetings

with competitors had been scheduled as of that date, and that Guy Carpenter had made an effective presentation. *Id.* However, on May 23, 2019, Durant and Yoder—having just commenced employment with Lockton—met with this same Guy Carpenter client and made a presentation (along with two other Lockton executives), for the same portion of the client's international business for which Guy Carpenter had just bid, and which Gardner had discussed with the client's CEO on February 28. *Id.* ¶¶ 10-11. Durant's and Yoder's presence at this meeting was confirmed by a participant from the client who attended the meeting. *Id.* ¶ 11.

### E.   Guy Carpenter Takes Steps To Ensure Defendants Adhere To Their Contractual Obligations

Guy Carpenter engaged extensively with Defendants during their 60-day notice period, including by asking them to confirm that they would comply with the RCAs, return Guy Carpenter's property and confidential information, and certify that they have not retained access to any Guy Carpenter materials. Despite writing to Defendants five (5) separate times during this period, and speaking to Defendants' counsel by phone, in order to accomplish these objectives, Guy Carpenter's efforts were met with delay and obfuscation. Just 10 days before the end of their notice period, Defendants' counsel returned over *30,000 electronic files* that Defendants inexplicably had on their *personal* devices, as well as a banker's box of hardcopy documents from Yoder. Neither Defendants nor their collectively retained counsel ever confirmed during this period that they would fully comply with the RCAs; instead, they provided identical and vague representations that they did not intend to violate any "valid" restrictions in the RCAs, while refusing to identify which restrictions they deemed "valid." Guy Carpenter wrote Defendants on May 6, 2019, their last day of employment, to provide a final reminder of their obligations under the RCAs, and to unequivocally put them on notice that Guy Carpenter would "not hesitate to take immediate legal action, with or without notice, for injunctive and/or monetary relief in the event the circumstances warrant it." *See* Declaration of Gary D. Friedman ("Friedman Decl.") ¶¶ 5-14 and Exs. A-I.

## ARGUMENT

### I. GUY CARPENTER IS ENTITLED TO A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

The standard for obtaining a temporary restraining order and a preliminary injunction are identical. *Sterling v. Deutsche Bank Nat'l Tr. Co., 2006-FF6*, 368 F. Supp. 3d 723, 726-27 (S.D.N.Y. 2019) (Daniels, J.). The movant must show "(1) irreparable harm; (2) either (a) a likelihood of success on the merits, or (b) sufficiently serious questions going to the merits of its claims to make them fair ground for litigation, plus a balance of the hardships tipping decidedly in favor of the moving party; and (3) that a preliminary injunction is in the public interest." *New York v. Actavis PLC*, 787 F.3d 638, 650 (2d Cir. 2015) (internal quotation marks omitted).

#### A. Guy Carpenter Has Suffered And Will Continue To Suffer Irreparable Harm Absent Injunctive Relief

To obtain preliminary injunctive relief, a movant must demonstrate that it will suffer an injury that "cannot be remedied if a court waits until the end of trial to resolve the harm." *Medicrea USA, Inc. v. K2M Spine, Inc.*, 2018 WL 3407702, at *10 (S.D.N.Y. Feb. 7, 2018) (Torres, J.) (quoting *Bisnews AFE (Thai.) Ltd. v. Aspen Research Grp. Ltd.*, 437 Fed. Appx. 57, 57 (2d Cir. 2011)). "[I]t is 'well established' in the Second Circuit that 'the loss of client relationships and customer goodwill that results from the breach of a [restrictive covenant] clause generally constitutes irreparable harm.'" *Id.* (quoting *Marsh USA Inc. v. Karasaki*, 2008 WL 4778239, at *14 (S.D.N.Y. Oct. 31, 2008) (Koeltl, J.)); *Mercer Health & Benefits LLC v. DiGregorio*, 307 F. Supp. 3d 326, 347 (S.D.N.Y. 2018) (Koeltl, J.) (same). Even where clients have not already defected, the "prospective loss of goodwill alone is sufficient to support a finding of irreparable harm." *Bulman v. 2BKCO, Inc.*, 882 F. Supp. 2d 551, 564 (S.D.N.Y. 2012) (Sullivan, J.). As with loss of client relationships, "the loss of [a company's] employees also constitutes irreparable harm." *Karasaki*, 2008 WL 4778239, at *14 ("The departure of Marsh employees deprives Marsh not only of its investment in training and developing those employees, but also, for those who were brokerage professionals, of those employees' clients who follow the employees because of the relationships developed with them at Marsh's

15

expense."). Moreover, "the use and disclosure of an employer's confidential customer information and the possibility of loss of customers through such usage, constitutes irreparable harm." *Capstone Logistics Holdings, Inc. v. Navarrete*, 2018 WL 6786338, at \*33 (S.D.N.Y. Oct. 25, 2018) (Daniels, J.).

Guy Carpenter has demonstrated irreparable harm through the loss of three senior executives who unlawfully solicited one another, and who, absent an injunction, will cause further irreparable harm to Guy Carpenter through their ongoing efforts to solicit Guy Carpenter's client base (including at least one major client already) and workforce (including brokers with their own valuable client relationships). Statement of Facts §§ C-D. Guy Carpenter is also being irreparably harmed by Defendants' illegal use of confidential information acquired through their employment about, for example, Guy Carpenter's brokers' sales performance, the nature of their client relationships, and compensation arrangements, in order to solicit Guy Carpenter's talented brokers and, in turn, those brokers' client relationships.

Courts have repeatedly recognized that the extent of harm caused by lost customer relationships and goodwill is inherently difficult to determine and appropriately remedied through injunctive relief. *See, e.g., Ticor Ins. Co. v. Cohen*, 173 F.3d 63, 69 (2d Cir. 1999); *Johnson Controls, Inc. v. A.P.T. Critical Sys., Inc.*, 323 F. Supp. 2d 525, 532 (S.D.N.Y. 2004) (Leisure, J.); *Willis of N.Y., Inc. v. DeFelice*, 299 A.D.2d 240, 242 (1st Dep't 2002) (irreparable harm established through a showing that, "in the absence of a restraint upon [insurance broker's] solicitation of plaintiff's clients, plaintiffs would likely sustain a loss of business impossible, or very difficult, to quantify.").[6] Absent injunctive relief, Guy Carpenter is likely to sustain further irreparable harm in the form of lost employees and clients alike. Indeed, in light of Defendants' equivocations regarding the validity of their RCAs, and given their blatant and ongoing solicitations of Guy Carpenter top brokers and their associated books of business, as well as

---

[6] Moreover, the Defendants agreed that "irreparable injury will result" from a breach of the RCAs, and that "monetary damages for such breach would not be readily calculable" since Guy Carpenter would have "no adequate remedy at law." Borik Decl. Ex. A ¶ 7. This supports a finding of irreparable harm. *See Ticor*, 173 F.3d at 69.

significant clients, Defendants will undoubtedly continue to violate their RCAs absent an injunction order by this Court.

### B.   Guy Carpenter Is Likely to Succeed On The Merits

As set forth below, Guy Carpenter is likely to succeed on the merits of its claims for breach of contract.[7]  Here, Guy Carpenter seeks "prohibitory" injunctive relief that does not require a change to the status quo, and thus, must only demonstrate "sufficiently serious questions going to the merits to make them a fair ground for litigation." *Williams v. City of New York*, 2018 WL 1785486, at *7 n.17 (E.D.N.Y. Apr. 13, 2018) (quoting *Int'l Dairy Foods Ass'n v. Amestoy*, 92 F.3d 67, 70 (2d Cir. 1996)).  Guy Carpenter meets, and easily exceeds, that bar.

### 1.   Defendants Have Breached Their RCAs

Through their solicitation of each other, Jameson, Collins, and a current Guy Carpenter client, *see* Statement of Facts §§ C-D, Defendants have plainly breached their obligations under the RCA to refrain from directly or indirectly (or through any subterfuge) soliciting Guy Carpenter employees and clients whom they had contact with in the last two (2) years of their employment, or about whom they obtained Confidential Information, during Defendants' employment with Guy Carpenter and for 12 months thereafter. *See id.* § B.

---

[7] To obtain injunctive relief, the movant need only establish a likelihood of success on one of its claims. *Yurman Design, Inc. v. Chaindom Enters., Inc.*, 1999 WL 1075942, at *5 (S.D.N.Y. Nov. 29, 1999) (Keenan, J.), *aff'd*, 4 F. App'x 48 (2d Cir. 2001).  Regardless, in addition to its breach of contract claims, Guy Carpenter is also likely to succeed on the merits of its declaratory judgment and breach of fiduciary duty claims, as well.  A declaratory judgment is appropriate where, as here, an actual controversy exists as to the rights and legal obligations of the parties. *See* 28 U.S.C. § 2201(a).  The RCAs are valid and enforceable for the reasons set forth in Section I.B.2., *supra*.  However, as discussed in the Statement of Facts above, Defendants appear to be parsing the language of the RCA to their self-serving advantage, claiming repeatedly—without any explanation whatsoever—that they do not intend to violate any "valid" restrictions.  Statement of Facts § E.  Thus, a declaratory judgment would "serve a useful purpose in clarifying or settling the legal issues involved" and "finalize the controversy and offer relief from uncertainty." *ICBC Standard Sec., Inc. v. Luzuriaga*, 217 F. Supp. 3d 733, 738 (S.D.N.Y. 2016) (Batts, J.) (quoting *Dow Jones & Co., Inc. v. Harrods Ltd.*, 346 F.3d 357, 359 (2d Cir. 2003)); *see H & R Block E. Tax Servs., Inc. v. Vorpahl*, 255 F. Supp. 2d 930, 935 (E.D. Wis. 2003) (granting declaratory judgment, finding that non-solicitation and non-competition covenants were valid and enforceable).  Additionally, Defendants' collusive conduct prior to their resignations, in which they secretly acted to advance Lockton's business interests at Guy Carpenter's expense and while fully on Guy Carpenter's payroll, amounts to a clear breach of their fiduciary duties to Guy Carpenter. *See Design Strategies, Inc. v. Davis*, 384 F. Supp. 2d 649, 661 (S.D.N.Y. 2005) (Marrero, J.), *aff'd sub nom. Design Strategy, Inc. v. Davis*, 469 F.3d 284 (2d Cir. 2006) (finding that employee's advocacy on behalf of employer's competitor to obtain a contract with a potential client constituted breach of fiduciary duty of loyalty).

Where an employer proffers evidence that defendants have solicited company employees or clients in violation of a contractual obligation, preliminary injunctive relief is appropriate. *See, e.g., Karasaki*, 2008 WL 4778239, at *20 (granting preliminary injunction based on defendant's solicitation of his former coworkers immediately following his departure for a competitor); *DiGregorio*, 307 F. Supp. 3d at 331-37 (granting preliminary injunction against insurance brokers who, following their coordinated resignation to join a Lockton subsidiary, began soliciting clients with whom they had contact while working for the plaintiff).[8] Here, Defendants have engaged in a pattern of conduct that evinces a fundamental disregard for their contractual obligations to Guy Carpenter, beginning with Defendants' solicitation of each other in late 2018 and continuing through their coordinated resignations on March 7, 2019 and their solicitations of Guy Carpenter employees and clients immediately after starting work for Lockton, all in accordance with Gardner's master blueprint laid out in the Lockton Interview Memo. *See* Statement of Facts, § C.1. Defendants' brazen, unlawful conduct will invariably continue absent a court order enjoining these violations.

2. The RCAs Are Valid And Enforceable

Restrictive covenants are valid and enforceable under New York law (which governs the RCA, *see* Borik Decl. Ex. A ¶ 12) if they are "(1) necessary to protect the employer's legitimate interests; (2) reasonable in time and area; (3) not unreasonably burdensome to the employee; and (4) not harmful to the general public." *Silipos, Inc. v. Bickel*, 2006 WL 2265055, at *3 (S.D.N.Y. Aug. 8, 2006) (Casey, J.) (citing *BDO Seidman v. Hirshberg*, 93 N.Y.2d 382, 388-89 (1999)). The RCA's narrowly tailored covenants satisfy these factors.

---

[8] Solicitation of co-workers while still employed by the contracting employer, just like post-employment solicitation, can violate a non-recruitment agreement. *See, e.g., Oliver Wyman, Inc. v. Eielson*, 282 F. Supp. 3d 684, 696 (S.D.N.Y. 2017) (Sullivan, J.) (denying former consultant's motion for summary judgment where a fact issue remained as to the violation of his non-recruitment clause because he solicited a companion to leave with him and acquire an information services company); *Genesee Valley Tr. Co. v. Waterford Grp., LLC*, 130 A.D.3d 1555, 1556, 1558 (4th Dep't 2015) (reversing trial court's dismissal of breach of non-recruitment agreement claim where one defendant allegedly solicited another employee while employed by plaintiff and they left plaintiff's employ in the same week).

a. The RCAs Are Supported by Legitimate Business Interests

(i) The RCAs Protect Guy Carpenter's Client Base

New York law recognizes an employer's "legitimate interest in protecting client relationships developed by an employee at the employer's expense." *Johnson Controls*, 323 F. Supp. 2d at 534; *see Karasaki*, 2008 WL 4778239, at \*17 (same, because "[t]he question is whether Karasaki developed those relationships independently of any efforts or expenditures made by Marsh, and there is no evidence that he did."); *DiGregorio*, 307 F. Supp. 3d at 350. This interest extends not just to clients of the former employee, but also to "clients of other employees who were supervised by the former employee." *Id.*; *see Karasaki*, 2008 WL 4778239, at \*16-17 (finding that enforcement of non-recruitment clause was necessary to protect employer's legitimate interest in "the relationships between clients and former employees who Karasaki supervised at Marsh").[9]

Accordingly, employers have a legitimate interest in enforcing employee non-recruitment provisions in order to protect the client relationships that the solicited employee developed at the employer's expense. *See, e.g.*, *Oliver Wyman, Inc. v. Eielson*, 282 F. Supp. 3d 684, 694 (S.D.N.Y. 2017) (former consultant's non-recruitment provision enforceable because the "loss of a consultant with strong client relationships can dramatically undercut a consultancy's business" and the consulting firm "depend[ed] on client relationships for its success");[10] *Renaissance Nutrition, Inc. v. Jarrett*, 2012 WL 42171, at \*4-5 (W.D.N.Y. Jan. 9, 2012) (non-recruitment

---

[9] *See also Spinal Dimensions, Inc. v. Chepenuk*, 2007 WL 2296503, at \*6 (Albany Cnty. Aug. 9, 2007) ("[P]laintiffs have demonstrated a legitimate employer interest in enforcing the restrictive covenant with respect to the accounts and customers upon whom they called, sold products to, [or] serviced . . . . Such an interest also extends to the clients of the sales representatives whom defendant Chepenuk supervised."); *Devos, Ltd. v. Record*, 2015 WL 9593616, at \*12 (E.D.N.Y. Dec. 24, 2015) (citing *BDO Seidman*, 93 N.Y.2d at 392 n.2) ("[T]he New York Court of Appeals has also suggested that this interest may extend to clients with whom the former employee had not had a relationship during employment, but whom he solicited using confidential information belonging to the employer."). Moreover, New York courts enforce restrictive covenants to protect client relationships "[e]ven where . . . there is no showing that a former employee has obtained a competitive advantage through the misappropriation of confidential customer information or that the employee possessed unique or extraordinary abilities." *Chepenuk*, 2007 WL 2296503, at \*5 (quoting *Scott, Stockrow & Co., C.P.A's, P.C. v. Skavina*, 9 A.D.3d 805, 807 (3d Dep't 2004)).

[10] The provision enforced in *Eielson* was nearly identical to the RCA. *See Eielson*, 282 F. Supp. 3d at 692-93.

provision breached where, after defendants solicited salesmen, the salesmen diverted their clients—developed at plaintiff's expense—to defendants' new competing business).

The lifeblood of a reinsurance brokerage company is its insurer client base, and by extension, the individual reinsurance brokers whose job it is to acquire, develop, and cultivate the relationships with those clients and service their business needs. Statement of Facts, § B. Thus, it is no surprise that numerous courts in this District have enforced restrictive covenants in the insurance industry. *See, e.g.*, *DiGregorio*, 307 F. Supp. 3d at 350 (recognizing insurance brokerage's legitimate interest in protecting its clients); *USI Ins. Servs. LLC v. Miner*, 801 F. Supp. 2d 175, 188 (S.D.N.Y. 2011) (same); *Karasaki*, 2008 WL 4778239, at *17 (same).[11]

Guy Carpenter enabled the Defendants to acquire, develop, and cultivate direct relationships with both clients and other Guy Carpenter employees—including brokers with their own valuable client relationships that Guy Carpenter enabled them to acquire, develop and cultivate—in numerous ways. Statement of Facts § A. By imposing narrowly-tailored restrictions on Defendants' ability to solicit Guy Carpenter's employees and clients, the RCAs serve Guy Carpenter's legitimate interest in protecting its client base, which was developed through Guy Carpenter's substantial efforts and investments. *See Karasaki*, 2008 WL 4778239, at *17 (enforcing employee and customer non-solicitation covenants based on client relationships formed by the employee with the employer's assistance, including by providing him a "generous expense account," hosting charity networking events, and offering him the support of other employees to service client accounts); *Jarrett*, 2012 WL 42171, at *4 (enforcing restrictive covenant where the employer "supported [the employees] in developing client relationships.").

---

[11] Lockton also recognizes the validity of employee and client non-solicitation covenants in the insurance industry, as Lockton's own restrictive covenant agreements impose such restrictions for *two years* following an employee's departure from Lockton (*i.e.*, double the duration of the restrictions in the RCAs). *See Mountain West Series of Lockton Cos. LLC v. McDaniel*, Memorandum in Support of Motion for Temporary Restraining Order and Preliminary Injunction at 4-5, No. 1916-CV07011 (Mo. Cir. Ct. Mar. 13, 2019), Amended and Restated Member Agreement between Derek L. Cady and Mountain West Series of Lockton Companies, LLC § 5.3.

(ii)     The RCAs Protect Guy Carpenter's Confidential
Information and Trade Secrets

The RCAs also serve a legitimate interest in protecting against harm from the disclosure of Guy Carpenter's confidential information and trade secrets. Each of the Defendants had access to highly confidential and proprietary information that would be valuable to competitors. Statement of Facts § A. Such information encompasses key details and insights learned through research and prior dealings with clients and prospects that competitors could use to lure away Guy Carpenter's clients, outbid Guy Carpenter in soliciting new prospects, develop competing products that utilize Guy Carpenter's proprietary information, and poach Guy Carpenter's most successful employees with the strongest client relationships.[12]  Guy Carpenter has gone to great lengths to protect the information it has developed—which is not known to persons outside of Guy Carpenter—including through the use of confidentiality agreements and the adoption of extensive written information security policies and practices. Statement of Facts § B. Where, as here, employers have developed and sought to protect confidential information through the use of restrictive covenants, courts have consistently recognized that doing so serves a legitimate business interest.[13]

---

[12] Notably, Lockton has also sought to protect this very type of information. *See Mountain West Series of Lockton Cos. LLC v. McDaniel*, Verified Petition for Injunctive and Other Relief, No. 1916-CV07011 (Mo. Cir. Ct. Mar. 13, 2019), Amended and Restated Member Agreement between Derek L. Cady and Mountain West Series of Lockton Companies, LLC §§ 4.1(b), 4.3 (providing an expansive definition of "Confidential Information" that includes, *inter alia*, "sales and other business methods or policies; prices or prices formulas; the identity of and information concerning former or current Customer Accounts of the Series, the Other Series and/or any Affiliate, including but not limited to Customer Account needs and preferences, levels of satisfaction and the terms of engagement ...; revenues, expenses, budgeting, finances and other financial information; computer systems, programs and software ... and other technology; business, marketing and development strategies and plans; [and] Series, Other Series and Affiliate member and/or Lockton personal information....").

[13] *See, e.g., Reed, Roberts Assocs., Inc. v. Strauman*, 40 N.Y.2d 303, 308 (1976) (internal citation omitted) ("Thus restrictive covenants will be enforceable to the extent necessary to prevent the disclosure or use of trade secrets or confidential customer information."); *DeFelice*, 299 A.D.2d at 242 (affirming preliminary injunction with respect to insurance brokerage's former employees because they "were undisputedly high-level Willis employees with access to confidential information that could be easily utilized by them in their new positions at Aon to Willis's detriment."); *Chernoff Diamond & Co. v. Fitzmaurice, Inc.*, 234 A.D.2d 200, 202 (1st Dep't 1996) (enforcing customer non-solicitation provision against former partner at insurance agency where he "obtained, while in plaintiff's employ, invaluable and otherwise unobtainable information concerning the business practices and resulting insurance needs of these clients due to his position as their trusted professional advisor."); *MasterCard Int'l Inc. v. Nike, Inc.*, 164 F. Supp.3d 592, 602 (S.D.N.Y. 2016) (Roman, J.) (finding that non-recruitment provision designed to "protect against the misappropriation of MasterCard's proprietary IS network coincides with the legitimate interests recognized by courts in New York.").

At bottom, Guy Carpenter developed the RCAs to protect against precisely the type of activities in which Defendants have been engaged—*i.e.*, using Guy Carpenter's confidential information about its employees, client accounts, top prospects, and growth strategies to solicit its best brokers (while avoiding the "book sitters" – to use Durant's words) and to support a competitor's efforts to lure away Guy Carpenter's biggest clients.

        b.    The RCAs Are Reasonable In Time And Scope

The non-solicitation provisions impose restrictions on Defendants for twelve months following the termination of their employment. *See* Statement of Facts, *supra* § B. "New York Courts routinely find one-year restrictions to be reasonable." *Silipos*, 2006 WL 2265055, at *6; *see also Miner*, 801 F. Supp. 2d at 188 (collecting cases and holding that two-year-long non-solicitation provision was reasonable because "courts addressing similar twenty-four month restrictions on solicitation of former clients in the insurance industry have found them to be reasonable."); *MasterCard*, 164 F. Supp. 3d at 601–03.[14]   Moreover, the scope of the non-solicitation provisions in the RCA is reasonable because, unlike strict covenants not to compete (which are often geography-based), the restrictions in the RCAs are far narrower: they are client-based and employee-based. *See Malcolm Pirnie, Inc. v. Werthman*, 280 A.D.2d 934, 935 (4th Dep't 2001) (holding that client-based restrictions are reasonable even without any geographical limitation); *MasterCard*, 164 F. Supp. 3d at 601–03 (noting that employee-based restrictions are reasonable even without any geographical limitation).

Further, the RCAs are narrowly tailored protect Guy Carpenter's legitimate business interests.   That is, the employee non-solicitation provision prohibits only the solicitation of employees (a) whom Defendants came into contact with during their last two years of their employment for the purpose of soliciting or servicing business or (b) about whom Defendants obtained Confidential Information.   Similarly, the client non-solicitation prohibits only the solicitation of clients or prospective clients which Defendants had contact with or obtained

---

[14] Defendants could not reasonable challenge the one-year duration of the restrictions in the RCAs, given that Lockton imposes *two-year* restrictive covenants. *See supra*, n.11.

Confidential Information or trade secrets about during their last two years of employment. *See, e.g.*, *DiGregorio*, 307 F. Supp. 3d at 334 (enforcing customer non-solicitation agreement preventing defendants from being able to "solicit business from or perform services for any [plaintiff's] clients or prospective clients with whom he or she had contact or about whom he or she obtained confidential information during his or her last two years of employment for [plaintiff]."); *Karasaki*, 2008 WL 4778239, at *3 (enforcing provision restricting former employee from soliciting "any former client of the Company or its affiliates who was such within two (2) years prior to [his] termination of employment and who was solicited or serviced directly by [him] or where [he] supervised, directly or indirectly, in whole or in part, the solicitation or servicing activities related to such former clients.'").

        c.      The RCAs Do Not Unduly Burden
                 Defendants Or Harm The Public

New York courts have recognized that the restrictions imposed by non-solicitation provisions like those at issue here are "'inherently more reasonable and less restrictive' than noncompete clauses." *OTG Mgmt., LLC v. Konstantinidis*, 40 Misc. 3d 617, 621–22 (Sup. Ct. N.Y. Cnty. 2013). Indeed, "[a]n important factor that courts consider in [the non-compete] context is the 'strong public policy militating against the sanctioning of a person's loss of the ability to earn a livelihood.'" *Jarrett*, 2012 WL 42171 at *4 (quoting *Ticor Title*, 173 F.3d at 70). The employee and client non-solicitation covenants in the RCAs do not prevent Defendants from earning a living through employment with Lockton or anywhere else of their choosing, nor do they unduly burden Defendants while doing so. *See, e.g.*, *OTG Mgmt., LLC*, 40 Misc. 3d at 622 ("Here, the court finds that the non-recruitment clause is enforceable because it is reasonable in scope and imposes no meaningful burden on Konstantinidis. There is no reason to believe that Konstantinidis' employment with SSP will be impacted by his inability to recruit his former co-workers."); *Chernoff Diamond & Co.*, 234 A.D.2d at 202 ("There is no reason to suppose that [a client non-solicitation] limitation will prevent defendant from pursuing his livelihood or that it will have the effect of precluding him from operating a successful insurance agency.");

*DiGregorio*, 307 F. Supp. 3d at 351 ("New York courts have routinely found that an individual does not suffer undue hardship where a restrictive covenant merely prohibits him from soliciting his former employer's clients for a reasonably defined period of time.").[15]

Nor are the RCAs injurious to the public. *See MasterCard Int'l Inc.*, 164 F. Supp. 3d at 601–03 (employee non-solicitation provision not injurious to the public); *DiGregorio*, 307 F. Supp. 3d at 351 (quoting *Uni-World Capital L.P. v. Preferred Fragrance, Inc.*, 73 F. Supp. 3d 209, 237 (S.D.N.Y. 2014) (Engelmayer, J.)) ("If anything, the public interest would be advanced by such an injunction, because, on the facts here, such an injunction would tend to encourage parties to abide by their agreements."). The RCAs do not impede Guy Carpenter's competitors from offering reinsurance products and services to the public; they simply prohibit Defendants, who developed industry relationships and knowledge of confidential information over decades of collective service to Guy Carpenter and other MMC-affiliated entities, from "free-riding" on their prior employer's efforts. Restrictive covenants like those at issue here "serve an important public policy function by encouraging employers to make significant investments in training key employees and permitting employers to share confidential information with employees, which encourages the free exchange of ideas" for the public's ultimate benefit." *Verizon Commc'ns, Inc. v. Pizzirani*, 462 F. Supp. 2d 648, 662 (E.D. Pa. 2006) (applying NY law).

## C. The Balance Of Hardships Overwhelming Favors Guy Carpenter And Granting The Proposed Injunction Is Consistent With The Public Interest

The balance of hardships overwhelmingly favors Guy Carpenter. Guy Carpenter risks irreparable harm from the loss of client relationships, customer goodwill, and confidential information. *See supra* § I.A. Defendants, by contrast, will not be unduly burdened by adhering to the RCAs, for which they were generously compensated. *See supra* § I.B.2.c.; *Chernoff Diamond & Co.*, 234 A.D.2d at 203 ("[C]onsidering that the restriction was freely bargained for as part of a negotiated contract, it cannot be said that the equities favor defendant."). The RCAs

---

[15] Defendants themselves recognize this to be true: they each acknowledged in accepting their awards and entering the RCA that such restrictions do "not prevent [them] from obtaining gainful employment in [their] field of expertise" and do not "cause [them] undue hardship." *See* Borik Decl. Ex. A ¶ 6.

do not preclude Defendants from working at Lockton and earning a living. *See DeFelice*, 299 A.D.2d at 242 ("With respect to the balance of the equities, in contrast to plaintiffs' showing of irreparable harm in the event that DeFelice is not restrained from soliciting its clients, the record affords no basis to conclude that DeFelice will suffer significant professional hardship from an appropriately limited anti-solicitation restraint."). An injunction would preserve the status quo by preventing Defendants from soliciting Guy Carpenter's employees and clients or using Guy Carpenter's confidential information. *Kelly v. Evolution Mkts., Inc.*, 626 F. Supp. 2d 364, 376 (S.D.N.Y. 2009) (Robinson, J.) (balance of hardships tilts against employee where he "is free to begin employment, even with a competitor . . . , and his livelihood is not jeopardized by this injunction"). Granting an injunction would also be in the public interest. *See supra* § I.B.2.c.

**D.    An Injunction Should Issue For One Year From The Court's Order**

A restrictive covenant's "time period may be extended for the length of time that the offending party was in violation of the agreement." *N.Y. Real Estate Inst., Inc. v Edelman*, 42 A.D.3d 321, 322 (1st Dep't 2007); *see Karasaki*, 2008 WL 4778239, at *21 (enforcing one-year restriction from the date of the preliminary injunction order). In light of the continued solicitation of Guy Carpenter employees following Defendants' separation from Guy Carpenter, an injunction should issue compelling Defendants to adhere to the restrictions in their RCAs for one (1) year from the date of the Court's order.

**E.    Guy Carpenter Is Entitled To Recover Its Attorneys' Fees**

The RCAs provide that Guy Carpenter is entitled to "recovery of all reasonable sums and costs, including attorneys' fees, expert witness fees, expenses and costs incurred by [Guy Carpenter] in seeking to enforce" its provisions. Borik Decl. Ex. A ¶ 7. In *Karasaki,* the court found that a substantially similar provision made it "unmistakably clear" in the event of a breach that "Marsh would be entitled to the recovery of attorneys' fees and costs incurred by Marsh in seeking to enforce the agreement." *See Karasaki*, 2008 WL 4778239, at *21. So too here.

**CONCLUSION**

For the foregoing reasons, Plaintiffs respectfully request that the Court grant their motion.

25

Dated  May 30, 2019
       New York, New York

                                    Respectfully Submitted

                                    _____
                                    Gary D. Friedman
                                    Jonathan D. Polkes
                                    David Yolkut
                                    Ami G. Zweig
                                    WEIL, GOTSHAL & MANGES LLP
                                    767 Fifth Avenue
                                    New York, New York 10153
                                    Telephone: (212) 310-8000
                                    Facsimile: (212) 310-8007
                                    gary.friedman@weil.com

                                    Attorneys for Plaintiffs
                                    GUY CARPENTER & COMPANY, LLC
                                    and MARSH & MCLENNAN COMPANIES,
                                    INC.