J5UAGUYOps

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------x

GUY CARPENTER & COMPANY, LLC, and
MARSH & McLENNAN COMPANIES, INC.,

                    Plaintiffs,

          v.                              19-cv-5062 (PAE)

TIMOTHY GARDNER, NICHOLAS DURANT,
and CLAUDE YODER,

                    Defendants.           Oral Argument

---------------------------------x

                                          New York, N.Y.
                                          May 30, 2019
                                          4:55 p.m.


Before:

                    HON. PAUL A. ENGELMAYER

                                          District Judge


                         APPEARANCES

WEIL, GOTSHAL & MANGES LLP
      Attorneys for Plaintiffs
BY:   GARY D. FRIEDMAN, ESQ.
      DAVID YOLKUT, ESQ.
      ELISABETH M. SPERLE, ESQ.
      AMI G. ZWEIG, ESQ.

SELENDY & GAY PLLC
      catch attorneys for Defendants
BY:   DAVID ELSBERG, ESQ.
      RYAN W. ALLISON, ESQ.

J5UAGUYOps

1              THE COURT:  First of all, let me thank our court

2     reporter for gathering on almost no notice.

3              All right.  We have before me the in newly assigned

4     case of Guy Carpenter & Company, LLC, and Marsh & McLennan

5     Companies, Inc. v. Timothy Gardner, Nicholas Durant, and Claude

6     Yoder.  And plaintiffs' counsel has submitted to me a proposed

7     order to show cause for a temporary restraining order and a

8     preliminary injunction.  I don't have an appearance sheet

9     because this popped up all of a sudden.  But let me just hear

10    from each side who I have at the table.  Who do I have for

11    plaintiffs?

12             MR. FRIEDMAN:  It's Gary Friedman from Weil Gotshal

13    for the plaintiffs, Marsh & McLennan and Guy Carpenter.

14             THE COURT:  Who are you joined by?

15             MR. FRIEDMAN:  David Yolkut.

16             THE COURT:  David?

17             MR. FRIEDMAN:  Yolkut.

18             MR. YOLKUT:  The spelling is Y-o-l-k-u-t.

19             THE COURT:  Y-o-l-k-u-t?

20             MR. YOLKUT:  Yes.

21             THE COURT:  Very good.

22             MR. FRIEDMAN:  Elisabeth Sperle.

23             THE COURT:  Last name.

24             MS. SPERLE:  Sperle, S-p-e-r-l-e.

25             THE COURT:  Very good.  Good afternoon.

J5UAGUYOps

1          MR. ZWEIG:  Good afternoon.  Ami Zweig, your Honor.

2          THE COURT:  Last name spelled how?

3          MR. ZWEIG:  Z-w-e-i-g.

4          THE COURT:  Very good.  Good afternoon to all of you.

5     And for the defense.

6          MR. ELSBERG:  David Elsberg, Selendy & Gay, for the

7     defendants.

8          THE COURT:  Sorry.  The last name is?

9          MR. ELSBERG:  David Elsberg, E-l-s-b-e-r-g.

10         THE COURT:  You said David, not Daniel?

11         MR. ELSBERG:  Correct.  I get that a lot, though.

12         THE COURT:  I'm sure you do.

13         MR. ALLISON:  Ryan Allison, Selendy & Gay,

14    A-l-l-i-s-o-n.

15         THE COURT:  Very good.  Good afternoon.

16         Just to review what I have received, again, the case

17    has just come in and I have done a quick read of what has been

18    submitted to me.  I have a memorandum of law from the

19    plaintiffs.  I have a proposed TRO.  I've got a declaration

20    from Michael Jamison.  I have a declaration from Gary Friedman

21    with substantial attachments.  I have a declaration from

22    Michael Borik, B-o-r-i-k.  I have a declaration from John

23    Trace.  I have a declaration from Steven Jones.  I have a

24    declaration from Hartwell Dew, D-e-w.  I have a declaration

25    from Arthur R. Collins.  And I have the complaint, which in

J5UAGUYOps

1    turn has several attachments.

2         From my review of the materials here, it appears that

3    there have been ongoing discussions or at least writings among

4    counsel who are here before me.  Very briefly, let me turn to

5    plaintiff's counsel -- I guess that's you, Mr. Friedman -- just

6    for an overview, not an exhaustive summary, but just tell me

7    about the matter, including any discussions that you and

8    defense counsel have had at this point, because it may be that

9    there is some common outcome that you're prepared to propose.

10        MR. FRIEDMAN:  Thank you, your Honor.

11        So this does actually have a longer tail than your

12   normal TRO/PI situation, because these three defendants were

13   very senior.  Tim Gardner was the CEO of North America for Guy

14   Carpenter, so he was really a heartbeat away from the top.  The

15   other two gentlemen, Nick Durant and Claude Yoder, were also

16   extremely senior executives at Guy Carpenter.  They resigned

17   suddenly on March 7, 2019.  Subsequent forensic activity showed

18   that they had been coordinating with one another to leave to go

19   to Lockton.

20        THE COURT:  How does Lockton relate to your client,

21   Guy Carpenter?

22        MR. FRIEDMAN:  Lockton is a direct competitor of Guy

23   Carpenter and of Marsh USA, which is the insurance broker arm.

24   Marsh USA is a worldwide company that's very active in the

25   insurance broking space, and they are clearly, as you see in

1    the announcement we have attached to our papers, they are

2    clearly creating a very, very large beachhead as it relates to

3    the reinsurance industry.

4            And, again, Guy Carpenter is a reinsurance broker,

5    your Honor.  And it's a subsidiary of Marsh.

6            THE COURT:  Not a reinsurance, reinsurer, but a

7    reinsurance broker?

8            MR. FRIEDMAN:  Correct.  It's a reinsurance broker.

9            And just to know, your Honor, as you would suspect,

10   their biggest client base are insurance companies.

11           So in any event, the defendants all decided to go to

12   Lockton.  To be clear, there was no non-compete involved in

13   this case.  And so it was a sudden resignation.  They are

14   subject to a restrictive covenant agreement, the RCA, which is

15   referred to throughout our papers.  It's a restrictive covenant

16   that they execute, frankly annually.  And this past year, 2018,

17   they received very substantial equity awards, all six-figure

18   equity awards, in exchange for those restrictions.

19           And those restrictions relate to nonsolicitation

20   activities.  It relates to clients and employees.  Over the

21   years, Guy Carpenter and Marsh have been very focused on

22   creating narrowly tailored restrictions that really try to

23   protect the essence of the business and the legitimate business

24   interests.

25           So in any event, they also were subject to a 60-day

J5UAGUYOps

garden leave provision.  That was put in there for a variety of

reasons.  But one of them is so that Guy Carpenter can circle

the wagons, can work out an orderly transition to make sure

that everybody is clear about their obligations during that

period.

          The three defendants did -- they remained on the

payroll for 60 days.  And that's when we fully engaged with

defendants' counsel.  As you can see, we had five separate

letters, multiple telephone calls, and extensive engagement

with them over a variety of issues.  We wanted to, A, assure

that we're going to get all of our documents and data back.

They dumped 30,000 electronic files on us a few days before

they left.  And those files, incidentally, were all on their

personal devices.

          THE COURT:  What species of files are we talking

about?

          MR. FRIEDMAN:  We're talking about all sorts of Guy

Carpenter business plans, presentations, revenue data.  There

was confidential information.  There was also nonconfidential

information.  There was Guy Carpenter-related information

relating to the business that we're involved with and the

business they had transacted for many years.

          One of the reasons for the garden leave period is so

we can engage with the employees.  And we sent multiple letters

really trying to lock down these restrictions with respect to

J5UAGUYOps

 1    the nonsolicitation.  What we wanted was an assurance from them

 2    that they would honor them.  And each time we went to the well,

 3    the well was dry.  And you'll see the penultimate letter that

 4    we wrote on May 6, which was their last day of employment,

 5    said, look, you haven't given us any answers during the 60-day

 6    period.  All we're trying to do is get you to confirm that

 7    you're going to raise your hand and say, we get it, we're going

 8    to abide by our restrictions and after the year expires the

 9    restrictions disappear.  We never got that.  What we did get

10    was the mantra, "I believe that I have not violated and do not

11    intend to violate any valid restrictions."  And of course,

12    being the lawyers that we are, we started very early, in March,

13    and we ended in May, saying:  What does that mean?  Please tell

14    us.  If you view any portion -- any portion -- of this

15    restrictive covenant as unenforceable, let's hear it.  This has

16    been the product of a lot of legal analysis by Marsh and Guy

17    Carpenter over the years, and they've tailored it

18    appropriately.  We got the bum's rush constantly with respect

19    to that.

20              THE COURT:  Did you take up with opposing counsel --

21    did you hear from opposing counsel any argument that any of the

22    nonsolicitation provisions, which is, I take it, what's at

23    issue here, that any of them are invalid?  I know you said that

24    the letters included the word "valid."  I assume you took up

25    either with the departing employees or with their counsel what

J5UAGUYOps

1    that meant.

2              MR. FRIEDMAN:  Yes.  I couldn't speak to the party

3    employees because they were represented by counsel from day

4    one.  We did it orally, we did it in writing, and every other

5    conceivable way short of smoke signals.

6              THE COURT:  Here's my question.  To this point, has

7    anybody from the other side, meaning opposing counsel,

8    articulated to you a view that the restrictions in place here

9    are invalid?

10             MR. FRIEDMAN:  Never, not once.

11             THE COURT:  Obviously the beauty of an exchange like

12   that beforehand would have been to allow the garden leave

13   period to have functioned as an opportunity to get declaratory

14   relief in effect during that period from a court, if there was

15   a difference of views between the two tables whether the

16   restriction was valid, rather than putting everybody in this

17   situation.

18             MR. FRIEDMAN:  That's a fair point, your Honor, except

19   they were being too cute by half, and we really tried to press

20   on this because, I mean, they didn't come right out and say to

21   us, to be clear, we do not intend to comply with all of the

22   restrictions in the agreement.

23             THE COURT:  No.  If what you are saying is accurate,

24   this is not on you, it's on them.  You asked them whether they

25   thought that there was something invalid and they didn't come

J5UAGUYOps

1   forward and say so and just waited until they had joined the

2   other employer.  From an equity's perspective, they get what

3   they pay for.  They may well in fact be temporarily restrained.

4   That was avoidable during the garden leave period.  That's my

5   point.  I'm asking you whether you invited that early

6   crystallization of the issue by saying to your adversaries:

7   What do you mean by "any valid restriction"?  Do you challenge

8   the legality of any of the restrictions that you've signed on

9   to each year?

10           MR. FRIEDMAN:  The answer is yes.  And you'll see it

11   in our correspondence, and then you'll see it in the

12   penultimate, May 6, which was their last day.

13           Needless to say, they wasted no time.  Within a couple

14   of weeks, actually less than a couple of weeks, we have

15   declarations from two very senior executives at Guy Carpenter,

16   Michael Jamison and Arthur Rob Collins, both of whom were

17   solicited directly, Michael Jamison solicited directly by Tim

18   Gardner, Rob Collins solicited directly by Nicholas Durant.

19           And, your Honor, maybe one of the most important

20   documents to bring to your attention is what we define in our

21   papers as the Lockton interview memo.  The Lockton interview

22   memo is in the Borik declaration, Exhibit D.  It is a short

23   read.

24           THE COURT:  One moment.  Sorry.  I see Exhibit C for

25   Lockton.  I see Exhibit D.  And what is this and how did you

J5UAGUYOps

1    get it?

2              MR. FRIEDMAN:  We got it as part of our forensic

3    search.  Mr. Gardner unfortunately forwarded it through his

4    personal e-mail, so it ended up on our server.

5              THE COURT:  This is which defendant?

6              MR. FRIEDMAN:  Defendant Gardner, who was the CEO for

7    North America for Guy Carpenter and is now the global CEO of

8    Lockton Global Re.

9              MR. ELSBERG:  Sorry.  May I just ask which exhibit

10   we're referring to?

11             THE COURT:  It's Exhibit D to the Borik declaration.

12   It doesn't have a tab.  It's photocopied.  But it's basically

13   two to three pages from the end of the Borik stack.

14             MR. ELSBERG:  Thank you.

15             THE COURT:  Of course.

16             MR. FRIEDMAN:  So this document was --

17             THE COURT:  You found this on your server.

18             MR. FRIEDMAN:  Correct.

19             THE COURT:  Because he forwarded it, apparently, no

20   doubt, from the Guy Carpenter server to his home?

21             MR. FRIEDMAN:  To his personal e-mail.

22             THE COURT:  I see.  Whereas strategically this should

23   have been created at home and kept at home.

24             MR. FRIEDMAN:  Correct.

25             THE COURT:  What's the thrust of the memo?

J5UAGUYOps

1          MR. FRIEDMAN:  By the way, this is a document that we

2     brought to defense counsel's attention.

3          THE COURT:  When?

4          MR. FRIEDMAN:  Early on, in, I believe, our first

5     correspondence, or at least our early correspondence, in March.

6     They've been aware of this since the outset of the garden

7     leave.

8          So just to take a general look at it, Judge, this is

9     the general patent blueprint for his action plan,

10    Mr. Gardner's, at Lockton.  And this is in preparation for his

11    interview which we know took place also from a forensic review

12    in November 2018.

13         So here's the essence of it as it relates to the

14    nonsolicitation.  First he talks about having strong C-suite

15    relationships with clients.

16         THE COURT:  Sorry.  Where is that?  I see, yes, bullet

17    point 6.

18         MR. FRIEDMAN:  Dropping down, there's a reference to

19    that Guy Carpenter's client list is the envy of the industry.

20    And he's talking about -- he's obviously trying to sell

21    himself -- what he brings to the table.  And he talks about

22    success with talent and recruiting.

23         THE COURT:  But he's allowed to recruit.  He just

24    can't recruit your personnel or your clients.  Right?

25         MR. FRIEDMAN:  Yes, that's correct.

J5UAGUYOps

1      THE COURT:  I mean, one would be expecting somebody in

2   this job to do something in the way of recruiting.  The issue

3   is whether he's crossing a contractual line.

4      MR. FRIEDMAN:  Correct.

5      THE COURT:  OK.

6      MR. FRIEDMAN:  He talks about, at the bottom of the

7   page, he'll be seeking to exploit what he thinks is a situation

8   of turmoil in terms of Marsh's combination with JLT.

9      THE COURT:  What's JLT?

10      MR. FRIEDMAN:  JLT is another insurance broker, and

11   they combined with them in the fall of last year.

12      THE COURT:  I see.  So it's actually explicitly -- it

13   says, "The recent MHC" -- I think that's Marsh -- "and JLT and

14   announcement will create considerable distraction for both

15   Marsh and" --

16      MR. FRIEDMAN:  Guy Carpenter.

17      THE COURT:  -- "Guy Carpenter.  There will be key

18   personnel on all sides that are disenchanted with the combined

19   entity and looking for alternatives."

20      So you understandably read that to mean that he's

21   going to be pursuing those opportunities.

22      MR. FRIEDMAN:  Aggressively.

23      THE COURT:  Go ahead.

24      MR. FRIEDMAN:  And then on the next page, Judge, the

25   top of the page, fourth bullet down, "Recruiting will be the

J5UAGUYOps

```
1    primary success driver for the business."  Lockton Re, which is
2    well known in the insurance broking space, has a nascent
3    business in the reinsurance broking space.  And then if you
4    also look at their press announcement, which is attached as
5    Trace Exhibit D, you will see that they say -- and by the way,
6    they announce this on March 7th, the hiring of these
7    defendants.  It was a clarion call.  "Reinsurance is a critical
8    pillar of Lockton's aggressive growth plan."  And so they go on
9    to talk about, "We will be in a major build-out of Lockton's
10   reinsurance capabilities."

11           And then, as it ties in to Mr. Jamison, just dropping
12   down in the middle of the page, under "immediate broker
13   recruiting," which is a gross understatement since it took him
14   all of about ten days to recruit Mr. Jamison, he says, "Program
15   (MGA/MGU clients) brokers."

16           THE COURT:  I'm sorry.  When you say "immediate" --
17   I'm sorry.  I didn't understand.  Oh, I see.  It took him ten
18   days to -- Jamison is one of your present employees.

19           MR. FRIEDMAN:  Correct.

20           THE COURT:  Never mind.  Got it.

21           MR. FRIEDMAN:  OK.  So clearly he's got his early game
22   plan.

23           THE COURT:  What it says, the bullet says "Program
24   (MGA/MGU clients)," so -- "brokers."  In other words, it's not
25   implicit from your point of view.  It's explicit that he's
```

J5UAGUYOps

1    targeting people covered by your restriction.

2            MR. FRIEDMAN:  Yes.  Not only covered by our

3    restriction, but he identified the individual except by name,

4    and that was the head of the MGA/MGU practice at Guy Carpenter.

5    And that is Michael Jamison.

6            And so he wasted no time in soliciting Mr. Jamison in

7    a telephone call on May 14th, and he said, in words that one

8    could not possibly concoct from scratch, not exactly

9    Shakespeare but it's memorable, "If I could point a golden

10   arrow at someone and hit them with it to lead a portion of my

11   organization, it would be you."

12           Mr. Jamison was the --

13           THE COURT:  That's an e-mail or a call?

14           MR. FRIEDMAN:  That's a call.  And it's all in

15   Mr. Jamison's declaration.

16           I would also note, just reverting to the Lockton

17   interview memo, that if you look underneath "immediate broker

18   recruiting" and "Program (MGA)," your Honor, it says

19   "reinsurance dependent," and here it says "personal

20   relationship driven" and "transportable."

21           THE COURT:  Where are we on this?

22           MR. FRIEDMAN:  It's page 2, Judge.  Underneath

23   "immediate broker recruiting."

24           THE COURT:  Right.

25           MR. FRIEDMAN:  There is an indented bullet, and right

1    underneath that, it says "reinsurance dependent."

2              THE COURT:  Yes, got it.

3              MR. FRIEDMAN:  OK.  So it's clear that in building

4    this business, they're building it laterally.  They need

5    portable books of business.  And so who better to know who the

6    success stories are than defendants, Gardner, Durant, and

7    Yoder.  And so that conversation took place.  He said:  Look,

8    I'll fly out to Dallas.  Mr. Jamison is head of the Dallas

9    office.  I'll fly out to Dallas.  I'd like to talk to you more

10   about this opportunity.

11             And he also promised him a leadership position.

12             THE COURT:  Go ahead.

13             MR. FRIEDMAN:  So that was on May 14th.  Then, seven

14   days later, Nick Durant.  Mr. Durant also had a very august

15   position at Guy Carpenter.  He was head of their sales and

16   segments business.  The sales business is what you would think

17   it is, your Honor.  He was the overlord, if you will, of all

18   sales activity for clients and prospects.  And as I'm sure you

19   would suspect, prospects in the insurance broker and

20   reinsurance brokerage business are very important, because

21   there are just thousands of companies out there that frankly

22   you can tap into, very different from other industries, where

23   prospects may be remote.  Guy Carpenter spends a lot of time on

24   prospects in addition to extant relationships.

25             So he was head of that.  And he was also head of the

J5UAGUYOps

other side, which is segments.  So there are segments to Guy

Carpenter's business, which would be property casualty.

They've got marine.  They've got various segments.  He, Nick

Durant, oversaw, first of all he oversaw part of the business

that Mr. Jamison was involved in.  And he also oversaw the

business that Rob Collins was involved in, which is captives.

And he had become quite a captive expert over the last few

years, and that had become a very lucrative business.

And in captives, as in MGA, a lot of the clients, you

know, epoxy themselves to the individuals who are running their

programs.  And so these three defendants don't suffer fools;

they definitely know, OK, we could pick this one, we can get

that book, we can get that book, we can get that book.

So what happened was, on -- the conversation between

Mr. Durant and Mr. Collins took place on May 21st, but first

there were a series of attempted -- there were phone calls to

his cellphone.

THE COURT:  Sorry.  The conversation with Durant and

Collins is by phone on May 21?

MR. FRIEDMAN:  Correct.

THE COURT:  And I take it Durant, like Jamison, is

uninterested and is thinking of ultimately reporting back to

outside counsel for Guy Carpenter.

MR. FRIEDMAN:  Correct.

THE COURT:  All right.  So but beforehand there are

J5UAGUYOps

1    attempts to reach him by phone, you're saying.

2              MR. FRIEDMAN:  Yes, attempts to reach him by phone

3    multiple times, kind of rat-a-tat-tat and once a week but in

4    rapid-fire succession.

5              And then Mr. Durant leaves Mr. Collins a voicemail

6    telling him to call him back.  We have a copy of the voicemail.

7              And so Mr. Collins calls Mr. Durant back while he's

8    driving home.  And they have a 26-minute telephone

9    conversation.  We know this exactly because that was recorded

10   on the phone.  The conversation wasn't recorded, but we know --

11             THE COURT:  Is this the conversation, though, that

12   Collins later attests to?

13             MR. FRIEDMAN:  That's correct.

14             THE COURT:  OK.

15             MR. FRIEDMAN:  So what happens in that call is, it's a

16   full-on pitch.  It's "why I'm at Lockton, what's great about

17   Lockton, their payment structure is very aggressive and very

18   different from what you are aware of and what you have been

19   involved with."

20             And by the way, Nick Durant had plenty of access to

21   the compensation of these individuals at his very high level.

22   So one of the restrictions in the restrictive covenant

23   involves, you cannot solicit employees that you've had contact

24   with for purposes of, first bucket, soliciting or servicing a

25   client.

J5UAGUYOps

1      THE COURT:  Right.

2      MR. FRIEDMAN:  Second bucket is any confidential

3  information that you have learned about the employee.  Those

4  two buckets.  Which, again, is narrowly tailored.  If you see

5  someone at a cocktail party and you bump into them in the loo,

6  that's not going to be covered.

7      So in any event, the conversation takes place for 26

8  minutes.  Full on.  "This is great," you know, "you should do

9  it, here's our model."  And then he says, "While I personally

10  can't offer you a job, I could arrange for it to happen.  So if

11  you're interested, hang up and someone from Lockton will call

12  you right back and offer you a job."

13      THE COURT:  So now we've got two of the defendants

14  here from your perspective implicated in blatant violations.

15  What about the third?

16      MR. FRIEDMAN:  Oh, good.  Good timing.

17      THE COURT:  Because I want to move to the defense.  So

18  go ahead.

19      MR. FRIEDMAN:  The third seminal event for your

20  Honor's consideration is a client solicitation that occurred

21  just a week ago, or eight days ago.  And that is that -- and we

22  intentionally did not disclose the name of our client.  We

23  describe it as client A.  This has been a long-term client of

24  Hartwell Dew over a decade.  It has been a long-term client of

25  Guy Carpenter.  And they are in the Midwest.  This is someone

1   that they service regularly.

2           So in a nutshell, Guy Carpenter learned in February of

3   2019 that this client was going to put a portion of their

4   business up for an RFP.  OK.  Not that uncommon.  February 27th

5   they learn this.  And this becomes critical.  So they learned

6   this at a meeting -- it was part of their annual meeting -- to

7   review the portfolio of this client.  When Hartwell Dew hears

8   this, he says, you know what would be helpful, it would be

9   great if we could have Tim Gardner, who is the CEO of North

10  America, join me at a meeting with the CEO of his client.  So

11  Mr. Gardner comes, flies in to see this client on February

12  28th.  That's a week before he announces his resignation.  They

13  meet with the CEO, talk about their portfolio, etc.  The

14  meeting breaks up.  The formal presentation by Guy Carpenter in

15  connection with this RFP for this client, takes place on April

16  19th, a big team from Guy Carpenter, big team from the client.

17          THE COURT:  But Gardner is on garden leave at this

18  point, right?  So he's not part of the presentation?

19          MR. FRIEDMAN:  That's correct.  And so then what

20  happens is, there is a subsequent meeting -- so the meeting

21  takes place on April 19th.  The feedback they get is, you guys

22  did a great job.

23          THE COURT:  April 19, yes.  OK.

24          MR. FRIEDMAN:  April 19.  The feedback they get from

25  the client is, you guys did a great job.  So far, no competitor

1    for this RFP is on the schedule.  That's what they were talking

2    about.

3         Guy Carpenter comes back again on May 6 for more of

4    the care and feeding of the client because they have an ongoing

5    relationship.  At this, May 6 -- which, incidentally happens to

6    be the last day of employment of the three defendants.  OK.

7    That meeting.  And the meeting ends, and a member of the team

8    says to Hartwell Dew, you guys are looking good for this piece

9    of business.

10        May 24, Hartwell Dew gets a call from chief executive

11   officer of this client and says, I just want to let you know

12   that Lockton was in our offices yesterday pitching for the same

13   business that you pitched for earlier.  And Mr. Dew found out,

14   at that meeting were four people, two of them Nick Durant and

15   Claude Yoder.

16        THE COURT:  OK.  So Durant is implicated in two

17   episodes.  This is how Yoder gets implicated from your

18   perspective.

19        MR. FRIEDMAN:  Correct.  And Yoder is also implicated,

20   just to tie this piece off -- this actually is quite important.

21   So Yoder is an analytics guy.  And let's just talk about

22   analytics.  It's at the bottom of page 2 in the infamous

23   Lockton memo.  It says, your Honor -- it's the last dark

24   bullet.  It says, "In addition to finding the best brokers,

25   analytics talent is an imperative."  That of course is why Tim

J5UAGUYOps

1   Gardner undoubtedly solicited Claude Yoder and vice versa.

2           Claude Yoder headed up the analytics team at Guy

3   Carpenter.  And without getting into any great detail, the

4   insurance industry has become very technologically and

5   analytically driven.  He has led that initiative.  He led an

6   initiative called GC Genesis.  I'll give you just ten seconds

7   on it.  GC Genesis is where they actually have a situation in

8   which they matched their clients with a technology company in

9   the insurance space so that they can work together to have

10  their insurance and reinsurance needs met.  Mr. Yoder led that

11  initiative.

12          So coming back full swing to client A, Mr. Yoder, who

13  was sitting in that room, apparently on May 23rd had met with

14  that same CEO, at a conference, in January, late January, 2019,

15  presumably well after he had decided to leave to go to Lockton,

16  for one meeting to discuss analytics and GC Genesis.

17          THE COURT:  Mr. Friedman, very, very helpful, and I

18  have to say, I've obviously had a number of matters like this.

19  This is one of the most single most impressive starting

20  presentations I've had.  Let me ask you where we're going here.

21  Now that things have crystallized, have you had any discussions

22  with your adversary about the course of this litigation, about

23  whether there is a prospect of it being resolved?  Do you know?

24  Where are we headed?

25          MR. FRIEDMAN:  We have not.  And frankly we were

J5UAGUYOps

1    trying to do that for 60 days.  We did let them know just

2    today.  We felt quite strongly that they were well, well, well

3    on notice.

4             THE COURT:  Let me put it differently.  Let's suppose

5    that the TRO is granted.  That obviously is just a short-term

6    matter.  Where are we going from there?

7             MR. FRIEDMAN:  So, Judge, if they are willing to abide

8    by the full set of restrictions -- and just so you know, as you

9    would suspect, our proposed order tracks the language.

10            THE COURT:  Right.  I noticed that.

11            MR. FRIEDMAN:  OK.  And what's interesting about the

12   document --

13            THE COURT:  You're seeking a TRO and a preliminary

14   injunction.

15            MR. FRIEDMAN:  That's correct.

16            THE COURT:  Part of the reason you're here is because

17   you got less than Sherman-like responses from them to your

18   letters, and you're also here because you've now got three

19   episodes spanning two defendants once, one defendant twice

20   here.  At this point, I take it a Sherman-like letter wouldn't

21   do the trick given the conduct.  I mean, I'm trying to

22   understand what it's going to take to get, if anything, to back

23   off the request for a PI.

24            MR. FRIEDMAN:  It would be perfect clarity as to the

25   boundaries, in terms of what they can and cannot do.  And

that's what we were trying to obtain.  So, frankly, we think

our agreement is clear.  We wanted to engage them in a

discussion about that, to make sure that they thought it was

clear, which is why you have the 60-day provision.  So, yes,

your Honor, if we got clarity from them that you understand

that you can't do X, Y, and Z directly you can't do A, B, and C

indirectly, that form of injunction, if they were willing to

abide by that for 12 months from their violation.

          THE COURT:  So let me understand.  The agreement,

which is a non-solicit, not a non-compete, permits the three

defendants to work and permits them to receive all their comp

there.  It simply precludes them from soliciting employees who

are clients.  And presumably -- we can take this up at a later

point -- but there would be some objective way of defining the

clients.  "Employees" is easy.  But "prospective clients" is,

in my experience from prior matters, that's often a somewhat

hazier universe.  How would one give content to that?

          MR. FRIEDMAN:  Excellent question.  And that's why I

mentioned earlier that in this world prospects are really

important.

          THE COURT:  I understand why they're important.  But

the problem is that, if I'm the defendant, the first thing I'm

saying is, I understand the spirit of the obligation.  I don't

want to be poaching prospects.  But I also don't want to be in

a situation in which my former employer identifies the entire

J5UAGUYOps

```
 1    S&P 500 as prospects.  So how do you go about creating a

 2    defined universe so that the defense table has clarity as to

 3    the ground rules?

 4              MR. FRIEDMAN:  Yes.  That is an excellent question.

 5    And I think the way we would do that would be by starting with

 6    the lists that were created by these same individuals, which is

 7    the top 75, the top 100, where there were meetings on this

 8    issue, for example, with Mr. Durant.

 9              THE COURT:  In other words, you've got documentary

10    proof of clients that had been on a prospect list.

11              MR. FRIEDMAN:  Yes.

12              THE COURT:  One could presumably, without filing it

13    publicly, have that exchange between you and become subject to

14    an agreement or a court order.  But the idea would be you would

15    be proposing to use existing documentary evidence back in the

16    day from when the defendant or defendants in question were

17    there, to give content to the prospect list.

18              MR. FRIEDMAN:  That's correct.  And also the parameter

19    of only a two-year look-back.  So that also gives them some

20    breathing room.

21              THE COURT:  It's a two-year look-back.  And how long

22    are they beached from the soliciting?

23              MR. FRIEDMAN:  12 months.

24              THE COURT:  From?

25              MR. FRIEDMAN:  From the date of their separation, the
```

J5UAGUYOps

```
 1    date of the breach.
 2              THE COURT:  Is it May 6th or is it March 6th?
 3              MR. FRIEDMAN:  No.  It would be May 6th.
 4              THE COURT:  So essentially we've got 11 months and a
 5    teeny bit to go.
 6              MR. FRIEDMAN:  Right.  Because of their breaches it's
 7    tolled under the agreement.
 8              THE COURT:  Right.  And assuming we are off to the
 9    races here, that there is a TRO but then it merges again
10    immediately into PI type of discovery, what's the discovery
11    we're going to be seeking of these people?
12              MR. FRIEDMAN:  Well, I mean, frankly, it's not that
13    common to have firsthand accounts of soliciting.  I have no
14    idea --
15              THE COURT:  Sorry.  I get that.  But I'm trying to
16    understand, I'm trying to look at the life cycle of this case.
17    Are we looking at -- you've obviously got access to your
18    indigenous e-mails, but presumably personal and -- the new
19    company is Lockton?
20              MR. FRIEDMAN:  Right.
21              THE COURT:  -- personal and Lockton e-mails, phone
22    records, that sort of stuff, for these people and presumably
23    Lockton supervisors?
24              MR. FRIEDMAN:  Yes, I think that's right, your Honor.
25    But I look at it in two phases.  I look at it in the injunction
```

1    phase, where frankly I think we can get right to the heart of

2    this matter if you want to hear testimony.  Or they can just

3    raise their hand and say, we're willing to abide by it, sorry

4    you had to come into court and make us abide by it.  But then

5    we're having another discussion in the damages phase.

6              THE COURT:  Yes, right, OK.  But I'm trying to work

7    through just -- I'm trying to figure out the efficient way

8    through this as to the liability phase, and obviously one hopes

9    that there is the agreed settlement phase, which is, you know,

10   preferable.

11             All right.  Very helpful.

12             Who will be speaking for the defense?

13             MR. ELSBERG:  David Elsberg.

14             THE COURT:  Very good.  Mr. Elsberg, just let me take

15   up a question or two and then I'm happy to give you the floor.

16   And I see you were untimely ripped.  So no worries.  I assumed

17   as much.  I've seen more casual for TROs.

18             I take it you are among the lawyers who has been with

19   this -- Mr. Friedman proffered that there have been discussions

20   with counsel.  I take it you've been on this matter, you have

21   familiarity.

22             MR. ELSBERG:  Yes, your Honor.

23             THE COURT:  OK.  Is it correct that there were letters

24   back and forth and an opportunity was provided to explain

25   whether there was a legal infirmity.  I'm looking at the word,

J5UAGUYOps

 1   you know, "valid."  Is it correct that that has not been

 2   ventilated in writing between the sides?

 3            MR. ELSBERG:  Yes, your Honor.

 4            THE COURT:  Tell me your views of the case, because

 5   that, you know -- look, I'm sensitive to your clients as

 6   real-world employees, and nobody wants to get -- with a TRO,

 7   your clients are in imminent danger of that, as you can

 8   imagine, given the showing that's been made.  It would have

 9   been a whole lot easier to have used the garden leave period if

10   they were intending to do anything along these lines or,

11   alternatively, to contest the legality of any of the

12   restrictions.  It would have been a whole lot easier to do that

13   at a point, at which it would have still been a ripe issue but

14   it wouldn't have required emergency relief while they were in

15   garden leave.  Why is it in your clients' interest for this to

16   occur now?

17            MR. ELSBERG:  Your Honor, what I would point out is

18   that there was a lot of dialogue back and forth where questions

19   were asked and we did provide answers.  So just to be clear

20   about what happened, for example, we were asked, would you

21   search the personal devices of these individuals, and we said,

22   yes, absolutely we will, propose search terms to us.  And what

23   we ended up doing was a very comprehensive search of documents

24   to try to do the right thing and be cooperative.  And we have

25   about ten document reviewers who reviewed documents for about

1    nine days.  We reviewed about 50,000 documents.  And we

2    returned to Guy Carpenter over 30,000 documents.  And that was

3    in an effort to say, we want to give any potentially

4    confidential information back and do the right thing.

5           THE COURT:  I take it you are representing, you know,

6    as a counselor to the Court, that no copies of any of those

7    were retained.

8           MR. ELSBERG:  Yes.

9           THE COURT:  And you are prepared to certify to me that

10   it's not merely that they were returned; it's that directly or

11   indirectly your clients haven't retained any copies of any of

12   those.

13          MR. ELSBERG:  Yes.  And we already did that to Guy

14   Carpenter's counsel at their request.  So we did do that.

15          We also gave a certification, which I think your Honor

16   has seen, where the individuals state that they believe that

17   they're in compliance and will remain in compliance with all of

18   the restrictions.

19          THE COURT:  When was that dated, if I may?  I read but

20   it, but I didn't retain the date.

21          MR. ELSBERG:  There were two of them.  One was on

22   March 13.  One was on April 26.  I could hand them up to your

23   Honor.

24          THE COURT:  No, that's fine.  I've read the text of

25   it.  I just forgot the date.  Early in the garden period and

J5UAGUYOps

1   towards the back end of the garden period they certify current

2   compliance, which is clearly not what's implicated right now by

3   plaintiff's showing but the future intent to comply.  And

4   plaintiff has proffered three incidents that on their face

5   appear to be noncompliance.

6          MR. ELSBERG:  Yes.  And that is the certification that

7   says, "I believe that I have not violated and do not intend to

8   violate any valid restrictions in the RCA, including with

9   respect to solicitation and the 60-day written notice period.

10  I believe I have complied with all such restrictions as well as

11  any fiduciary duties owed to Guy Carpenter.  I have not and

12  will not start work at Lockton and will not receive

13  remuneration from Lockton before the expiration of the 30-day

14  period."  It also says, "I certify that I return all Guy

15  Carpenter property and confidential information that was

16  identified by performing a diligent search for such information

17  and no longer possess or have access to such information."  And

18  that refers to the comprehensive documents.

19         THE COURT:  Sir, let me cut you off.  That's good.

20  I've certainly seen cases where that's not been done.  So I

21  certainly commend that degree of proactivity.  But the

22  restriction here isn't, at least exclusively, a documentary

23  restriction.  Knowledge of the client target -- I mean, the

24  last incident involves somebody who had actually already met

25  the client.  I'm just thinking about my old days from when I

J5UAGUYOps

was in a law firm.  You could destroy all the records that I

have with some of my favorite clients, but I would be able to

go in and make a wiz of a pitch because I knew the business and

knew the needs.

          So I guess the issue is that, even assuming that all

those statements are true even as to their then intentions as

to the future, we have the proffer here that each of those

three individuals has breached the terms of the agreement after

May 7th.  What do we do with that?

          MR. ELSBERG:  Yes.  So a couple things.  One is that I

would just point out that I believe there is no claim that

there is any breach when it comes to confidential information.

We returned it.  If you look at their papers, they don't say we

have confidential information, that we've done something wrong

with it.  They don't say, we've got it, it's been destroyed, or

around with the new employer, and so there's some imminent harm

there.

          So what they're really talking about is, they say, you

had information, you gave it back to us, we're not saying that

you used any of it improperly.  What they do say is that --

          THE COURT:  Well, they're not saying that they used

the documents, because they had been turned over and, accepting

your premise, they were no longer in hand.  But the

information, that is, the identity and needs of the client, is

presumably in the grayware up here, right?

1           MR. ELSBERG:  Well, even they don't argue inevitable

2      disclosure, the inevitable disclosure doctrine, which is a

3      disfavored doctrine.  I believe your Honor knows better than

4      anybody in this room what it looks like when briefs come in and

5      they say "confidential information" where it has been taken and

6      it's in somebody's head and it's been used.

7           THE COURT:  Sorry.  I think we're talking past each

8      other.  As I understand it, there is a confidential-information

9      dimension to the restriction, and I think if what you're saying

10     is, that's not the spirit of Mr. Friedman's presentation, that

11     I get.  He is essentially addressing himself to the outreach to

12     executives and to a client.  And given the hour, the better use

13     of your advocacy would be to tell me why that conduct either

14     didn't happen or can be viewed in a more benign light, or

15     whether, if it's a violation of the provision, why the

16     provision is unlawful.

17          MR. ELSBERG:  Yes.  So a couple things, your Honor.

18     First of all, what they would need to show in order to

19     demonstrate that any of these are violations is not just that

20     the employee was an employee of Guy Carpenter or that the

21     client was a client of Guy Carpenter, but that each of the

22     individuals had a certain type of contact involvement with the

23     client or with the prior employee in order to qualify that

24     prior client or employee under the restriction.  So, for

25     example, Mr. Yoder, they say that Mr. Yoder met with a client.

1

2          THE COURT:  They say Yoder had previously known this

3    very client.  It's not somebody else's client, in some

4    concentric circle.  They say this was somebody Yoder actually

5    knew.

6          MR. ELSBERG:  Well, knowing a previous client isn't

7    enough to trigger this.  It's not that you knew a client and

8    that is enough.  There's more of a requirement, that you need

9    to have actually done work for that client.  And I only just

10   got these papers when you did, your Honor, but when I read

11   these papers, they don't say, look, this is a client that

12   Mr. Yoder had been doing work for.  What they say, I think, is

13   that Mr. Yoder had seen this client at some sort of an event.

14   So their showing on whether these qualifications had been met

15   are weak.  That's number one.

16         Number two, because I just saw these papers an hour

17   and a half ago, we also don't know, for example, on clients,

18   whether the client that they say there was this meeting with is

19   a client where there was a preexisting relationship.  Now, I

20   asked counsel why they didn't give me, say, 24 hours' notice of

21   this so that I could find these things out.  I've had no chance

22   to do that.  But it may well be that this client is a

23   preexisting relationship, and there's no protectable interest

24   in a preexisting relationship.

25         THE COURT:  What do I do, though, with -- this Lockton

J5UAGUYOps

1   conversation is close to a confession.  And then reaching out

2   to the CEO, Jamison.

3          MR. ELSBERG:  Yes.  That is -- I'm sorry.

4          THE COURT:  Go ahead.  The overall pattern is quite

5   disquieting.

6          MR. ELSBERG:  Well, your Honor, I believe, just to be

7   clear, that you're talking about these Lockton talking points.

8   Is that --

9          THE COURT:  Yes, indeed.

10          MR. ELSBERG:  So first of all, I will just point out

11   that counsel conceded that counsel was aware of this document

12   all the way back in early March.

13          THE COURT:  Right.  I get that.  But he was hoping

14   that the letters would reflect a Sherman-like commitment to

15   abide by the agreement.  And even after they weren't, they

16   didn't bring this action until they had three episodes.  So the

17   fact that he is aware of it and didn't act on it actually

18   reflects some degree of temperance, not delay.  Had he run into

19   court based on the document without anything more, you would

20   have said that he was impetuous because there's no conduct in

21   violation.

22          MR. ELSBERG:  Right.  So this document itself, I don't

23   believe, is one on which he's moving for relief.

24          THE COURT:  Sorry, sir.  It's the pattern.  It's the

25   overall portrait.  This is a really strong case of a violation.

J5UAGUYOps

1   I'm sorry.  I'm being really blunt with you.  Because I've seen

2   this play before and this is a particularly strong version.

3   Any individual item, yes, he's not moving at the time based on

4   the Lockton document.  But he's got three different war stories

5   with three people, two of them working in tandem, reaching tout

6   high-level folks at the company.  I'm giving it to you bluntly.

7   To isolate them and say he's not moving on the document is

8   unpersuasive.

9           Let me try it this way.  Is there an argument that the

10  restriction is legally invalid?

11          MR. ELSBERG:  Yes.

12          THE COURT:  Why was that not articulated when the

13  opportunity was presented among counsel, or was it?

14          MR. ELSBERG:  Yes.  The reason is that what -- the

15  question was, if there are any parts of this document that you

16  believe are not valid, please let us know.  And that was asking

17  in the abstract for me to do a legal analysis of the entire

18  document and say, this one could be viewed as overbroad and

19  that one.  It was not a specific, here's a situation as applied

20  in this circumstance there would be invalid.

21          THE COURT:  But your clients have come right out of

22  the box and engaged in conduct that, at least as proffered, is

23  within the scope of the restriction.  Your clients would have

24  been well advised, if that was where their intention was, to at

25  least, if not issue-spotting everything, spot the scenario that

they had in mind.  I mean, the problem is, your clients are
inviting this TRO by wasting the garden leave period to get
here.

          I'm going to issue the TRO because I'm not hearing
anything that says I shouldn't.  This is really extreme.  And
the argument, he should have moved earlier based on the Lockton
document or this document alone, doesn't do it.  It's the
overall portrait.  And I'm mystified why this is before me now.
Your clients couldn't have wanted a TRO, but they invited it by
not taking advantage of the 60 days.  That was what it was
there for.

          MR. ELSBERG:  Your Honor, if I had received a call
from counsel saying, hey, I heard a week ago or two weeks ago,
if I had gotten a call saying, I heard that your client called
some weeks ago, we think that's a real problem, I would have
immediately said, let me look into it, let me find out if that
happened, and I have a feeling that we can probably figure
something out here that makes everybody --

          THE COURT:  I have a feeling that your client didn't
clear with the lawyer their conduct before engaging in it.  And
I'm not going to ask you to waive the privilege, but it is
notable to me that none of them is apparently -- I mean, it
sounds to me like you just learned of this conduct in the
course of the papers today.  Right?

          MR. ELSBERG:  Yes, your Honor.

1           THE COURT:  So it looks as if, unless there's some

2      other legal counsel they got, your clients are resorting to

3      self-help.  They just assumed or hoped that their conduct

4      wouldn't be violative.  We'll see.  But it's troubling, because

5      they had an opportunity if they had in mind reaching out to,

6      you know, Jamison or Collins, there was some way to spot that

7      issue, perhaps not by mentioning the name, but there was some

8      way to say to your adversary, we think that this form of

9      conduct falls into a legally gray or unenforceable area, can we

10     agree about that or at least find a way to cue up the issue.

11     The problem is -- and it's not your fault, because your clients

12     apparently may not have communicated to you their intention to

13     do this -- but by waiting to act into the employment period,

14     they forwent the 60-day period in which this could be litigated

15     without consequence.  I'm being blunt with you, you know.

16          MR. ELSBERG:  Your Honor, I would also just point out,

17     again, I didn't receive a call from the other side saying this

18     happened, can we figure something out.

19          THE COURT:  Why should they?  Sorry, but why should

20     they?  Given that your clients had language in response that

21     had wiggle room and given the waiting of the 60-day period, I'm

22     trying to understand why it is that the fault gets thrown on

23     the other side.  If I were in their shoes and got these three

24     pieces of evidence, I would be at 40 Centre Street too.

25          MR. ELSBERG:  This is what I'm saying could have

J5UAGUYOps

1    happened, and I think still there is the opportunity for this

2    to happen without the need for a TRO.  If I had gotten a call

3    two weeks ago when this had happened --

4              THE COURT:  From your clients?

5              MR. ELSBERG:  No, no, no, no.  I'm saying from Weil

6    Gotshal, saying, hey, I heard this has happened, is this

7    something that your clients believe they should be doing.  I

8    would have said, you know what, first I'm learning of it, let

9    me check with the client, let me get back to you.

10              THE COURT:  Well, you can do that now you're in the

11   TRO period.  I understand that Weil Gotshal could have done

12   that.  Maybe that would have been within the realm of and

13   certainly would have within the realm of permissible options.

14   Under the circumstances, though, it's within the toolbox of the

15   lawyer to say, enough is enough, we're going to go to court.

16   And this doesn't look like rushing the gun to me, given the

17   strength of the proffers that have been made, the sworn

18   statements by Collins and Jamison.

19              Look, let me do this.  It's late on a Thursday.  This

20   is as strong an initial showing as they come.  I'm really being

21   blunt with you.  I've been at this for seven and a half years.

22   We'll see where we go, but it seems to me that I've seen very

23   few showings at this stage as between the eyes of violation but

24   nonsolicited.  The fact that it's a non-compete also, on the

25   face of it, gives me some degree of confidence that the

1    provision would likely be upheld.  I appreciate that there may

2    be subtlties about the "who."  I'm not sure that they really

3    help you with the fact pattern that's been proffered, in

4    particular as to the Jamison, for example.

5             May I suggest, two weeks from now would be the

6    duration of the TRO.  I'm in an initial conference committee

7    meeting for the back half of that week.  I'm going to put it

8    over to Monday.  That gives you 11 days.  It's a slightly

9    shorter TRO as a result.  I'm going to find time for you in my

10   schedule that Monday.  It's my hope that between now and then,

11   the parties will have figured something out here.  I have no

12   interest in hobbling your clients' professional ability.  But

13   I've heard enough just here that -- the showing is very strong.

14   I mean, you're not contesting factually what happened here.

15   You don't appear to have any information about it other than

16   what the plaintiffs proffered, right?

17             MR. ELSBERG:  Well, your Honor, I would just point

18   out, I'm not in a position to contest it factually, because I

19   learned about it two hours ago.

20             THE COURT:  Right.  Did you reach out to your clients?

21             MR. ELSBERG:  I have had no chance to do that, your

22   Honor.  One thing we could do is give me an opportunity to come

23   back tomorrow and dispute the facts without entering a TRO

24   between now and then.

25             I really learned of this at this courthouse.  When I

1    was in Room 105 is when I got the papers.  And then we walked

2    up here.  I have had no chance to contact anybody, your Honor.

3              THE COURT:  One moment.

4              Off the record.

5              (Discussion held off the record)

6              THE COURT:  Back on the record.  Go ahead.

7              MR. ELSBERG:  What I'm requesting is that a TRO not be

8    entered until I have a chance, which I could do very quickly,

9    to come in and say, these supposed facts, I have proof that

10   they're simply not true.

11             THE COURT:  And I'm saying to you, no.  I'm saying to

12   you that the three separate episodes here, sworn to by people

13   with a documentary piece of evidence that is corroborative, I'm

14   happy for you to assemble a contrary showing if your clients

15   dispute these facts.  I expect they will be prepared to take

16   the stand in front of me to do that, with all the consequences

17   that would come from denying it.  But the answer is, on the

18   face of this, the plaintiff has the right not to be denuded of

19   clients or employees.  And I'm not going to give your client

20   another 24 hours to do this.  It just, for the record, is

21   really bad.

22             Counsel, I'm going to come back in five minutes after

23   checking my calendar.  I'm going to see if I have time next

24   Wednesday or next Tuesday.  I don't know that I do.  I've just

25   finished a very long bench trial, and so we've shoehorned a lot

J5UAGUYOps

```
1    of things into the first few days of that week, and the

2    judicial conference is next Thursday and Friday.  So I'm going

3    to try to find room for you next week.  If not, we'll shoehorn

4    it in the following Monday.  I'm sensitive to your clients'

5    interests in getting this resolved beforehand.  But unless and

6    until either there is a factual rebuttal to this or there is a

7    legal showing that this is unenforceable, there is every reason

8    to have a TRO in place protecting the plaintiffs' interests

9    until then.

10         My strong hope is that a discussion begins now and

11   persists tomorrow, this time with client involvement, in which

12   we can try to figure out some solution.  Your clients don't

13   benefit from this turning into a ground war.  But that's for

14   you to guide.

15         I'll be back in about five minutes.  Thank you.

16         MR. FRIEDMAN:  Thank you, your Honor.

17         (Recess)

18         THE COURT:  Counsel, I take it nothing to report from

19   while I was out?

20         MR. ELSBERG:  Correct.

21         THE COURT:  OK.  So I have several narrow windows

22   during the first three days of next week.  Regrettably the

23   state of it is fairly chockablock, but if it's important to

24   your clients to get in here before Monday the 10th, I can make

25   limited windows available.  I will expect your clients to be
```

J5UAGUYOps

1    here and at least potentially prepared to testify, depending

2    upon what the nature is of the rejoinder.  If the answer is,

3    you should assume the facts as proffered and it's purely a

4    legal defense, that's one thing.  But if there's a dispute that

5    this happened, in deciding whether to convert the TRO to a PI,

6    extend the TRO as the case may be, I may need their testimony.

7    So just be mindful of that.  If they're not here, I think I

8    will wind up taking the facts as proffered.

9            OK.  Your call.  I can put this down for, for example,

10   next Tuesday, June 4, from 4 p.m. to 6 p.m.  I am, Mr. Elsberg,

11   trying to be respectful of your clients' interest in urgency.

12           MR. ELSBERG:  Yes.

13           THE COURT:  It's not clear to me that that is actually

14   what you want.  But if you really want to be in a situation

15   where they're here at 4 o'clock on Tuesday and prepared to

16   briefly testify and be cross-examined about what happened, we

17   can make that work.

18           MR. ELSBERG:  Yes, your Honor.

19           THE COURT:  Very good.  Then what I'm going to do is,

20   I'm going to schedule this for June the 4th, 2009, at 4 p.m.

21   I'm going to issue the TRO.  Now, your papers in response to

22   that, I want to make sure that the defendants and I have had an

23   opportunity to take stock of them.  So why don't we say by noon

24   on Monday?

25           MR. ELSBERG:  Yes, your Honor.

J5UAGUYOps

1          THE COURT:  Again, I realize I'm torching your weekend

2     here.  And if you had wanted something later, I would come --

3     I'm trying not to do that, but I'm hearing you loud and clear.

4     You really want to get your clients in right away.  Am I --

5          MR. ELSBERG:  I believe that's right, your Honor.

6          THE COURT:  All right.  Fair enough.  Let me leave it

7     this way.  I'm going to put down June 3rd, 2019 at 12 noon.

8     And any reply should be filed by June 4th at noon,

9     Mr. Friedman, so that my chambers has a fighting chance to

10    review materials.  I will ask that counsel not only file these

11    on ECF but please e-mail my chambers.  And obviously, if

12    there's anything bulky, I expected it to be hand-delivered at

13    noon as well.  But I want to be in a position where my staff

14    and I can make sense of this promptly.

15         Mr. Elsberg, I realize you're triply hamstrung here

16    because you haven't spoken with your clients about this.  They

17    may have a different view about whether this is really what

18    they want to do and on that schedule.  I am certainly open if

19    my chambers gets a call from you to extending the TRO to a date

20    that gives you some breathing room so that you can actually

21    master the facts here and assemble a better argument or, for

22    that matter, tend to your weekend, whatever the plans may be

23    and perhaps not inconvenient your client.  So I'm not directing

24    that this has to get done within the 14-day window.  And that

25    means the outer date for me is the 11-day window June 10,

because after that I'm away the rest of the week.  But I'm

absolutely open to push this off late into the TRO window on

consent.  So please convey to your client that I'm not pushing

this quite as fast as you are.

          MR. ELSBERG:  I am grateful for that, your Honor.

Thank you.

          THE COURT:  All right.

          MR. FRIEDMAN:  Excuse me, your Honor.

          THE COURT:  Yes.

          MR. FRIEDMAN:  In light of the fact that there may be

an evidentiary hearing on Tuesday, I just want to make sure we

understand the parameters of it.  Is this a situation in which

you just want to hear from the defendants?

          THE COURT:  Look, I am eager to hear whatever you can

give me.  If we do this on Tuesday, very likely we are going to

want to continue it into some window on Wednesday.  I don't

know.  I'm just respecting the tight schedule and I'm

respecting the defendants' interest here.  But given the

showing you have made factually, we'll see what the defendants

come up with, but again, if the facts are not controverted and

it's a legal defense, that's one thing, and then it's really an

argument, an oral argument before me.  If on the other hand,

factually, the statement is, I was never at a meeting,

Mr. Yoder is saying, I was never at that meeting with that

client, or another defendant is saying, it wasn't me who

J5UAGUYOps

1    offered a job to the CEO, that's a factual dispute, and under

2    those circumstances, my sense is the quickest search for the

3    truth is to permit examination of the party in question.

4              MR. FRIEDMAN:  My concern would be -- and I understand

5    that, your Honor -- getting our witnesses here if we needed to

6    rebut by Tuesday.  They're all over the place.

7              THE COURT:  Right.  I understand.  For the time being,

8    we may need to go deep into the evening on Tuesday depending on

9    whether we're looking at a congo line of people, but I want to

10   be respectful of everybody's interests here.  Until we see what

11   the nature is of the defense response, it's not necessary for

12   you to bring the witnesses.  But if the defendants literally

13   say, you know, that's untrue, you know, it wasn't me on that

14   phone call or something like that, it might become necessary.

15   I don't know that I can tell you more.

16             MR. FRIEDMAN:  And, Judge, can I ask one other thing.

17   And that is, if there is going to be no evidentiary hearing,

18   Mr. Elsberg is not going bring his client, can we know by the

19   end of the day tomorrow?  Because we do need to prepare.

20             THE COURT:  Right.  Look, Mr. Elsberg, I appreciate

21   that you are caught completely off guard here.  And so I'm

22   respectful of that.  And I'm also, as anyone who has practiced

23   in this courtroom knows, a real stickler for professional

24   courtesies and not hobbling a lot of people.  It's a reason why

25   I was dismayed by your clients' choosing not to take advantage

J5UAGUYOps

1    of the 60-day period to ventilate these issues.  I think the

2    request that plaintiff's counsel has made is a legitimate one.

3    As soon as you know what the nature is of what you're going to

4    be defending on, including whether there's a factual dispute,

5    please let Mr. Friedman known.  I will be very dismayed to

6    learn -- I'm sure I won't be -- that you waited to tell him

7    just to inconvenience him.  That will be viewed with stern

8    disdain.  I know you won't do that.  But Mr. Friedman raised

9    the issue.  I expect, you know, counsel to work together

10   collegially on stuff like that so this gets litigated just on

11   the merits.

12           MR. ELSBERG:  Yes.  Of course, your Honor.

13           THE COURT:  I do encourage you, Mr. Elsberg -- I look

14   forward to seeing everyone on June 4th at 4 p.m.  I look

15   forward to reading all of your papers on June 3rd and June 4th.

16   It would please me even more to know that, after thoughtful

17   consideration with your clients, there have been serious

18   discussions that got underway, now catalyzed by the fact that a

19   court has been brought into the picture, trying to find some

20   way through this.  I'm not ruling.  There's been no adversarial

21   briefing, nor have I read case authority, nor have I done

22   anything other than skim what's been provided to me and hear a

23   preview.  But I have the benefit of experience.  This one

24   doesn't look good.  And there would be much wisdom in thinking

25   about this from a client-counseling perspective, in the hope

J5UAGUYOps

1    that, through thoughtful conversations with opposing counsel

2    and hopefully some work-out, this can get resolved.  But heaven

3    forbid for your client -- they are now officially under a

4    TRO -- heaven forbid they breach the court order.  Then the

5    consequences are immeasurably worse than having the terms of

6    the non-solicit enforced against them.  I really don't want to

7    be in that situation.  So I'm urging you to try to approach

8    this with what I know will be a high degree of detachment and

9    ask yourself, where do I want my clients to be.  OK?

10             MR. ELSBERG:  Yes, your Honor.

11             THE COURT:  Very good.  I'm going to have my law clerk

12   make copies of the papers that I just completed so you each

13   have a copy.  We will docket this on ECF.  But it's past 6

14   o'clock, and every likelihood is it won't hit ECF until about 9

15   tomorrow, but just for avoidance of that, you're on notice that

16   the fact that the TRO exactly as sought has just issued, and I

17   expect the moment you get out of the courthouse, you will

18   notify your clients and, as soon as you're technologically

19   able, you will be able to forward this to them.

20             MR. ELSBERG:  Yes, your Honor.

21             THE COURT:  Before we adjourn, Mr. Friedman, anything

22   further from you?

23             MR. FRIEDMAN:  No.  Thank you very much, your Honor.

24             THE COURT:  Mr. Elsberg, anything further from you?

25             MR. ELSBERG:  No.  Thank you, your Honor.

J5UAGUYOps

1           THE COURT:  Look, again, please, I encourage you to

2    try to find a way to work things out.

3           Thank you.  We stand adjourned.  I will, barring

4    further words, see you on Tuesday.  Have a good weekend,

5    everyone.

6           (Adjourned to 4:00 p.m., June 4, 2019)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25