**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

GUY CARPENTER & COMPANY, LLC AND
MARSH & MCLENNAN COMPANIES, INC.,

        Plaintiffs,

    v.

TIMOTHY GARDNER, NICHOLAS
DURANT, and CLAUDE YODER,

        Defendants.

Case No. 1:19-cv-05062-PAE

**MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' PARTIAL MOTION
TO DISMISS THE AMENDED COMPLAINT**

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Plaintiffs
GUY CARPENTER & COMPANY, LLC
and MARSH & MCLENNAN
COMPANIES, INC.

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ..................................................................................................1

FACTS ........................................................................................................................................3

    I.      Defendants' Employment with Guy Carpenter ....................................................3

           A.      Gardner ....................................................................................................3

           B.      Durant .....................................................................................................4

           C.      Yoder ......................................................................................................5

    II.     Defendants' Restrictive Covenants Agreements ..................................................6

    III.    Defendants Breach Their RCAs by Soliciting Each Other to Join Lockton ............8

           A.      Gardner Lays Out His Solicitation Blueprint ...............................................8

           B.      Gardner Solicits Durant and Yoder, and Each Solicits One Another ..........9

    IV.    Defendants Brazenly Violate Their RCAs Immediately After Joining
          Lockton .......................................................................................................9

           A.      Unlawful Solicitation of Michael Jameson ...............................................9

           B.      Unlawful Solicitation of Rob Collins .........................................................9

           C.      Unlawful Solicitation of Client A .............................................................11

    V.     Procedural History ...........................................................................................12

ARGUMENT ............................................................................................................................12

    I.      Legal Standard .................................................................................................12

    II.     Guy Carpenter Has Sufficiently Alleged That Defendants Breached Their
          Restrictive Covenant Agreements by Soliciting Client A .....................................13

           A.      The RCA Proscribes Defendants From Soliciting Client A .....................13

           B.      Durant Breached the RCA by Soliciting Client A ....................................15

           C.      Yoder Breached the RCA by Soliciting Client A .....................................16

           D.      Gardner Breached the RCA by Soliciting Client A ..................................18

    III.    Guy Carpenter Has Sufficiently Alleged That Defendants Breached Their
          RCAs By Soliciting Each Other, and By Durant and Gardner Soliciting
          Collins .........................................................................................................18

           A.      The RCA Permissibly Restricts Defendants from Soliciting One
                 Another During Their Employment .........................................................18

           B.      Durant Breached the RCA by Soliciting Collins ......................................21

    IV.    Guy Carpenter Has Sufficiently Alleged Defendants' Breach of Fiduciary
          Duties ...........................................................................................................23

i

CONCLUSION...........................................................................................................25

# TABLE OF AUTHORITIES

**Cases**                                                     **Page(s)**

*Alves v. Affiliated Home Care of Putnam, Inc.*,
  2017 WL 4350283 (S.D.N.Y. Sept. 28, 2017)....................................................13

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)........................................................................................13

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007)...................................................................................12, 13

*Design Strategies, Inc. v. Davis*,
  384 F. Supp. 2d 649 (S.D.N.Y. 2005), *aff'd*, 469 F.3d 284 (2d Cir. 2006).....................23, 25

*In re Document Technologies Litigation*,
  275 F. Supp. 3d 454 (S.D.N.Y. 2017).........................................................19, 20, 21

*Estee Lauder Cos. v. Batra*,
  430 F. Supp. 2d 158 (S.D.N.Y. 2006)...........................................................19

*Freedom Calls Found. v. Bukstel*,
  2006 WL 845509 (E.D.N.Y. Mar. 3, 2006)....................................................25

*Genesee Valley Tr. Co. v. Waterford Grp., LLC*,
  130 A.D.3d 1555 (4th Dep't 2015)................................................................19

*Iannucci v. Segal Co.*,
  2006 WL 8407380 (S.D.N.Y. June 27, 2006) ..............................................23

*Johnson Controls, Inc. v. A.P.T. Critical Sys., Inc.*,
  323 F. Supp. 2d 525 (S.D.N.Y. 2004)....................................................13, 14, 15

*Marsh USA Inc. v. Karasaki*,
  2008 WL 4778239 (S.D.N.Y. Oct. 31, 2008).............................................14, 15

*Marsh USA Inc. v. Schuhriemen*,
  183 F. Supp. 3d 529 (S.D.N.Y. 2016), *as amended*, 2016 WL 2731588 (S.D.N.Y.
  May 3, 2016)............................................................................................14, 15

*MasterCard Int'l Inc. v. Nike, Inc.*,
  164 F. Supp. 3d 592 (S.D.N.Y. 2016)..........................................................13

*Mercer Health & Benefits LLC v. DiGregorio*,
  307 F. Supp. 3d 326 (S.D.N.Y. 2018)..........................................................14

*Mil'chamot v. N.Y.C. Hous. Auth.*,
  2016 WL 659108 (S.D.N.Y. Feb. 16, 2016).............................................16, 17

i

*Nostrum Pharm., LLC v. Dixit,*
   2016 WL 5806781 (S.D.N.Y. Sept. 23, 2016) ........................................................23

*Oliver Wyman, Inc. v. Eielson,*
   282 F. Supp. 3d 684 (S.D.N.Y. 2017) ...........................................................18, 20

*Poller v. BioScrip, Inc.,*
   974 F. Supp. 2d 204 (S.D.N.Y. 2013) ...........................................................24, 25

*Pure Power Boot Camp, Inc. v. Warrior Fitness Boot Camp, LLC,*
   813 F. Supp. 2d 489 (S.D.N.Y. 2011) ..................................................................25

*Schusterman v. Mazzone,*
   2019 WL 2547142 (S.D.N.Y. June 19, 2019) .......................................................13

*TBA Glob., LLC v. Proscenium Events,*
   *LLC,* 114 A.D.3d 571 (1st Dep't 2014) ................................................................14

*W. Elec. Co. v. Brenner,*
   41 N.Y.2d 291 (1977) ...........................................................................................23

## Other Authorities

52 N.Y. Jur. 2d Employment Relations § 225 ..............................................................23

## PRELIMINARY STATEMENT

Plaintiffs Guy Carpenter & Company, LLC and its parent company, Marsh & McLennan Companies, Inc. ("MMC," and together with Guy Carpenter, "Guy Carpenter" or "Plaintiffs"), brought this action to enforce their contractual rights and enjoin former Guy Carpenter senior executives Timothy Gardner, Nicholas Durant, and Claude Yoder ("Defendants") from unlawfully soliciting Guy Carpenter's clients and employees in violation of their Restrictive Covenant Agreements (the "RCA"). Guy Carpenter has extensively detailed how Defendants each repeatedly violated their RCAs, both before and after their simultaneous resignations and defections to Lockton Global Re ("Lockton"), an insurance brokerage firm seeking to launch a reinsurance business off of Guy Carpenter's back.

On May 30, 2019, Plaintiffs commenced this action and, following a hearing before this Court, obtained a temporary restraining order enjoining each of the Defendants from engaging in any further unlawful solicitation. Observing that Guy Carpenter had provided "as strong an initial showing as they come," and noting its "degree of confidence that the [RCA] provision would likely be upheld" (May 30, 2019 Hearing Tr. ("Tr.") at 37) this Court fully granted the temporary relief sought by Guy Carpenter. Facing the specter of a preliminary injunction hearing at which their unlawful conduct would be laid bare, Defendants voluntarily consented a few days later to extend the TRO indefinitely by converting it into a preliminary injunction.

Despite both this Court's finding *and their own concession* that Plaintiffs were entitled to injunctive relief, Defendants now contend that some of Guy Carpenter's claims should be dismissed at the initial pleadings stage—including most of the breach of contract claims that form the very basis of the existing injunction. That is absurd. Significantly, Defendants either admit or do not deny *any* of the specific conduct alleged in the Amended Complaint, including the meetings and conversations that formed the very basis of this Court's decision to grant injunctive relief. Instead, Defendants play fast and loose with the record, violating applicable procedural rules by repeatedly straying well outside the pleadings to distort or minimize

otherwise uncontested facts in support of a series of hair-splitting arguments that do not withstand scrutiny.

*First*, even though Defendants do not dispute that Durant and Yoder solicited business from a longtime, substantial Guy Carpenter client ("Client A") just days after leaving Guy Carpenter, they quibble with the precise nature of the business they were targeting. Claiming that their solicitation concerned Client A's international book of business—which Guy Carpenter was actively pursuing, as Defendants were well aware, given that *Gardner discussed that very piece of business with Client A's CEO* just months before as a fiduciary of Guy Carpenter— Defendants ask this Court to transmute Client A into a "prospective client" by carving out one piece of business and treating it as a separate client altogether from the one that had generated millions of dollars in annual revenue for Guy Carpenter over many years. As explained below, such a myopic position has no support in New York law or the RCA.

*Second*, Defendants acknowledge, but attempt to minimize, their solicitation of one another as merely "speaking with each other about leaving Guy Carpenter for Lockton Re," and then baldly claim that "New York law bars Plaintiffs' cross-solicitation claim." ECF No. 32 (the "Motion" or "Mot.") at 3. Defendants are flatly wrong. The Amended Complaint details how Gardner, as the ringleader, hatched and executed a deliberate plan to solicit and then coordinate his departure with Durant and Yoder, and openly encouraged them to solicit one another. Indeed, in preparation for his November 2018 interview with Lockton, Gardner drafted a memo (the "Lockton Interview Memo") delineating his business and recruiting plan on behalf of Lockton, a principal part of which involved laying siege to Guy Carpenter's employee talent and enviable client base. Upon review, this Court noted that the Lockton Interview Memo was "close to a confession." Tr. at 32. By detailing the various ways in which Defendants executed on the blueprint laid out in the Lockton Interview Memo, the Amended Complaint presents a textbook case of solicitation clearly prohibited by the narrowly-tailored restrictions of the RCA.

*Third*, Defendants *admit* that Durant openly solicited Rob Collins, the head of Guy Carpenter's "Captive" insurance practice, but make the strained argument that Durant did not

2

have sufficient "contact" with or "confidential information about" Collins "such that Mr. Durant could be fairly restricted from soliciting him." Mot. at 4. Nonsense. Plaintiffs have alleged a ***plethora of allegations*** setting forth the considerable extent of Durant's business contacts with Collins throughout 2018, as well as the substantial confidential information that Durant accessed about Collins and his business. In tacit recognition that these fulsome allegations sink any hopes for dismissal of this claim, Defendants now relegate this attack to the final pages of their brief.

*Finally*, Defendants try to explain away their improper conduct following their coordinated decisions to join Lockton by disingenuously claiming that they were just "[doing] their jobs" for Guy Carpenter. Mot. at 2. Folderol. The Amended Complaint is replete with allegations that each of the Defendants cashed their substantial Guy Carpenter paychecks while secretly soliciting one another and laying the groundwork to solicit Guy Carpenter brokers and clients. Defendants' disloyal and unfair conduct includes: Durant suddenly expressing a keen interest in meeting with and learning confidential business information from a team of Guy Carpenter brokers in Dallas whom Gardner had identified as prime targets for recruitment; and Gardner and Yoder personally meeting with Client A's CEO, ostensibly in their roles as Guy Carpenter executives, but in reality to lay the groundwork for soliciting Client A to take its business to Lockton. Those allegations sufficiently state a claim for breach of fiduciary duty.

## FACTS

### I. Defendants' Employment with Guy Carpenter

#### A. *Gardner*

Gardner worked for Guy Carpenter and other MMC-affiliated entities for 26 years, culminating in his elevation to CEO of North America Operations at Guy Carpenter on August 1, 2015. Am. Compl. ¶ 24. In that capacity, Gardner oversaw Guy Carpenter's entire North American reinsurance operations and its 550-employee workforce, with direct managerial responsibility for several dozen senior executives. *Id.* ¶ 5. Gardner was responsible for strengthening and maintaining Guy Carpenter's relationships with its most important clients,

many of which generated seven or eight figure revenues annually. *Id.* ¶ 28. Guy Carpenter invested substantial resources towards Gardner's business development activities and client relationships. *Id.* At Gardner's fingertips, he had access to and regularly reviewed the widest possible array of highly confidential and proprietary information about Guy Carpenter's business, its employees, its clients, and its client prospects. *Id.* ¶¶ 36-44.

### B.   *Durant*

Durant worked for Guy Carpenter and/or other MMC-affiliated entities for over 22 years, including most recently as Head of Sales and Segments at Guy Carpenter since October 16, 2017. *Id*. ¶ 25. As Head of Sales, Durant managed the sales performance of, and interacted with, Guy Carpenter's branch offices and individual brokers across the country, such as Collins, to devise account and engagement strategies to grow revenue. *Id.* ¶¶ 25, 29. At bottom, Durant was the senior leader responsible for managing and developing all new or prospective business at Guy Carpenter. *Id.* ¶ 29. As Head of Segments, Durant was integrally involved in investment and growth strategies across all of Guy Carpenter's various business Segments. *Id.*

Durant also had broad and deep access to confidential, proprietary, and trade secret information concerning Guy Carpenter's clients, as well as Guy Carpenter's own investment and growth strategies, relating to both current engagements and future prospects, and tapped into that confidential information regularly in his position as Head of Sales and Segments. *Id.* ¶ 38. Like Gardner, Durant had unrestricted access to, and regularly accessed, Guy Carpenter's proprietary GC Force database. *Id.* ¶ 40. Because he managed all of Guy Carpenter's sales activities, it was Durant's job to know which Guy Carpenter products and services clients purchased, the needs and preferences of those clients, and client revenue and profitability information. *Id.* ¶ 38. And, like Gardner, Durant also had access to confidential information concerning Guy Carpenter's employees, including compensation and other sensitive personnel information obtained through participating in performance reviews, ranking and compensation sessions, and succession planning meetings pertaining to many of Guy Carpenter's brokers and their teams. *Id.* ¶ 41.

On November 26, 2018, Durant visited Guy Carpenter's Dallas office, and probed the Dallas team (which specializes in the Managing General Agent / Managing General Underwriter or "MGA/MGU" space) for information concerning its top prospects and strategies for converting them into clients, including evaluations of, and the company's action plan for, each prospect. *Id.* ¶ 88. Contrary to Defendants' assertion that Durant was merely "carry[ing] out his job responsibilities," *see* Mot. at 6, this trip was anything but ordinary: not only was this Durant's first visit to the Dallas office, but he held "deep-dive, one-on-one meetings" with the MGA/MGU specialists in that office. Am. Compl. ¶ 88. These meetings "were not typical for Durant," whose "usual practice when visiting branch offices was to hold a group meeting, not individual sessions with each member of the team." *Id.* Unbeknownst to Guy Carpenter, Gardner had already targeted the MGA/MGU team as ripe for poaching in the Lockton Interview Memo, and he had already solicited Durant to leave Guy Carpenter for Lockton. These facts are more than enough to support the inference that Durant's true purpose in probing the Dallas team for confidential information was to "usurp[] Guy Carpenter's business opportunities in the MGA space for use by Durant's future employer, Lockton." Am. Compl. ¶ 146.

C.       *Yoder*

Yoder transferred from Marsh USA Inc. ("Marsh") to Guy Carpenter in 2017 as Chief Innovation and Product Development Officer. *Id.* ¶ 26. Prior to that, Yoder, held several positions at Marsh, including Global Head of Analytics. *Id.* Yoder is an actuary with extensive background in insurance analytics and modeling, and has particular expertise in designing and implementing cutting-edge technologies used by reinsurance brokerage companies. *Id.* ¶ 30.

Among other things, Yoder was responsible for leading two important client-related initiatives: (1) "GC Genesis," a proprietary database that uses technology and know-how to match Guy Carpenter's insurer and reinsurer clients with "InsurTech" partners (*i.e.*, companies that use technological innovations to create efficiencies or other improvements in the insurance industry); and (2) "GC Logic," a proprietary database and content management platform that

allows Guy Carpenter's brokers to easily and efficiently access information to assist them in offering products and services to Guy Carpenter's clients. *Id.* ¶¶ 30, 33. Guy Carpenter presented Yoder to clients as the face of GC Genesis, and invited him to speak about the product at conferences (*e.g.*, the prestigious Global Reinsurance Rendezvous), Guy Carpenter-hosted client events, and one-on-one meetings with clients interested in this unique service. *Id.* ¶ 31.

Contrary to Defendants' *ultra vires* and self-serving mischaracterizations, GC Genesis is not a standalone service available to anyone who wishes to pay for it; rather, it is an integral part of Guy Carpenter's overall reinsurance brokerage product and service offerings to its existing and prospective clients, which Guy Carpenter uses as a mechanism for maintaining and growing its brokerage business with these clients. *Id.* ¶ 32. Thus, when Guy Carpenter arranged for Yoder to speak with clients about GC Genesis, it did so for the purpose of promoting and growing its primary business as the broker of reinsurance contracts for those clients. *Id.*

Yoder had access to all of the confidential, proprietary information on which GC Genesis is based, as well as (like Gardner and Durant) unrestricted access to Guy Carpenter's proprietary GC Force database. *Id.* ¶ 42-44. Yoder also had supervisory responsibility for the other employees who worked in the GC Genesis unit, and thus had access to confidential information concerning those employees, including sensitive personnel information. *Id.* ¶ 42.

## II.    Defendants' Restrictive Covenants Agreements

As Defendants acknowledge, *see* Mot. at 5-6, they are each bound by an RCA that they entered into in exchange for lucrative equity awards in 2018. Am. Compl. ¶ 46; ECF No. 10-1. Defendants also agree that the RCA's restrictions are "limited" in scope. *See* Mot. at 6.

Under Paragraph 3 of the RCAs, Defendants agreed that during their employment with Guy Carpenter and for 12 months thereafter, they would not, either on their "own account or on behalf of any person, company, corporation or other entity, ***directly or indirectly, solicit, or endeavor to cause any employee of [Guy Carpenter]*** with whom [Defendants], during the last two (2) years of [their] employment with [Guy Carpenter], came into contact for the purpose of

soliciting or servicing business or about whom the [Defendant] obtained Confidential

Information ***to leave employment with [Guy Carpenter]***.”  ECF No. 10-1; Am. Compl. ¶ 47

(emphases added).

Under Paragraph 2(b) of the RCAs, Defendants agreed that for 12 months after the end of

their employment with Guy Carpenter, they would not, directly or indirectly:

> (i) ***solicit clients of [Guy Carpenter]*** for the purpose of selling or
> providing products or services of the type sold or provided by [the
> Defendant] while employed by [Guy Carpenter]; or (ii) ***induce
> clients or prospective clients of [Guy Carpenter] to terminate,
> cancel, not renew, or not place business with [Guy Carpenter]***; or
> (iii) perform or supervise the performance of services or provision
> of products of the type sold or provided by [the Defendant] while
> [the Defendant] was employed by [Guy Carpenter] on behalf of
> any clients or prospective clients of [Guy Carpenter]; or (iv) ***assist
> others to do the acts*** specified in Paragraphs 2(b)(i)-(iii).

Am. Compl. ¶ 48 (emphases added).  Further highlighting the “limited” nature of the RCAs’

restrictions, *see* Mot. at 6, Paragraph 2(b) provides that the client non-solicitation restrictions

“shall apply only to those clients or prospective clients of the Company with which the

Employee had contact or about which the Employee obtained Confidential Information or trade

secrets during the last two (2) years of his or her employment with the Company.”  *Id.* ¶ 49.[1]

Although ignored by Defendants, the RCAs clarify that Defendants shall not ***“engage in any***

***subterfuge*** to circumvent this prohibition, including, but not limited to accompanying others on

calls to the client, ***contacting the client with other persons, supervising other persons in***

***soliciting or serving the client,*** providing Confidential Information to others to assist them in

soliciting or serving the client, ***participating in developing presentations to be made to the***

***client***, or other similar activities.”  *Id.* ¶ 51 (emphases added).  Defendants acknowledged that

---

[1] Under the RCA, “contact” means any “interaction between the Employee and the client which takes
place to further the business relationship, or making (or assisting or supervising the making of) sales to or
performing or providing (or assisting or supervising the performance or provision of) services or products
for the client on behalf of [Guy Carpenter].”  ECF No. 10-1 at 2.  Further, “‘contact’ with respect to a
‘prospective’ client means interaction between the Employee and a potential client of [Guy Carpenter]
which takes place to obtain the business of the potential client on behalf of [Guy Carpenter].”).  *Id.*

the restrictions in the RCAs are "necessary to protect the legitimate business interests of [Guy Carpenter] and are reasonable in view of the benefits and consideration" Defendants received from Guy Carpenter. *Id.* ¶ 53. Alarmingly, Defendants engaged in precisely the subterfuge that they agreed to avoid.

III.     **Defendants Breach Their RCAs by Soliciting Each Other to Join Lockton**

    A.     *Gardner Lays Out His Solicitation Blueprint*

As set forth in the Amended Complaint, the plot began at least as early as November 2018, when Gardner flew to Kansas City, Missouri to interview with Lockton. *Id.* ¶ 63. In preparation, Gardner drafted "talking points" for his interview (the "Lockton Interview Memo"), laying out a blueprint for building Lockton's reinsurance business through unlawful solicitation of Guy Carpenter's employees and clients—a plan that Defendants subsequently executed. *Id.* ¶ 64. In that document, Gardner acknowledges that Guy Carpenter is a "competitor" of Lockton, identifies numerous Guy Carpenter clients *by name*, boasts that ***"Guy Carpenter['s] . . . client list is the envy of the industry,"*** and touts his own "strong relationships" with the C-Suite executives of Guy Carpenter's largest clients. *Id.* ¶ 65 (emphases added). He states that ***"[r]ecruiting will be the primary success driver"*** for developing a reinsurance brokerage— specifically, recruiting brokers who have ***"[e]xisting client relationships."*** *Id.* ¶¶ 66-67 (emphases added). Foreshadowing Gardner's direct solicitation of the head of Guy Carpenter's MGA/MGU practice, he highlights the need for "[i]mmediate" recruiting of ***"Program (MGA/MGU clients) brokers,"*** whose clients are "reinsurance dependent, personal relationship driven, [and] transportable." *Id.* ¶ 66 (emphasis added). Gardner further states that to build a successful reinsurance brokerage, ***"analytics talent"***—*i.e.*, Yoder's area of expertise—***"is an imperative. . . . Building a world class analytics offering for clients is vital."*** *Id.* ¶ 68 (emphasis added). Tellingly, he highlights his own "[s]ignificant activity and success with talent and recruiting," including with the ***"GC Genesis Team"***—*i.e.*, Yoder and his staff. *Id.* ¶ 67.

B.  *Gardner Solicits Durant and Yoder, and Each Solicits One Another*

On November 25, 2018—just five days after Gardner's meeting with Lockton—Gardner sent a text message to Durant: "Hey pal. You around today for a quick call? Something I wanted to bounce off of you." *Id.* ¶ 70. The next day, Gardner sent Durant another text message: "***Spoke to CY [Claude Yoder]. All good for you two to connect.***" *Id.* ¶ 71 (emphasis added). Gardner, Durant, and Yoder then repeatedly held private meetings and calls, including on December 13, 2018, January 3, 2019, and January 12, 2019, and Durant sent Yoder multiple press releases about Lockton in January 2019. *Id.* ¶¶ 73-74. On the morning of March 7, 2019, Gardner, Durant, and Yoder each abruptly tendered their resignations to Guy Carpenter, effective in 60 days. *Id.* ¶¶ 78-80. That same day, Lockton issued a press release announcing its new hires and detailing their lengthy careers with Guy Carpenter and Marsh. *Id.* ¶ 81.

IV.  **Defendants Brazenly Violate Their RCAs Immediately After Joining Lockton**

Defendants commenced work at Lockton on or about May 7, 2019, following their 60-day "garden leave" at Guy Carpenter. *Id.* ¶ 4. *Almost immediately*, they brazenly violated their RCAs yet again by directly soliciting key Guy Carpenter brokers and clients.

A.  *Unlawful Solicitation of Michael Jameson*

On May 14, 2019—a ***mere eight days*** after the end of his 60-day notice period—Gardner solicited Michael Jameson, the head of Guy Carpenter's MGA/MGU practice, to join Lockton in a "leadership position," memorably stating: "If I could point a golden arrow at someone and hit them with it to lead a portion of my organization, it would be you." *Id.* ¶ 90. Defendants do not challenge Guy Carpenter's claim that this conduct breached the RCA.

B.  *Unlawful Solicitation of Rob Collins*

On May 16, 2019—just two days after Gardner's call to Jameson—Durant placed multiple calls to Rob Collins, a broker who has worked in various sales and leadership roles at Guy Carpenter for over twenty years (including as Gardner's direct report). *Id.* ¶ 93. On May 21, 2019, Durant tried again, and spoke with Collins for 26 minutes. *Id.* Durant explained why

he had chosen to join Lockton, and why he believed Collins should, too. *Id.* ¶ 99. He detailed the generous, commissions-based compensation package that Lockton intended to offer, which would pay brokers a significant percentage of the revenues they generate. *Id.* He told Collins that the Lockton team—surely including Gardner—had identified a list of specific, already-successful brokers to target for recruitment, and that Lockton was not seeking "book sitters" (*i.e.*, brokers who do nothing more than "babysit" an existing book of business), but rather, brokers who would bring and then grow their books of business. *Id.* And he told Collins that, although he could not offer Collins a job at Lockton, if Collins wanted a job, Durant would hang up and someone else from Lockton would call Collins back and offer him a job. *Id.* ¶ 100.

Contrary to Defendants' fictitious assertion that "all Plaintiffs allege is that Durant knew Collins while the two worked for Plaintiffs," Mot. at 8, the Amended Complaint recites Durant's ***extensive business contact with Collins throughout 2018***. This contact included: emails and phone calls in April and May 2018 regarding Collins's Captives business, his work for a specific client, and new business efforts; an email on May 25, 2018 in which Collins introduced Durant to a third party to connect about the Captives business; emails on June 20, 2018 and October 1, 2018 regarding one of Collins' clients and another business matter; and correspondence in September 2018 regarding an RFP for a specific client. Am. Compl. ¶ 97. Moreover, Durant opened and accessed an extensive array of confidential information about Collins's accounts and client portfolio, including a confidential list containing existing and prospective new business information specific to Collins's accounts, which Durant accessed as recently as October 2018; a report of GC Force data containing detailed information about Collins' new business generated in 2017 and 2018 and his "pipeline" of prospective new business and opportunities for 2018 and 2019, which Durant had on his work computer; additional GC Force data reports with information concerning changes to business opportunities with several of Collins' accounts during the December 2018 to January 2019 period, which Durant also had on his work computer; and a report that Durant created, titled "2-21-19 US Wins," detailing several instances in 2018 in which Collins personally succeeded in expanding business with existing Guy Carpenter clients.

*Id.* ¶¶ 38, 95. In the face of these allegations, Defendants' attempt to portray Durant and Collins as virtual strangers speaks volumes about Defendants' lack of credibility.

    C.      <u>Unlawful Solicitation of Client A</u>

On February 28, 2019—just *days* before Defendants announced their resignations— Gardner traveled to the offices of Client A, a longtime, substantial Guy Carpenter client from which Guy Carpenter receives global annual revenues in the millions, to meet with the client's CEO, presumably laying the groundwork for the improper solicitation of Client A's international business that would soon follow. *Id.* ¶¶ 101-02. As Defendants point out, the day before that meeting, Client A had informed Guy Carpenter that it would be putting a portion of its international reinsurance business out for an RFP, and asked Guy Carpenter to submit an RFP for this work. *See* Mot. at 7. Moreover, the Guy Carpenter broker assigned to Client A's account wanted Gardner to attend the meeting with Client A's CEO (notably, the CEO of Client A's *entire* business, both domestic and international) *specifically because of the opportunity that Guy Carpenter was pursuing with respect to Client A's international business. See id.* Yoder had also recently met in-person with this same CEO on January 28, 2019, following Yoder's presentation at an industry conference, for the purpose of furthering Guy Carpenter's business relationship with Client A. Am. Compl. ¶¶ 103, 147. And Durant accessed and obtained a substantial amount of confidential information about Client A, including a report he accessed in October 2018 detailing Guy Carpenter's historical revenues from Client A and estimates of additional revenues that could be achieved in new business from this existing client, as well as emails he received in October 2018 and February 2019 containing confidential information concerning historical revenues and new business opportunities with Client A and others. *Id.* ¶¶ 39, 105. Thus, Defendants each had contact with, and/or obtained information about, Client A during the last two years of their employment—which they presumably used to get Lockton's foot in the door to pitch Client A for what Defendants concede to be the *very same piece of international business* that was the subject of Gardner's February meeting *Id.* ¶¶ 138, 147.

On May 23, 2019, Durant and Yoder—having *just commenced* employment with Lockton—met with Client A to pitch for the large portion of Client A's international business discussed above. *Id.* ¶ 101. As CEO of the recently-formed Lockton Global Re, with supervisory authority over and a close working relationship with Durant and Yoder, Gardner undoubtedly knew about, was involved in, and approved of the May 23rd meeting. *Id.* ¶ 101. Given the relationship-driven nature of the reinsurance business, Yoder's presence at the meeting was clearly by design, as Lockton leveraged Yoder's relationship and familiarity with Client A— built through his work for Guy Carpenter—to pitch for Client A's business. *Id.* ¶ 104.

## V.     Procedural History

Guy Carpenter commenced this action by filing a Complaint on May 30, 2019. ECF No. 1. Belying Defendants' absurd notion that Plaintiffs' initial complaint was "facially-deficient," Mot. at 1, on Guy Carpenter's emergency request for a TRO, the Court found that Guy Carpenter put forth "as strong an initial showing as they come," granting the full degree of injunctive relief that Guy Carpenter sought in its proposed order. *See* ECF No. 3 & Tr. at 37. On June 4, 2019, Defendants advised the Court that they would "agree to convert the May 30, 2019 temporary restraining order into a preliminary injunction," after which the Court extended the TRO against Defendants indefinitely. ECF No. 19. On June 5, 2019, Defendants filed a Partial Motion to Dismiss the Complaint. ECF No. 21. Guy Carpenter filed the Amended Complaint, as of right, on June 26, 2019, to incorporate certain information gleaned from its continuing forensic review of documents and data that further support their claims against Defendants, as to which Defendants filed their Motion.

## ARGUMENT

## I.     Legal Standard

A complaint need only contain "a short and plain statement of the claim showing that the pleader is entitled to relief," and plead sufficient allegations that, when accepted as true, "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570

(2007). A claim has "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "In considering a motion to dismiss, a district court must accept as true all well-pleaded factual allegations in the complaint, and draw all reasonable inferences in the plaintiff's favor." *Schusterman v. Mazzone*, 2019 WL 2547142, at *3 (S.D.N.Y. June 19, 2019) (Engelmayer, J.). Given the fact-intensive nature of claims for breach of restrictive covenant agreements, courts routinely deny motions to dismiss such claims. *See, e.g., Alves v. Affiliated Home Care of Putnam, Inc.*, 2017 WL 4350283, at *6 (S.D.N.Y. Sept. 28, 2017) (Karas, J.) ("taking Defendants' allegations as true, it is plausible that the restrictive covenant was not unreasonable"); *MasterCard Int'l Inc. v. Nike, Inc.*, 164 F. Supp. 3d 592, 602–03 (S.D.N.Y. 2016) (denying motion to dismiss claim for employee solicitation).

## II. <u>Guy Carpenter Has Sufficiently Alleged That Defendants Breached Their Restrictive Covenant Agreements by Soliciting Client A</u>

Plaintiffs have alleged that on *numerous* occasions during their last two years at Guy Carpenter, each Defendant had contact with and/or obtained confidential information about Client A. Facts § IV.C. While either condition is a sufficient predicate under the RCA, the Amended Complaint alleges that both have been met. Moreover, almost immediately upon joining Lockton, each of the Defendants, either directly or indirectly, solicited Client A for the purpose of selling or providing services of the type they sold or provided while they were employed by Guy Carpenter. These allegations state a claim for breach of the RCAs.[2]

### A. *The RCA Proscribes Defendants From Soliciting Client A*

Under New York law, it is well-settled that an employer may enforce reasonable restrictive covenant agreements to protect its client relationships. *See, e.g., Johnson Controls,*

---

[2] Defendants' contention that they have "scrupulously avoided doing anything that could even arguably be construed as an attempt to directly or indirectly solicit or service Client A" since Plaintiffs filed this action is laughable, and cannot easily be reconciled with Defendants' flatly wrong belief that "Durant is not restricted from pursuing Client A in his capacity as a Lockton Re employee." *See* Mot. at 3 n. 3 & 18.

*Inc. v. A.P.T. Critical Sys., Inc.*, 323 F. Supp. 2d 525, 534 (S.D.N.Y. 2004); *TBA Glob., LLC v. Proscenium Events, LLC*, 114 A.D.3d 571, 572 (1st Dep't 2014) (an employer's legitimate interests "include the protection of client relationships."). This legitimate interest extends not only to clients of the former employee, but also to "clients of other employees who were supervised by the former employee." *Mercer Health & Benefits LLC v. DiGregorio*, 307 F. Supp. 3d 326, 350 (S.D.N.Y. 2018); *see also Marsh USA Inc. v. Karasaki*, 2008 WL 4778239, at *17 (S.D.N.Y. Oct. 31, 2008) (finding non-recruitment clause necessary to protect "the relationships between clients and former employees who Karasaki supervised at Marsh").

Here, Defendants do not challenge the RCA's restrictions on solicitation of *current* clients, but argue that (i) New York law permits solicitation of *prospective* clients, and (ii) Client A was a "prospective client," because Guy Carpenter "never had" the international business for which Defendants solicited Client A. Mot at 15. Neither argument supports dismissal.

*First*, Defendants mischaracterize Client A as a "prospective" client by ignoring that Client A is a long-standing Guy Carpenter client that generates annual revenues for Guy Carpenter in the millions. Facts § IV.C. Splitting hairs as finely as possible, Defendants contend that Client A's international business—which the Amended Complaint does *not* allege as "prospective," rendering Defendants' *ultra vires* allegations improper on a motion to dismiss— should be viewed independently from its domestic business, with the former being Guy Carpenter's "prospective" client and only the latter being its "current" client. *See* Mot. at 15-16. That is nonsensical. If Defendants were correct, *any* new business opportunity with an existing client would be non-protectable under New York law, even where, as here, the decision-makers for the new business opportunity and the existing business are the same (*i.e.*, Client A's CEO). That is decidedly not the law, and none of the cases Defendants cite supports any such argument.

In *DiGregorio*, the court enjoined solicitation of current clients, while declining to enjoin solicitation of potential clients on the specific facts in that case. 307 F. Supp. 3d at 350-51. Here, Guy Carpenter has alleged that Client A is a current, longtime, substantial client. That relationship is protectable under *DiGregorio*. Similarly, in *Marsh USA Inc. v. Schuhriemen*, 183

F. Supp. 3d 529, 537 (S.D.N.Y. 2016), *as amended*, 2016 WL 2731588 (S.D.N.Y. May 3, 2016) and *Karasaki*, 2008 WL 4778239, at *17, the courts merely expressed reservations about enjoining the solicitation of prospective clients, while enjoining the solicitation of current clients. Neither decision even remotely suggests that ***new business from a current client*** should be relegated to "prospective client" status. Nor does *Johnson Controls*, also relied upon by Defendants, suggest such a result. There, the court held that an employer's relationships with potential clients were non-protectable *specifically because* the employer had "no significant or special relationship with [those] potential clients to protect." 323 F. Supp. 2d at 540. Here, however, Client A is not a "prospective client"; quite the contrary, its relationship with Guy Carpenter stretches back many years. For this reason, Defendants do not argue that Guy Carpenter failed to allege a "significant or special relationship" with Client A—nor could they.

*Second*, Defendants' position also fails under the RCA, which makes clear that "prospective" clients are—*unlike Client A*—potential clients whose business Guy Carpenter has *not yet* obtained. *See* Facts, § II ("'contact' with respect to a 'prospective' client means interaction between the Employee and a potential client of [Guy Carpenter] which takes place to obtain the business of the potential client on behalf of [Guy Carpenter].").

*Third*, even if Client A *were* a prospective client, Defendants' Motion would still fail because Guy Carpenter alleges that Defendants improperly solicited Client A after acquiring confidential information about Client A from Guy Carpenter. Facts, §§ I, IV.C. New York law recognizes that "restrictions on soliciting prospective clients can be justified by the need to protect trade secrets and confidential information." *See Karasaki*, 2008 WL 4778239, at *18. At the very least, Guy Carpenter is entitled to discovery as to whether Defendants used any of that confidential information in their solicitation activity.

B.    *Durant Breached the RCA by Soliciting Client A*

In responding to Guy Carpenter's allegations that Durant directly solicited Client A, Defendants make the strawman argument that Durant is not restricted "from soliciting every

15

single client or prospective client" contained in the Guy Carpenter database that Durant had access to during his tenure at Guy Carpenter. Mot. at 18. That point misses the boat. The Amended Complaint does not merely allege that Durant *could* have *potentially* accessed confidential information about Client A, but also that he *did in fact* access, and thereby obtained, confidential information about Client A—as recently as October 2018—such as Guy Carpenter's historical revenues from Client A, and its estimates of additional revenues that could be achieved by penetrating Client A for new business. Facts, § IV.C. Thus, Guy Carpenter has sufficiently alleged that by soliciting Client A at the May 23, 2019 meeting, Durant breached the RCA, which prohibits him from soliciting Guy Carpenter's clients or prospective clients about which he obtained confidential information during the last two years of his employment. *Id.*, § II.

### C. *Yoder Breached the RCA by Soliciting Client A*

Guy Carpenter has also sufficiently pleaded that Yoder's solicitation of Client A violated the RCA because Yoder had access to confidential information about, and contact with, Client A within the RCA's two-year lookback period. Yoder's meeting with Client A's CEO in January 2019, for the purpose of furthering Guy Carpenter's business relationship with Client A, falls squarely within the RCA's definition of "contact." *Id.*, §§ II ("contact" includes client interaction "which takes place to further the business relationship"), IV.C. Yoder unlawfully leveraged that contact by attending Lockton's business pitch to Client A on May 23, 2019, offering, at a minimum, a familiar face to Client A, as is critical in the relationship-driven reinsurance business. *Id.*, § IV.C

Impermissibly ignoring the Amended Complaint and relying on *ultra vires*, self-serving, and patently erroneous assertions,[3] Defendants insist that Yoder's solicitation of Client A was

---

[3] Here, as they improperly do throughout their brief, Defendants make various unsupported (and untrue) factual assertions that go beyond the four corners of the Amended Complaint, including (i) the length of Durant's trip to Dallas, (ii) the duration and subject matter of Yoder's discussions with Client A in January and May 2019, (iii) Yoder's job description and responsibilities at Lockton, (iv) what Defendants believe "[d]iscovery will show" regarding the nature of GC Genesis; and (v) the alleged purpose behind an email between Durant and Collins. *See, e.g.*, Mot. at 11-12, 19. These assertions are obviously improper on a motion to dismiss, and should be summarily disregarded. *See, e.g., Mil'chamot v. N.Y.C.*

not "for the purpose of providing the same services or products Mr. Yoder provided to Client A while he was employed by Guy Carpenter." Mot. at 19. Defendants maintain that Yoder's role at Guy Carpenter was limited to GC Genesis, which they claim to be a distinct "service or product" from Guy Carpenter's reinsurance brokerage offerings. *Id.* According to Defendants, the May 23rd meeting "had nothing to do with the services or products Mr. Yoder provided during his employment with Guy Carpenter, namely GC Genesis or InsurTech." *Id.*

Defendants' attempt to thread the needle is unavailing. Putting aside that Defendants' assertions are untrue and beyond the scope of the Plaintiffs' pleading, the Amended Complaint does not limit Yoder's extensive role at Guy Carpenter to GC Genesis or InsurTech-related issues. Nor did Guy Carpenter allege that GC Genesis has "nothing to do with" Guy Carpenter's broader reinsurance brokerage offerings. Quite the contrary, the Amended Complaint alleges that Yoder was Guy Carpenter's Chief Innovation and Product Development Officer; that he specialized in reinsurance modeling and analytics; and that he had a high-ranking, managerial, client-facing role with responsibilities that cut across analytics, innovation, and product development. Facts, § I.C. The Amended Complaint further alleges that GC Genesis is a prominent part of Guy Carpenter's overall reinsurance brokerage product and service offerings to its existing and prospective clients, which Guy Carpenter uses as a mechanism for maintaining and growing its brokerage business with these clients. *Id.*

In short, when Yoder met with Client A's CEO in January 2019 to discuss GC Genesis— indisputably "contact" under the RCA—he did so for the purpose of furthering Guy Carpenter's primary business as the broker of reinsurance contracts for Client A. *Id.* And, when Yoder again met with Client A just months later, this time working for Lockton, he was there for the *very same purpose*: selling or providing reinsurance brokerage services. *See* Mot. at 19. In asserting that "offering a familiar face" does not violate the RCA, *see id.* at 20, Defendants miss the point:

---

*Hous. Auth.*, 2016 WL 659108, at *1 n.1 (S.D.N.Y. Feb. 16, 2016) (Engelmayer, J.) ("A court generally may not look outside the pleadings when reviewing a Rule 12(b)(6) motion to dismiss.").

Yoder's familiarity to Client A's CEO was *the very reason* he was present to solicit Client A.

D.  *Gardner Breached the RCA by Soliciting Client A*

Although Defendants concede that Gardner's meeting with Client A's CEO on February 28, 2019 constituted "contact" with Client A, they argue that the Amended Complaint has not adequately alleged that Gardner solicited Client A. *See* Mot. at 20-21. Defendants are wrong: the RCA expressly prohibits Gardner from directly ***or indirectly*** soliciting Guy Carpenter's clients, and from "engag[ing] in any subterfuge to circumvent this prohibition, including, but not limited to . . . supervising other persons in soliciting or serving the client . . . ." Facts, § II.

Guy Carpenter has adequately alleged that Gardner indirectly solicited Client A. Gardner was CEO of the recently-formed Lockton Global Re with supervisory authority over and a close working relationship with Durant and Yoder, and he knew Client A particularly well from a longstanding relationship that he further solidified at the February 28th meeting. Facts, § IV.C. Moreover, Gardner had already laid out his blueprint for targeting Guy Carpenter's clients by recruiting Guy Carpenter personnel with existing relationships with those clients. *Id.* § III.A. These allegations support the reasonable inference that Durant and Yoder's solicitation of Client A would not have happened without Gardner's knowledge and approval. *Id.* Even if he was not physically present at the meeting, Gardner plausibly engaged in a "subterfuge to circumvent" his own solicitation obligations, which the RCA likewise bars.

III.  **Guy Carpenter Has Sufficiently Alleged That Defendants Breached Their RCAs By Soliciting Each Other, and By Durant and Gardner Soliciting Collins**

A.  *The RCA Permissibly Restricts Defendants from Soliciting One Another During Their Employment*

Defendants baldly contend that "New York law bars Plaintiffs' cross-solicitation claim." Mot. at 4. That is simply a flat misstatement of the law. New York federal and state courts *routinely enforce* pre-resignation non-solicitation provisions. *See, e.g., Oliver Wyman, Inc. v. Eielson*, 282 F. Supp. 3d 684, 695 (S.D.N.Y. 2017) (Sullivan, J.) (holding that the employer had "a valid interest in restricting the ability of its employees to encourage fellow employees to

separate from the company"); *Genesee Valley Tr. Co. v. Waterford Grp., LLC*, 130 A.D.3d 1555, 1558-59 (4th Dep't 2015) (reversing trial court's dismissal of breach of non-recruitment agreement claim where one defendant allegedly solicited another employee while employed by plaintiff and they left plaintiff's employ in the same week); *Estee Lauder Cos. v. Batra*, 430 F. Supp. 2d 158, 165, 182 (S.D.N.Y. 2006) (Sweet, J.) (former senior brand manager breached non-recruitment provision while still employed by "actively soliciting" a coworker to work on projects for a competitor and then to leave for that competitor).[4]

Cutting through their rhetoric, Defendants' argument that a restrictive covenant agreement could *never* prevent them from soliciting each other, *see* Mot. at 21-22, rests entirely on a misapplication of *In re Document Technologies Litigation*, 275 F. Supp. 3d 454 (S.D.N.Y. 2017) (Rakoff, J.). In that case—the lone case Defendants cite on their cross-solicitation argument, and which involved a motion for a preliminary injunction following a three-day evidentiary hearing, not a motion to dismiss—the plaintiff argued that "by jointly searching for new employment," the defendants violated their non-recruitment obligations vis-à-vis one another because "they became 'much more attractive than a lone wolf pitch to employers looking to poach their competitors' rainmakers.'" *Id.* at 466. To be sure, Judge Rakoff rejected the plaintiff's asserted interest in preventing "the potential harm to [plaintiff's] operations arising from the coordinated *en masse* resignation of several employees," as non-protectable under New York law. *Id.* (citations omitted). But Judge Rakoff observed that the plaintiff did "not contend that the employee non-solicitation covenant [was] necessary to protect its trade secrets or confidential customer lists," and that the plaintiff presented no evidence of the defendants providing unique or extraordinary services. *Id.* at 467 and n.14.[5] For those reasons, Judge

---

[4] Lockton too recognizes the validity of cross-solicitation claims, having itself brought them against seven former employees for coordinating the mass resignation of 13 of their fellow coworkers. *See* Verified Petition for Injunctive and Other Relief at 40, *Mountain W. Series of Lockton Cos. LLC v. McDaniel*, No. 1916-CV07011 (Mo. Cir. Ct. Mar. 13, 2019).

[5] Here, in addition to their client relationships and access to confidential information, Defendants provided unique and extraordinary services to Guy Carpenter, given their leadership and senior executive roles.

Rakoff held that the plaintiff failed to demonstrate a legitimate protectable interest *for purposes of obtaining injunctive relief. Id.* at 467.

By contrast here, Guy Carpenter has already obtained indefinite injunctive relief based on its detailed factual showing—which this Court called "as strong an initial showing as they come." Tr. at 37; *see also id.* at 39-40 (finding that "there is every reason to have a TRO in place protecting the plaintiffs' interests"); Facts § V. Unlike the plaintiff in *Document Technologies,* Guy Carpenter does not seek to enforce the RCAs solely to protect against the coordinated *en masse* resignation of its employees. Instead, Guy Carpenter has alleged numerous facts demonstrating its legitimate interests in protecting its confidential information and client relationships. Facts, §§ I.B. – I.C. (detailing Durant and Yoder's possession of confidential information and their valuable relationships with Guy Carpenter's clients). Guy Carpenter has further alleged exactly how Defendants' unlawful solicitation of one another—all presaged by Gardner's master recruitment blueprint in the Lockton Interview Memo—put Guy Carpenter's confidential information and client relationships in severe jeopardy.

Indeed, the RCA is nearly identical to the provision that Judge Sullivan held to be enforceable in *Eielson*; both restrict an employee's ability to "solicit or endeavor to cause" their coworkers to separate from the employer. *Compare Eielson*, 282 F. Supp. 3d at 692, *with* ECF No. 10-1 at 2. Judge Sullivan emphasized that the language of the provision nullified any vagueness concerns because it was limited to situations where the solicitor acted "on his 'own account or on behalf of any person, company, corporation, or other entity.'" *Eielson*, 282 F. Supp. 3d at 695. This limitation, which also appears in the RCA, gave the clause "a narrower scope," since it "only prevents the poaching of co-workers for actual, available employment opportunities in which the solicitor has an interest." *Id.*; Facts, § II. Accordingly, just as in *Eielsen*, the RCA properly "protects [Guy Carpenter's] interest in ensuring that its employees do not actively solicit their co-workers for their own benefit without chilling water-cooler conversations or offers of advice for purely altruistic purposes." *Id*.

Finally, Defendants here were not "jointly searching for new employment" to make

themselves "more attractive than a lone wolf pitch." *See Document Techs.*, 275 F. Supp. 3d at 466. Rather, as alleged in the Amended Complaint, Defendants had a clear ringleader—Gardner—who first solicited Durant and Yoder in the days following his private audience with Lockton, and then encouraged them to solicit each other, all via text messages, phone calls, and private meetings. Facts, § III. As this Court has already observed, Gardner's Lockton Interview Memo "is close to a confession." Tr. at 32. That near-confession, together with Guy Carpenter's myriad other allegations, presents more than plausible claims for relief. *Compare* Am. Compl. ¶¶ 63-83 *with Document Techs.*, 275 F. Supp. 3d at 461.

B.     *Durant Breached the RCA by Soliciting Collins*

As to Durant's blatant solicitation of Collins, *see* Facts, § IV.B., the RCA is clear: Durant is prohibited from soliciting Guy Carpenter employees "with whom [he], during the last two (2) years of [his] employment with [Guy Carpenter], came into contact for the purpose of soliciting or servicing business or about whom [he] obtained Confidential Information." *Id.*, § II. Faced with an Amended Complaint brimming with allegations directly on point, Defendants weave pure fiction in claiming that Durant had neither contact with, nor obtained confidential information about, Collins so as to give rise to liability under the RCA. Mot. at 23-24.

*First*, Defendants disingenuously submit that Durant did not have "contact" with Collins based solely on one instance of their contact with each other—an industry event in Vermont—that allegedly took place three years ago, rather than two. Mot. at 24. But Guy Carpenter's solicitation claim in no way hinges on this one background detail. Rather, Guy Carpenter has alleged that Durant communicated with Collins about business matters on *numerous* occasions during the relevant period, including throughout the year leading up to Durant's departure. Facts, § IV.B. These include: (i) emails and phone calls in April and May 2018 regarding Collins's Captives business, including emails in which Collins discussed the type of work he was doing for specific clients; (ii) emails in May and June 2018 pertaining to Collins' work for a specific Guy Carpenter client; and (iii) emails and other correspondence in September and

October 2018 about new business efforts and an RFP for a specific client. *Id.*

Defendants insist that these allegations somehow do not provide sufficient detail regarding the nature of Durant's communications with Collins, and quibble with the alleged purpose behind *one* of Durant's several work emails to Collins. Mot. at 24. The Amended Complaint, though, speaks for itself in laying out an array of business-related "contacts" between Durant and Collins—including newly uncovered details following a forensic review of Durant's work computer. At a minimum, this Court can reasonably infer that the business-related communications between Durant and Collins set forth above relate to Collins' Captives business and his specific work for Guy Carpenter clients—*i.e.*, they were "for the purpose of soliciting or servicing business," thus triggering the non-recruitment provision in the RCA. Facts, § II.

*Second*, the Amended Complaint clearly alleges that Durant obtained confidential information about Collins. As an initial matter, in Durant's capacity as Head of Sales and Segments, he obtained confidential personnel information regarding Collins, including compensation and performance details as well as information regarding his skills, qualifications and abilities.[6] Facts, § I.B. Moreover, the Amended Complaint alleges in detail that Durant opened, accessed, and obtained a substantial amount of confidential information about Collins's accounts and his client portfolio (information that would be highly relevant to Lockton in assessing whether and how to recruit Collins), including that Durant: (i) opened the "Confidential Client and Prospect Portfolio" as recently as October 2018, which contained information about Collins's existing and prospective client accounts; (ii) accessed a "New Business Review," which contained new client accounts that Collins generated between 2017 and 2018, as well as Collins's pipeline of potential client accounts for 2018 and 2019; (iii) retrieved "GC Force" data reports with information concerning several of Collins' accounts from December 2018 to January 2019; and (iv) created the "2-21-19 US Wins" report, detailing Guy

---

[6] The RCA defines "Confidential Information" to include, *inter alia*, "personnel information, such as the identity and number of the Company's other employees and officers, their salaries, bonuses, benefits, skills, qualifications and abilities." ECF No. 10-1 at 3.

Carpenter's new business "wins" in 2018, including Collins's business with new clients and penetration of new business with existing clients. Facts, § IV.B.[7]

## IV.    Guy Carpenter Has Sufficiently Alleged Defendants' Breach of Fiduciary Duties

The Amended Complaint details how, on multiple occasions in the lead-up to their simultaneous resignations, Defendants violated their fiduciary duties to Guy Carpenter. "Under New York law, an employee owes a duty of good faith and loyalty to his employer." *Design Strategies, Inc. v. Davis*, 384 F. Supp. 2d 649, 659 (S.D.N.Y. 2005), *aff'd*, 469 F.3d 284 (2d Cir. 2006. A fundamental aspect of this duty is that an employee is "prohibited from acting in *any manner* inconsistent with his agency or trust and is *at all times* bound to exercise the utmost good faith and loyalty in the performance of his duties." *Id.* (quoting *W. Elec. Co. v. Brenner*, 41 N.Y.2d 291, 295 (1977) (emphases added). An employee also has "an affirmative duty at all times to act in his employer's best interests." *Id.* (internal quotes omitted); *see also* 52 N.Y. Jur. 2d Employment Relations § 225 (explaining that the duty of loyalty derives from the "the rule that he or she who undertakes to act for another may not in the same matter act for himself or herself."). Guy Carpenter has sufficiently alleged that each of the Defendants violated these principles by acting in Lockton's—not Guy Carpenter's—best interests, at Guy Carpenter's expense, and by using Guy Carpenter's time, resources, facilities, and confidential information.

As to Durant, Plaintiffs allege that in November 2018—on Guy Carpenter's time and at its expense—Durant visited the MGA/MGU team in Dallas for the first time, at the exact same time he was in talks with Gardner (and, likely, Lockton) about leaving Guy Carpenter for

---

[7] Even in the absence of such detailed allegations, Guy Carpenter need not establish at this initial stage that Durant actually *obtained* confidential information about Collins, given the ample allegations that he had access to confidential information about Collins. Under New York law, nothing more is needed. *See Iannucci v. Segal Co.*, 2006 WL 8407380 (S.D.N.Y. June 27, 2006) (Leisure, J.) (holding that single allegation in declaration that actuary had "unfettered access" to employer's confidential information, in combination with the departure of certain clients, was sufficient to grant temporary restraining order); *Nostrum Pharm., LLC v. Dixit*, 2016 WL 5806781, at *12 (S.D.N.Y. Sept. 23, 2016) (McMahon, C.J.) (finding that employee's "access to 'the compilation of information' that would give him 'an opportunity to obtain an advantage over competitors'" was sufficient to enforce non-compete) (quotations omitted).

Lockton Global Re, and after Gardner had already identified the MGA/MGU space as a prominent component of his blueprint plan to develop a successful competing reinsurance business at Lockton Global Re. Facts, §§ I.B., III. In Dallas, Durant had "deep-dive," one-on-one meetings with the MGA/MGU team that were not typical for Durant, as his usual practice when visiting branch offices was to hold a group meeting, not individual sessions with each member of the team. *Id.*, § I.B. These allegations support the inference that Durant's true purpose in probing the Guy Carpenter MGA/MGU team for confidential information about their business—including their insights into strategies and prospects for business growth—was not to perform his job duties for Guy Carpenter, but rather to "usurp[] Guy Carpenter's business opportunities in the MGA space for use by Durant's future employer, Lockton." *Id.*

As to Yoder and Gardner, Guy Carpenter alleges that they breached their fiduciary duties when they participated in separate meetings with Client A in late January and late February 2019, respectively. *Id.*, § IV.C. When Yoder and Gardner met with the CEO of Client A, Gardner had already decided to defect to Lockton, and had already solicited Yoder to join him. Just several weeks after their 60-day notice period had expired, Yoder and Gardner, now at Lockton, wasted no time in pouncing on the business opportunity for which they had each laid the groundwork. Yoder attended a business pitch meeting with this *very same client* on May 23, 2019; as CEO of Lockton Global Re, Gardner undoubtedly knew about, approved of, and was involved in the preparation for that meeting. *Id.* Thus, in remarkably short order upon joining Lockton, Yoder and Gardner unfairly leveraged the confidential information they obtained about, and the relationships they fostered with, Client A while on Guy Carpenter's dime.

Defendants argue, inconsistently, that in these multiple instances, they were either simply doing their job, or were engaged in lawful "preparations to compete" with Guy Carpenter. *See* Mot. at 11-13 (citing *Poller v. BioScrip, Inc.*, 974 F. Supp. 2d 204 (S.D.N.Y. 2013)). Defendants cannot have it both ways. Guy Carpenter's allegations show Defendants engaging in activity that goes well beyond permissible conduct for a fiduciary. "Although an employee may, of course, make preparations to compete with his employer while still working for the employer, he

or she may not do so at the employer's expense, and may not use the employer's resources, time, facilities, or confidential information." *Pure Power Boot Camp, Inc. v. Warrior Fitness Boot Camp, LLC*, 813 F. Supp. 2d 489, 521 (S.D.N.Y. 2011) (Katz, M.J.). For example, an employee may not charge expenses to his employer while acting on his own behalf. *Id.* at 522. An employee is also "not free to exploit the same trade if the opportunity was facilitated by acts of preparation and disloyalty during his employment." *Freedom Calls Found. v. Bukstel*, 2006 WL 845509, at *17 (E.D.N.Y. Mar. 3, 2006) (internal citations omitted). Here, the conduct that Defendants portray as them simply doing their job was the *very same conduct* that, Guy Carpenter alleges, Defendants actually took in *Lockton's* best interests (consistent with the blueprint laid out in the Lockton Interview Memo), disregarding their duty under New York law to provide "the utmost good faith and loyalty" to Guy Carpenter. *Davis*, 384 F. Sup. 2d at 659.

Defendants' argument that an employee's fiduciary duties "generally cease when the employee is no longer working for the former employer," *see* Mot. at 10 & n.6, fails for at least two reasons. *First*, Guy Carpenter's claim primarily concerns conduct that Defendants engaged in *while working for* Guy Carpenter. *Second,* former employees have a continuing "duty not to exploit to the former employer's detriment specific information obtained during the employment that was either technically confidential or that was available to the fiduciary only because of the employment." *BioScrip*, 974 F. Supp. 2d at 227–28. Here, Guy Carpenter alleges that Defendants presumably used the confidential information they obtained about Client A from their time at Guy Carpenter to get Lockton's foot in the door for the May 23 meeting. Facts, § IV.C. These allegations easily state a plausible claim for breach of fiduciary duty.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court deny Defendants' Partial Motion to Dismiss the Amended Complaint, in its entirety.

Dated  July 31, 2019                           Respectfully Submitted,
       New York, New York


                                               /s/ Gary D. Friedman
                                               Gary D. Friedman
                                               Jonathan D. Polkes
                                               David Yolkut
                                               Ami G. Zweig
                                               WEIL, GOTSHAL & MANGES LLP
                                               767 Fifth Avenue
                                               New York, New York 10153
                                               Telephone: (212) 310-8000
                                               Facsimile: (212) 310-8007
                                               gary.friedman@weil.com

                                               Attorneys for Plaintiffs
                                               GUY CARPENTER & COMPANY, LLC
                                               and MARSH & MCLENNAN COMPANIES,
                                               INC.